IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

REBECCA J. PAYNE, Personally,
and as the Personal Representative of the
ESTATE OF NOAH HUNTER BRITTAIN;
JORDAN L. KING; and JAMES L. CROWDER                    PLAINTIFFS

V.                              CASE NO. 4:22CV00588 KGB

MICHAEL C. DAVIS; NATHAN RICE;
JOHN W. STALEY; and LONOKE COUNTY
SHERIFF JOHN W. STALEY                                   DEFENDANTS

**STATEMENT OF FACTS NOT IN DISPUTE**
**FOR PURPOSES OF SUMMARY JUDGMENT**

COMES Separate Defendant, Michael C. Davis, in his individual capacity only, by his

attorneys, Fuqua Campbell, P.A., and states facts not in dispute for summary judgment:

I.      Michael C. Davis Background

1.      Separate Defendant, Michael C. Davis ("Davis"), began working as a patrol deputy

with Lonoke County Sheriff's Office in late 2012 or early 2013. Exhibit 1, Deposition of Michael

C. Davis ("Davis Deposition"), 11:21-23.

2.      In 2013, Davis completed the Arkansas Law Enforcement Training Academy

("ALETA") in Camden, Arkansas. *Id*. at 11:19-20; Exhibit 2, Transcript of Michael C. Davis

Testimony in *State of Arkansas v. Michael C. Davis*, 43CR-21-489 ("Davis Criminal Trial

Transcript"), RT 708:3-13.

3.      In June of 2021, Davis held the rank of sergeant for the Lonoke County Sheriff's

Office. Exhibit 1, Davis Deposition, 7:15-21.

<u>II.     Michael C. Davis Observations and Actions on June 23, 2021</u>

4.     On June 23, 2021, at approximately 3:00 a.m., Davis was working a patrol shift for the Lonoke County Sheriff's Office.

5.     Davis drove a marked Lonoke County Sheriff's Office truck with "Sheriff" displayed in reflective lettering on the side. Exhibit 1, Davis Deposition, 74:4-7; Exhibit 3, Photographs of Davis Patrol Vehicle at Scene.

6.     Davis traveled southbound on Highway 89, in route to back up Separate Defendant Lonoke County Sheriff's Deputy Nathan Rice ("Deputy Rice") on a suspicious vehicle call. Exhibit 1, Davis Deposition, 69:9-11, 71:25 – 72:2.

7.     The area in which Davis drove was a high crime area, known for stolen vehicles and drug trafficking. *Id*. at 69:20-22, 71:10-14.

8.     While traveling southbound on Highway 89, Davis noticed a truck stopped on Forbus Road. *Id*. at 69:9-13.

9.     The truck was in the west and eastbound sides of Forbus Road. *Id*. at 69:15. The back end of the truck was in the northbound lane of Highway 89. *Id*. at 69:15-17.

10.     Davis noticed a lot of smoke coming from the northbound lane of Highway 89, as if someone was burning or squealing tires. *Id*. at 69:25 – 70:3. Smoke was also emanating from the truck. *Id*. at 70:4-6.

11.     Davis could not see who was in the truck or the number of occupants in the truck. *Id*. at 70:23-25.

12.     The truck had tinted windows. Exhibit 2, Davis Criminal Trial Transcript, RT 778:4-5.

13. As Davis passed the truck, he noticed that the reverse lights came on. Exhibit 1, Davis Deposition, 71:1-4.

14. Davis got an uneasy feeling. *Id*. at 71:10-14.

15. Davis felt "maybe that the vehicle had been stolen and was damaged prior to the theft or during the theft." *Id*. at 71:12-14.

16. Davis thought it may be stolen because, "it was 3:00 in the morning. [Lonoke County Sheriff's Office] had a lot of stolen vehicles in that area. . . . [Lonoke County Sheriff's Office] had had a lot of vehicle break-ins and theft of vehicles hit there recently in that area. And . . . [Davis] was on [his] way down there to assist [Deputy Rice] on a suspicious vehicle." *Id*. at 71:20 – 72:2.

17. Davis drove slowly by the truck, continued southbound on Highway 89, and stopped in a church parking lot. *Id*. at 71:15-19, 73:17 – 74:1.

18. Davis observed the truck drive southbound on Highway 89, towards the direction of Davis. *Id*. at 73:24.

19. As the truck drove passed Davis, Davis noticed that the truck drove left of center twice. *Id*. at 74:9-11. The truck was very loud and continued to emit smoke. *Id*.

20. Davis still could not determine how many occupants were in the vehicle. *Id*. at 75:6-7.

21. Davis pulled out of the church parking lot and drove behind the truck. *Id*. at 75:5.

22. Davis noticed the truck drive left of center two more times. *Id*. at 75:7-9.

23. Davis radioed the license plate number to dispatch. *Id*. at 75:11-12. Dispatch responded that the truck was registered to a McRae, Arkansas address. *Id*. at 75:12-16. McRae,

Arkansas is located in a different county and was approximately 30 to 40 miles from Davis's location at the time. *Id*. The truck was not reported as stolen. *Id*. at 76:18-21.

24. Davis felt the truck was out of place and suspicious because the truck was "out of a totally different county, like, 30-some miles, almost 40 miles," it was "3:00 in the morning in a high crime area," and crimes had recently been committed in the area. *Id*. at 77:1-6.

25. At one point, the truck drove completely left of center to the point where it was more than halfway into the opposite lane of traffic. *Id*. at 77:6-8.

26. Davis suspected that the driver of the vehicle may be intoxicated or under the influence of a narcotic. Exhibit 2, Davis Criminal Trial Transcript, RT 732:16-23.

27. Davis decided to conduct a traffic stop and advised dispatch. Exhibit 1, Davis Deposition, 77:8-18.

28. Davis initiated his blue lights. *Id*. at 77:20-23.

29. The truck engine revved and got really, really loud. *Id*. at 78:1-2.

30. The truck slowed down and drove into the opposite, northbound lane of traffic. *Id*. at 78:2-3.

31. Davis stopped his vehicle in the northbound lane and partially in a ditch and began to exit his vehicle. *Id*. at 78:4-5.

32. The truck accelerated and entered the southbound lane of traffic. *Id*. at 78:7-8. The truck sounded like it was accelerating rapidly. *Id*. at 89:5-14.

33. Davis intended to pick up his radio and advise dispatch that the truck was fleeing, but he dropped his mic. *Id*. at 78:11-17.

34. As Davis attempted to grab his mic, the truck "whipped into the Mahoney['s] [Body Shop] parking lot." *Id*. at 78:17-18.

35. The parking lot of Mahoney's Body Shop was approximately 200-300 yards from where Davis initiated the stop. *Id*. at 89:18-25.

36. Davis pulled in behind the truck. *Id*. at 78:20-23.

37. Before Davis could even position his vehicle, Noah Hunter Brittain ("Brittain") jumped out of the driver's side of the truck. *Id*. at 92:13 – 93:1.

38. Brittain jumped from the truck with such purpose that he slipped on the gravel "trying to get traction to run back towards [Davis]." *Id*. at 93:1-4.

39. At the same time, the truck was rolling towards Davis. *Id*.

40. Davis slammed his vehicle into park and exited the vehicle. *Id*. at 93:4-9.

41. Davis observed that Brittain was "adamant on getting back towards [Davis]." *Id*. at 93:10-11.

42. Davis felt that "[Brittain] was trying to hurt [him] with such intent or was - - had such intent on causing [him] harm that he didn't care about putting the vehicle into park, didn't care if it rolled into [Davis]." *Id*. at 95:20 – 96:2.

43. Brittain looked towards Davis and towards the corner of the back bed of the truck. *Id*. at 97:9-11.

44. Brittain was "go[ing] for the bed of the truck." *Id*. at 93:13-14.

45. Brittain placed one hand in the bed of the truck and then the other. *Id*. at 93:14-17.

46. Davis believed Brittain was reaching for a rifle. *Id*. at 93:17-18.

47. Davis believed "[Brittain] was going to shoot through the bed of the truck" or "come up firing from the bed of the truck." *Id*. at 99:21-25.

48. Davis could not see Brittain's hands. *Id*. at 99:19-20.

49. Brittain's body was projecting a shadow into the bed of the truck. *Id*. at 104:16-21.

5

50. Davis could only see the position of Brittain's arms. *Id*.

51. Brittain was positioned as if he was coming up with a rifle. *Id*. at 104:22-23.

52. Davis fired one shot at Brittain. *Id*. at 93:21.

53. Davis saw that "whatever [Brittain] was getting out of the bed of the truck had went flying through the air." *Id*. at 93:21-23.

54. Davis believed, at that time, that the threat was neutralized. *Id*. at 93:23-24.

55. At some point during the incident, Jordan L. King ("King") placed his hands outside the door of the passenger side. *Id*. at 100:9-21.

56. After firing the shot at Brittain, Davis called out on his radio, "Shots fired." *Id*. at 110:17-18.

57. Knowing a passenger was in the vehicle, Davis retreated to the back of his vehicle for cover. *Id*. at 111:17 – 112:3. Davis gave verbal commands to King to stay in the vehicle and show him his hands. *Id*.

58. Deputy Rice subsequently arrived at the scene and detained King. *Id*. at 112:4-18.

59. After Deputy Rice detained King, Davis approached Brittain and placed him in a recovery position, on his side. *Id*. at 107:24-25, 108:19 – 109:17; 114:5 – 115:2.

60. Davis's bullet hit Brittain in his neck and Brittain subsequently died. Exhibit 4, Brittain Autopsy Report.

61. The Autopsy Reported identified Brittain had cannabinoids in his system. *Id*.

III.     Noah Hunter Brittain, Jordan L. King, and James L. Crowder

62. On June 22, 2021, Brittain, King, and James L. Crowder ("Crowder") were together at Mahoney's Body Shop installing a new transmission into Brittain's truck. Exhibit 5, Deposition

of James L. Crowder ("Crowder Deposition"), 6:23 – 7:4, 7:7-11, 8:24 – 9:3, 9:20-23; Exhibit 6, Deposition of Jordan L. King ("King Deposition), 13:1-3, 14:19-25.

63. Brittain, King, and Crowder began working on the truck at Mahoney's Body Shop at approximately 5:00 p.m. or 6:00 p.m. Exhibit 5, Crowder Deposition, 9:15-19.

64. Brittain, King, and Crowder installed the new transmission and, at approximately 2:00 a.m. or 3:00 a.m. on June 23, 2021, Brittain and King took the truck on a test drive. *Id*. at 11:3-12, 24:10-13. Brittain was the driver and King was the passenger. Exhibit 6, King Deposition, 16:24 – 17:4.

65. Crowder stayed behind at Mahoney's Body Shop to clean up. Exhibit 5, Crowder Deposition, 11:5-18.

66. Brittain and King drove down Highway 89 and realized the transmission was slipping. Exhibit 6, King Deposition, 17:6-7.

67. The truck was revving up really high and loud and smoking. *Id*. at 20:3-17, 41:12-25.

68. There were no other vehicles on the road. *Id*. at 65:22-25.

69. Brittain and King stop on the side of the road to check the transmission fluid. *Id*. at 69:8-19. At that time, they placed a coolant jug behind one of the tires to keep the truck from rolling back while they checked the transmission fluid. *Id*.

70. As Brittain and King drove southbound on Highway 89, towards Mahoney's Body Shop, King observed Davis in his patrol vehicle parked in a church parking lot. *Id*. at 18:9-11.

71. Davis began following Brittain and King. *Id*. at 66:5-6.

72. Brittain and King knew they were going to get pulled over and "maybe get a ticket or something." *Id*. at 66:15-22.

73. Davis initiated his patrol lights, and Brittain and King turned into Mahoney's Body Shop. *Id*. at 21:14-24.

74. The truck came to a stop but would not go into park due to issues with the transmission. *Id*. at 22:16-19, 23:7-13.

75. Almost as soon as the truck stopped, within seconds, Brittain jumped out of the truck to "stick something under the tire to keep it from rolling back" and "then all [King] heard was a gunshot." *Id*. at 22:18-20; 24:7-18.

76. King did not see Davis fire the shot but saw Brittain on the ground after he was shot. *Id*. at 26:14-21, 27:5-9.

77. King did not hear Davis say anything before the gunshot. *Id*. at 70:1-3.

78. After the gunshot, Davis told King to stay in the vehicle. *Id*. at 78:8-10.

79. King put his hands up out of the top of the door. *Id*. at 79:1-2.

80. Deputy Rice arrived on scene and detained King, placing him in a patrol unit. *Id*. at 32:11 – 34:19.

81. King never saw Davis with a gun drawn. *Id*. at 95:2-4.

82. Prior to this incident, King did not know Davis. *Id*. at 72:6-8.

83. King does not believe Brittain knew Davis prior to the incident. *Id*. at 72:9-11.

84. King does not believe Davis "had it out" for Brittain or King. *Id*. at 72:12-14.

85. Following the incident, King heard Davis crying in the back of a patrol unit and saying "stuff like" "It was just a kid." *Id*. at 83:10-25.

<u>IV.</u>    <u>Crowder Observations</u>

86.    When Brittain and King returned to Mahoney's Body Shop following the test drive, Crowder observed a police car behind Brittain's truck with its lights activated. Exhibit 5, Crowder Deposition, 11:23 – 12:9.

87.    The truck was loud. *Id*. at 27:10-11.

88.    Crowder was located at the back shop door. *Id*. at 12:10-12.

89.    Crowder began walking towards Brittain's truck and heard the gunshot. *Id*. at 12:21-22.

90.    The time period between when the truck came to a stop and when Crowder heard the gunshot was between zero and five seconds. *Id*. at 28:10 – 29:1.

91.    Crowder walked off to the side and stood in front of another vehicle parked in front of the fence of his grandparents' house. *Id*. at 12:22-24.

92.    Crowder was located to the right of the passenger side of the vehicle. *Id*. at 27:22 – 28:2. He could not see the driver's side of the vehicle. *Id*.

93.    Crowder heard someone yell, "Shots fired." *Id*. at 15:13-15.

94.    After Davis yelled, "Shots fired," Crowder saw Davis walking towards the truck. *Id*. at 36:17 – 37:22. Crowder did not see Davis prior to that. *Id*. at 30:10-11.

95.    Crowder observed another law enforcement officer arrive on scene, order King out of the vehicle, and detain King. *Id*. at 15:17 – 16:8.

96.    Crowder went to his grandparents' house, next door to Mahoney's Body Shop, to tell them what happened. *Id*. at 16:20 – 17:1.

97.    As Crowder walked to his grandparents' house, he saw Brittain on the ground. *Id*. at 38:6-20, 46:17-19.

98.     Crowder remained at his grandparents' house until sometime later that day. *Id*. at 18:13-16.

99.     According to Crowder, Davis never said anything prior to shooting Brittain. *Id*. at 18:19 – 19:6.

V.      Miscellaneous

100.    Davis does not have liability insurance that would cover the claims asserted against him in the First Amended Complaint. Exhibit 7, Davis Affidavit.

101.    The Association of Arkansas Counties Risk Management Fund ("AACRMF") is not insurance. *See Hearnsberger v. Bradley County*, No. 06-CV-1081, 2007 U.S. Dist. LEXIS 60383, at \*5 (W.D. Ark. Aug. 16, 2007) (citing *Kauffman v. Board of Trustees of the Ass'n of Ark. Counties Risk Mgmt. Fund*, No.  87-2076 (W.D. Ark. 1988)). The AACRMF General Liability Protection Agreement specifically excludes coverage for negligence. Exhibit 8, AACRMF General Liability Protection Agreement.

Respectfully submitted,

Annie Depper
Ark. Bar No. 2009267
Email: adepper@fc-lawyers.com

FUQUA CAMPBELL, P.A.
Riviera Tower
3700 Cantrell Road, Suite 205
Little Rock, Arkansas 72202
(501) 374-0200 – Telephone
(501) 975-7153 – Facsimile

*Attorneys for Separate Defendant Michael C. Davis, Individually*