**EXHIBIT**

1

# Transcript of the Testimony of
# **Michael Davis**

**Date:** February 28, 2024
**Case:** Payne v. Davis, et al.



Arkansas Diamond Court Reporting
Phone:501.319.4807
Email:scheduling@arkdiamondcr.com

1

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF ARKANSAS

CENTRAL DIVISION


REBECCA J. PAYNE, personally, and as

the Personal Representative of the Estate of

Noah Hunter Brittain, et al.                    PLAINTIFFS


V.                          NO. 4:22-CV-00588 KGB


MICHAEL C. DAVIS, et al.                         DEFENDANTS


ORAL DEPOSITION

OF

MICHAEL C. DAVIS

TAKEN FEBRUARY 28, 2024, AT 12:13 P.M.


Arkansas Diamond Court Reporting

21043 Natalie Lane

Little Rock, Arkansas  72206


scheduling@arkdiamondcr.com

PHONE:  501.319.4807

2

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:

MR. DEVON M. JACOB

JACOB LITIGATION, INC.

P.O. BOX 837

MECHANICSBURG, PENNSYLVANIA 17055

djacob@jacoblitigation.com

ON BEHALF OF SEPARATE DEFENDANT MICHAEL C. DAVIS:

MR. CHRIS STEVENS

FUQUA CAMPBELL, P.A.

3700 CANTRELL ROAD, SUITE 205

LITTLE ROCK, ARKANSAS 72202

cstevens@fc-lawyers.com

MR. ROBERT A. NEWCOMB

ATTORNEY AT LAW

P.O. BOX 149

LITTLE ROCK, ARKANSAS 72203

robertnwcmb@aol.com

ON BEHALF OF SEPARATE DEFENDANTS NATHAN RICE, JOHN W. STALEY,

and LONOKE COUNTY SHERIFF JOHN W. STALEY:

MR. JASON E. OWENS

JASON OWENS LAW FIRM, P.A.

P.O. BOX 850

CONWAY, ARKANSAS 72033

owens@jowenslawfirm.com

INDEX

STYLE AND NUMBER . . . . . . . . . . . . . . . . . . . . . . . 1

APPEARANCES . . . . . . . . . . . . . . . . . . . . . . . . . 2

STIPULATION PAGE . . . . . . . . . . . . . . . . . . . . . . 4

WITNESS:  MICHAEL C. DAVIS

     Examination by Mr. Jacob . . . . . . . . . . . . . . . . 5

     Examination Concluded. . . . . . . . . . . . . . . . . 167

COURT REPORTER'S CERTIFICATE . . . . . . . . . . . . . . . . 168

ERRATA SHEET/SIGNATURE PAGE

E X H I B I T S

EXHIBITS:                                        IDENTIFIED:

27.  One-page Notice of Employment Termination . . . . . . 152

28.  One-page Lonoke County Sheriff's Office Letter . . . . 154

C A P T I O N

ANSWERS AND ORAL DEPOSITION OF MICHAEL C. DAVIS, a witness produced at the request of the Plaintiffs, taken in the above-styled and numbered cause on the 28th day of February, 2024, at 12:13 p.m., at the Polk County Sheriff's Office, 507 Church Avenue, Suite 1, Mena, Arkansas, pursuant to the Federal Rules of Civil Procedure.

P R O C E E D I N G S

THEREUPON,

MICHAEL C. DAVIS,

THE WITNESS HEREINBEFORE NAMED, having been first duly cautioned and sworn by me to testify to the truth, the whole truth, and nothing but the truth, testified on his oath as follows, to-wit:

EXAMINATION

BY MR. JACOB:

Q    Okay, can you state your full name for the record?

A    Michael Christian Davis.

Q    Mr. Davis, we're here obviously to take your deposition --

A    Yes, sir.

Q    -- in a litigation that's resulted from the death of Hunter Brittain.

A    Yes, sir.

Q    Are you prepared to proceed?

A    Yes, sir.

Q    Is there any reason that you wouldn't be able to answer truthfully questions here today?

A    No, sir.

Q    There's no medication or medical condition that would prevent you from doing so?

A    No, sir.

Q    I'm going to assume that you've never given a deposition before?

A    I have given a deposition.

Q    I'm sorry.  You have?

A    I have.

Q    You have, okay.  So for lack of a better term, I'm going to give some ground rules just to make sure we're all on the same page here.

A    Yes, sir.

Q    First of all, we have a court reporter.  She has two hands, but it's not one for you, one for me.  So I'm going to do my best to let you finish your answers before I begin my questions, but I'm going to ask that you do the same.  Even if you can anticipate what the question is going to be, if you let me just get it out, that way we can get it down on the record before you answer; okay?

A    Yes, sir.

Q    And you're doing a fine job, your, you know, audible answers.  I'm going to ask you continue to do that.  Obviously, nods of the head, gestures, uh-huh, huh-uh, those are all things that we don't want to try to decipher later on a transcript; okay?

A    Yes, sir.

Q    If you need a break at any time, just let me know.  It's fine.  I don't really even need to know why.  I just ask if

there's a question pending at the time, that you answer that question before we take the break; okay?

A    Yes, sir.

Q    At any point in time you don't understand a question that I ask, it's probably my fault.  So just ask me to rephrase it, restate it, explain it, whatever it is that you need from me in order to understand the question before you answer; okay?

A    Yes, sir.

Q    Because, again, we're making a record here.  All the attorneys, not just me, want a clear record, and we don't want you guessing or trying to figure out what's in my mind, right.  I actually want you to answer the questions that I intend to ask; okay?

A    Yes, sir.

Q    All right.  So with that in mind, am I correct that in June of 2021 you were employed by the Lonoke County Sheriff's Office?

A    Yes, sir.

Q    And am I also correct that at that time you had -- you held the rank of sergeant?

A    Yes, sir.

Q    And that you were a sworn law enforcement officer?

A    Yes, sir.

Q    And then you were working the night shift?

A    Yes, sir.

Q    And that that had been a shift that you had worked for quite some time?

A    Yes, sir.

Q    I'm also going to presume that you had gone through the academy and had the required legal updates?

A    Yes, sir.

Q    And I'm also going to presume that you had been provided with the county's policies and procedures as they had been adopted to comply with during your employment.

A    Yes, sir.  For those at the time.

Q    Okay.  And am I also correct that when you were acting in your capacity as a law enforcement officer, that you were always acting pursuant to the policies of the Lonoke County Sheriff's Office?

A    Yes, sir.

Q    And the same question with respect to training, that when you were acting in your capacity as a law enforcement officer, that you were doing your best at least to act in accordance with the training that was provided to you?

A    Yes, sir.

Q    Was the Lonoke County Sheriff's Office your first law enforcement position?

A    Yes, sir.

Q    And did you have military experience?

A    No, sir.

Q    Prior to going into law enforcement, what type of employment did you have?

A    I worked at Dollar General, Harps, and McDonald's, I believe.

Q    Okay.

A    And I've done some construction.

Q    So, I mean, it goes without saying, law enforcement is a big switch in career.

A    Yes.

Q    What was it that drew you to law enforcement?

A    I knew I either wanted to be a firefighter or get into law enforcement.  And I kind of started doing volunteer fire department stuff and then got a job at the detention center and realized that law enforcement was more so my calling.  I enjoy helping folks, giving to the community and stuff like that.

Q    Okay.  Did you have other members of your family that have been in law enforcement?

A    No, sir.

Q    So this was something that was completely new to you then?

A    Yes, sir.

Q    And you said you were involved with a correctional center?  Is that what you said?

A    The detention center.

Q    Oh, detention center?

A    Yes, sir.

Q     I'm assuming you're referring to a jail?

A     Yes, sir.

Q     And was that also in Lonoke?

A     Yes, sir.

Q     And what did you do in that capacity?

A     I was a detention officer.  I'm not sure the exact dates that -- what it was from at the time, but I believe it was 2011 I was hired on as a detention officer.

Q     And is that -- it sounds like, from having talked to other officers, that that's sort of the normal path.  They started in the correctional area and then move into law enforcement?

A     Yes, sir.

Q     And when you were in the correctional center, what type of training was provided to you there?

A     If I recall, went through jail standards and got taser certification and pepper spray certification.

Q     And roughly how long is that training?

A     I do not recall.

Q     Okay.  I mean, is it an academy that you go to?

A     No, sir.  They put it on there at the sheriff's office, I believe.  That's where they've got it.

Q     And when you receive that training, do you walk away with certifications?

A     Yes, sir.

Q     And are those certifications that are recognized by the

state of Arkansas?

A    I'm not sure on that.

Q    Okay.  And then at some point you move from corrections into the sheriff's office, law enforcement side.

A    No, sir.

Q    No, you didn't.  Okay, then explain, please.

A    After being a detention officer, I think it was approximately six to eight months maybe I was moved over to transport.

Q    Ah, okay.  And explain that, if you would.

A    We're in charge of transporting inmates to and from court, picking them up to court and stuff like that.

Q    And then was it from there that you went into the patrol?

A    Yes, sir.  I was moved from transport to transport supervisor, and now I moved to patrol.  I was promoted.

Q    Okay.  And then did you -- is it then that you went to the academy?

A    No, sir.

Q    When did you go to the academy?

A    2013.

Q    And when did you start in patrol?

A    I'm not for sure exactly the date.  I believe it was early 2013 or late 2012 when I was actually promoted.

Q    Okay.  And I -- so going from transport to patrol is a promotion?

A     Yes, sir.

Q     And is going from corrections to transport a promotion?

A     Somewhat.

Q     Okay.  And then I do understand that I guess some people, depending on the schedule at the academy, some start with the FTO and then go to the academy.  Is that what you did?

A     Yes, sir.  If I remember correctly, it was -- you had a year to actually -- that where the sheriff's office was required to have you certified, go to the academy half a year before you had to do that.

Q     Okay.  And tell me a little bit about the FTO program.  Just explain generally what it is.

A     If I remember correctly at the time, we had two or three FTOs that we bounced from.  We had a typical home FTO, which was our main FTO, and went through the training process.  They basically -- we would observe them for a little while.  And then after a certain point in your FTO training, they would allow you to take over, and they would just more so watch you to make sure you're doing everything correctly.

Q     Okay.  During the FTO program, did you -- is that when you received the policies and procedures for the patrol side of the sheriff's office?

A     Yes, sir.

Q     And is that something that you had to sign for?

A     I believe so.

Q    And presumably there are updates that come out from time to time?

A    Yes, sir.

Q    And are those signed for as well?

A    I'm not sure if those were signed for.  We -- they issued us a jump drive.  And any time there's an update, they would send us an email or something like that.  And we would have to go give the jump drive to the captain, and the captain would update it.

Q    I see.  So you received them in electronic format on, like, a flash-drive-type thing?

A    Yes, sir.  And then some of them we would receive via our county email.

Q    Okay.  Any other methods of communication for policies and procedures?

A    They might have printed them out and put them in our box. I know whenever -- if I recall correctly, that there's case law dates or something like that, changes the law, they would send via email and then also through -- print them out and stick them in the mailbox.

Q    Okay.  Were there shift briefings before you would go out on the street?

A    Some days.  But typically, no.  We didn't have, like, a mandatory shift briefing or anything like that.

Q    You worked 12-hour shifts; correct?

A    Correct.

Q    And it's my understanding that at least at the time of this incident, you were the on-the-street supervisor for the night shift.

A    Yes, sir.  Can I go back to the question you asked --

Q    Yes.  Sure.

A    -- before about the briefings and stuff?  Typically, whenever I was a supervisor, I would call each patrol deputy -- I guess you would consider that a briefing -- and basically ask them what reports they had or if it was, like, the second day that we were on duty, what reports they had that needed to be done.  So that way I can kind of allot time later on to make sure that they get those reports taken care of.

Q    I see.  So how much time was, I guess, preferred for a report to be turned in?

A    Typically, it depends on the situation.  If they had made a felony arrest, obviously, they have to have an affidavit done within 72 hours signed by a judge at the time.  And then they have to have their case file completed.  At one point in time when I had first started, it was 30 days to complete your case file.  And then at the time of me being -- or this incident, it was ten days.

So typically if there's a report for, like, a stolen pack of gum or something like that, you know, they obviously had 30 days to report yourself, if I remember correctly.  And then the

more major reports and stuff, they had to get done before the end of shift.

Q   I see.  And so as the street supervisor, you were responsible to make sure that the deputies under your supervision actually completed the paperwork that was required?

A   Yes, sir.

Q   And then presumably you would pass that paperwork up the chain of command?

A   Whenever they finished their reports, they would turn them in to a box.  And I would go up to the office, typically at the end of each shift, and basically review the reports.  And then I would submit them in a report box to the highers up to file them.

Q   Okay.  So this call that you referenced to each deputy, it was more for administrative purposes to make sure you were staying on top of their paperwork essentially?

A   That and also just to check on them and make sure, you know, everything was going right and that there weren't any issues or anything and that they were good for work.

Q   Okay, when you say, "good for work," what do you mean?

A   If somebody -- you know, some -- the work that we do and stuff, it can be stressful.  And, like, typically if we, like, deal with a death or something like that, an infant death, and ultimately, like, bad car wrecks and cases that we go on and stuff, you know, I just make sure that they're good for duty

and just check on them and stuff, make sure there aren't any issues at home and stuff like that.

Q   And was that something that was a regular occurrence where these officers would be encountering infant deaths or serious car wrecks that that would impact them?

A   It wasn't something that was always done.  But, I mean -- or that happened all the time.  But, I mean, it happens.  It's part of the job.  Some are more stressful than others.  And, typically, bigger situations we have a debriefing or something like that at the sheriff's office and -- with a pastor and stuff like that.

But, you know, you don't -- I found that there's -- you know, some supervisors that I've had in the past don't really have a personal connection with their officers and the people that they're under.  And so I try to treat my deputies and stuff that are under me as family.  And, you know, yeah, there's times where I got to do my job and, you know, be harsh on certain things and get onto somebody's butt.

But I try to have that personal connection so they feel free to -- and comfortable to open up with me about their home life.  And if there's any issues going on, that -- you know, if it's something that you might -- or I'd have them cover a slower district or slower area.

Q   Okay.  On any given night, how many deputies were on duty under your command?

A    If I remember correctly at the time, there would be three. They had changed up certain shifts and changed stuff up so many times. But typically at this time or at the time of the incident, I believe it was -- I had a canine from either noon to midnight or from 2:00 to 2:00. So they worked from either noon to midnight -- so I'd have them from 5:00 in the afternoon to midnight, or it was from 2:00 in the afternoon. So I'd have them from 5:00 to 2:00.

So with him, it was three. And then typically, the rest of the time, it would be two other deputies that were under me, and then we each took a short night one night of the week. Typically, it was on the weekends. We would take -- one of us would have to take our short night and -- to not carry overtime. So we would get off, I believe it was, 8:00. It's four hours early.

Q    Okay. And I think you just said that was to prevent triggering overtime.

A    Yes, sir.

Q    Switching gears a little bit, just you in general, you're not a small guy. So --

A    Yes, sir.

Q    -- how tall are you?

A    6' 7".

Q    6' 7"?

A    6' 7".

Q    And how much do you weigh?

A    300 pounds about.

Q    And presumably those stats were the same in June of '21 or close to?

A    Yes, sir.

Q    And the 300 or so pounds, you look like a guy who exercises?

A    Other than tossing kids up and stuff like that, I mean, I don't go out of my way to go to the gym or nothing.  But I do a little running and stuff like that.

Q    You keep yourself generally in shape?

A    Yes, sir.

Q    Now, how about -- it came up during the criminal trial as well.  But how about mentally?  How was your mental health growing up, let's say?

A    I had an abusive dad and stuff like that.  But, you know --

Q    When you say, "abusive dad," what do you mean by that?  Like, verbally or physically?

A    Verbally.  Occasionally, sometimes physically.  But, I mean, it was mostly projected towards my mother.

Q    I see.  And that had an impact on you psychologically?

A    It wasn't more so, like, psychologically.  It just made me want to help people in that situation.

Q    I see.  Okay.  And did you suffer from any mental health

issues?

A    No, sir, not that I recall.

Q    Depression, anxiety?

A    No, sir.

Q    ADHD?

A    Yes, sir.  ADHD.

Q    ADD?

A    Maybe.  I believe so.  I'm not sure.

Q    ODD?

A    No, not that I've been diagnosed.  I don't believe so.

Q    Okay.  So were you actually diagnosed with the ADHD?

A    Yes, sir, I believe so.

Q    And do you recall any other diagnoses for mental health issues?

A    No, sir.  Whenever I was diagnosed with ADHD, if I was diagnosed with it, it would have been way -- when I was younger.

Q    Okay.  And my understanding -- I don't know a whole lot about it.  But my understanding is there's different types of ADHD.  Do you recall the type you had?

A    No, sir.  I don't remember any of that.

Q    And do you remember -- you said when you were younger, but do you remember roughly what age?

A    No, sir, I do not.

Q    Did you take medication for it?

A     Yes, sir.

Q     And what medication did you take?

A     I believe there was all different types, I mean, at first. And then they found out that Adderall worked better for me and -- from my understanding and my knowledge.

Q     And roughly how old were you when you switched to the Adderall?

A     It would have been when I was way young.  I don't remember.

Q     Okay.  I mean --

A     I think we were living in Texas, so six or seven guesstimation.

Q     So pretty young.

A     Yes, sir.

Q     And what age did you go work for Lonoke County?

A     I believe I was 20 or 21.

Q     So you had already -- well, actually I'm assuming.  Were you still taking Adderall at that time?

A     Yes, sir.

Q     And so you had been on Adderall then for 14, 15 years at that point?

A     Yes, sir.

Q     When you moved to patrol, did you have to fill out a separate application?

A     I do not recall that.

Q    Were you -- do you recall ever actually filling out a written application for the sheriff's office?

A    Yes, sir.

Q    And in that application do you recall what you disclosed about your mental health?

A    If there was a spot on there, I would have put it as ADHD.

Q    And do you recall if you disclosed any medications?

A    Yes, sir, I would have.

Q    And I understand -- just so we're clear on the record, I understand you say you would have.  But do you actually have a recollection of doing so?

A    Not that I can think of right now.  But I know that typically per our policy at the sheriff's office, anytime you're taking any new type of medications or anything like that, you're going to let your supervisor know.  So --

Q    Sure.  The ADHD, how did it impact you when you weren't medicated?

A    Just had trouble focusing on, like, doing reports and stuff.  I would typically take my medication off and on.  It depends on how my -- like, for report-wise.  Off medication I could function normally and not have any issues.  It was just a problem with focusing with the task at hand, like, reports.

Q    I see.  And when you went from childhood, you know, being a minor to adulthood, did you switch doctors?

A    I believe the only time I actually ever switched doctors

when we moved from Dallas, Texas to here. And I was seeing a primary care physician at the Cabot Medical Clinic. And then I believe he retired, and the person that was taking on his practice -- or his patients stayed with him.

Q    I see. Did you ever treat with a psychiatrist?

A    What do you mean by "treat"?

Q    Meaning -- I'm hearing you worked with a general practitioner, but did you have a psychiatrist supervise your medication?

A    No, sir.

Q    Did you ever counsel with a psychologist?

A    I'm not sure I'm understanding. Like, I have referred to -- talked to the psychol -- or psychiatrist and all that stuff. But prior to me working in the sheriff's office and, like, on a day-to-day basis prior to all this stuff, no. I did not have, like, a permanent psychiatrist I was dealing with.

Q    All right, so do you understand that there is a difference between a psychologist and a psychiatrist?

A    Can you explain the differences?

MR. STEVENS:  I'm sorry. He needs to get into this office real fast. I was trying to jump in --

MR. JACOB:  It's fine. Are you okay just continuing?

MR. NEWCOMB:  Yeah, I'm just --

MR. STEVENS:  Yeah, I'm fine.

MR. NEWCOMB: He's going to be through in just a minute.

MR. JACOB: Oh, I see.

(WHEREUPON, after a break was taken, the proceedings were resumed as follows, to-wit:)

BY MR. JACOB:

Q    So again, I'm not a doctor either.  But my understanding is that a psychologist is, you know, someone you can talk to about, you know, mental health issues --

A    Yes, sir.

Q    -- going on.  Psychiatrist though has the ability to prescribe medication.  That's my lay understanding of it.  Do you recall whether you had a psychologist or a psychiatrist?

A    Not that I recall.  I believe my mom and my dad had said something about me -- that's who -- I'm assuming that's the person that would have had to diagnose me with ADHD.  So, I mean, at some point I'm sure I have.

Q    Okay.  But you're just not sure as you sit here?

A    Yes, sir.

Q    The general practitioner who you were seeing at the time you were employed by the sheriff's office, who would that have been?

A    Dr. Jason Merrick.

Q    I'm sorry.  The last name?

A    Merrick.

Q    Merrick.  Do you happen to know his contact information, town, any of that?

A    It's in -- he works at the Cabot Medical Clinic in Arkansas.  I don't know the number of the top of my head or nothing like that.

Q    And do you know if he's still practicing?

A    Yes, sir, to my knowledge.

Q    And before him, who would it have been, if you recall?

A    McGee, Dr. McGee, I think is ringing the bell.  I'm not 100 percent sure on that though.

Q    And is he the one that you referenced as retired?

A    Yes, sir.

Q    And Dr. Merrick --

A    Yes, sir.

Q    -- did he prescribe Adderall for you?

A    Yes, sir.

Q    And he was the one who was overseeing your prescriptions?

A    Yes, sir.

Q    And that was throughout your employment at the sheriff's office?

A    Yes, sir, to what I recall.

Q    Any other doctors who you recall overseeing your medication?

A    What do you mean by "overseeing"?

Q    I'm sorry.  That was a poor question on my part.  In

addition to Dr. Merrick, were there other doctors who were also prescribing you medication?

A    No, sir.

Q    And were you on any other medications, other than Adderall, during the time that you were on Adderall as an adult?

A    Yes, sir.

Q    What types of medication?

A    I want to say it was omeprazole for heartburn.  And I had kind of had a sleep study done, and it was -- they prescribed me Ambien I think it was for the time during that sleep study. I'm sure there's other medications that I've been prescribed for -- I had a trench foot one time and some stuff like that but nothing I took on, like, a regular basis.  So it would have been something that I just taken for, like, 14 days or so and then quit.

Q    Okay.  Quit because the doctor wanted you to stop taking it, or quit because you wanted to stop taking it?

A    Because the doctor wanted me to stop taking it.

Q    And with respect to mental health medications, any type of antidepressants?

A    No, sir, not that I recall.

Q    Any type of antianxiety medications?

A    Lexapro maybe.

Q    Okay.  And when do you think you were on Lexapro?

A     Oh.  I'm not 100 percent sure.  My -- I know I talked to my doctor about it, because my wife said that I needed to get on Lexapro because she was taking Lexapro.  But she wouldn't take her medicine, so she said that I needed to take -- get on Lexapro.  And so I talked to him about it, and he prescribed it to me.  But I didn't take it all the time.  It was just -- you know, the wife wouldn't take hers, and then she's like -- go crazy.  So --

Q     Explain that a little bit more to me.  Why did you need to be on Lexapro if she wasn't taking her medication?

A     She -- it's a -- I don't know how to explain it.  It's just something that -- she would stop taking it.  And I don't know how to explain it.  I mean, she would say that I was a source of problem -- you know how our marriages go -- and stuff like that.  So --

Q     Is this wife -- are you still married to her?

A     Yes, sir.

Q     And what's her name?

A     Kayla Davis.

Q     I'm sorry?

A     Kayla Davis.

Q     Kayla Davis.  And if she -- have you been married other than to her?

A     No, sir.

Q     And when approximately did you get married?

A    2017, I believe.  '16, '17.  I'm sorry.  I'm just --

Q    That's all right.  Without saying their names -- I don't want that on the record -- but do you have children?

A    Yes, sir.

Q    And how many?

A    Two.

Q    Both still minors?

A    Yes, sir.

Q    Both with your present wife?

A    Yes, sir.

Q    The -- when your wife would say you were the source of the problems, what problems was it that she was saying you were the source of?

A    Like, not doing dishes and stuff like that.  And she would pick fights just to start fights and stuff like that, just arguments.

Q    And she made some observations about you and believed you needed to be medicated?

A    No.  She thought that I needed to be medicated.

Q    But you took that information to your doctor, and apparently your doctor agreed; is that correct?

A    I would assume so, maybe.

Q    Okay.  And -- well, what was the conversation with your doctor about why you needed to be on it?

A    I don't recall 100 percent the conversation.  Like I said,

I -- he prescribed it to me one time, and then that was it.

Q    But presumably when he prescribed it to you, it was because he felt there was a medical necessity, and it was appropriate to prescribe to you; correct?

A    I'm assuming.

Q    Did you understand though that that's a medication that needs to build up in your system, and then you stay on it?

A    I don't know all that stuff.

Q    Okay.  Did your doctor say, Hey, stop taking the Lexapro, or did you just say, Yeah, I'm not taking this?

A    I don't recall all that stuff.

Q    Okay.  Well, did your doctor ever ask you, Hey, you haven't asked for another prescription?

A    When I said that he had prescribed it to me that one time, I think I had gotten it filled.  I'm not sure exactly how many more times.  But I believe, if I recall correctly, he had asked me how the medication -- or how I was doing on the medication. I told him I don't notice any difference or anything like that, that it was -- I'm not really 100 percent sure on that.  And so I had stopped getting it filled.

Q    Okay.  And then other than the Lexapro, any other type of mental health medication you can think of?

A    At the time, no, sir.

Q    Okay.  Is it possible though that there are other mental health medications that you've been on that you just are not

recalling?

A    There wouldn't have been anything else that was for a long period of time or nothing like that, nothing -- not to my knowledge on the mental medication.

Q    Okay.  You said not for a long period of time.  For a short period of time, anything else?

A    No, sir, not that I can recall.

Q    All right.  Because generally, at least in my opinion, if you go to a doctor and they say there's some sort of mental health issue that's going to require medication, I don't see it as something that one's going to forget.

A    No, sir.

Q    So, you know, as you sit here, is this something that you recall, yeah, there was something?  I just don't remember the exact details to it?

A    No, sir.  I don't remember any -- being prescribed any other medication.

Q    Was there a diagnosis that was associated with the Lexapro prescription?

A    No, sir.  I don't believe so.

Q    And were you taking the Lexapro at the same time that you were taking the Adderall?

A    Yes, sir, I believe so.

Q    And the time you were taking the Lexapro and the Adderall, that was while you were employed with the sheriff's office?

A   Yes, sir.

Q   And was the fact that you were taking Lexapro disclosed to the sheriff's office?

A   Yes, sir.

Q   And roughly, year-wise, when do you think it was disclosed to the sheriff's office?

A   Go back to the previous question.  I'm not 100 percent sure if it was -- or advised to the sheriff's office.  It would have been advised to my lieutenant at the time, which was William Langley.  But from my understanding of the policy, it was anything that would alter your -- Schedule II narcotic or something like that that was mind-altering or causing effects on your day-to-day work.  So it wasn't in writing or anything like that, because it wasn't considered one of those.

Q   Okay.  That's your understanding --

A   Yes.

Q   -- of the policy as you're sitting here?

A   Yes, sir.

Q   And -- but you're saying regardless, you do know that you disclosed it to the lieutenant?

A   Yes, sir.

Q   But it's my understanding you're saying you disclosed it verbally?

A   Yes, sir.  Might not have been written.  It might be written, but I'm not 100 percent sure on that.

Q    Okay.  So if I talk to the lieutenant, he's going to say what?

A    If you recall, it was -- he was advised of it.

Q    Okay.  And it's your belief though that it wasn't something that you needed to disclose even though you did disclose it?

A    No.  It was something -- like, anytime I was taking any new medication, it was something that I advised my supervisor of.

Q    And again, I'm not sure if we covered it.  But time frame, you're not sure of the year that would have been?

A    No, sir.  And to be a 100 percent honest, it -- I mean, it could have been after this incident.

Q    Okay.  After this incident though you were immediately put on administrative leave; correct?

A    Correct.

Q    So you weren't on the street then.  In the event it was after the incident, you weren't on the street while taking Lexapro?

A    Correct.  It might it might have been afterwards.  I'm not 100 percent sure on that.  I would have to check with my records and stuff like that.  But --

Q    Sure.

A    -- I know at some point in time I was prescribed to Lexapro, whether for a long period of time -- I think I had

gotten, like, two or three refills maybe, and that was it.

Q    Sure.

A    Currently, now I'm still taking Lexapro.

Q    Okay.

A    Since I got in here.

Q    Since you got in here.  So you've restarted Lexapro?

A    Yes, sir.

Q    And was that a -- the facility's doctor that decided that, or was that your primary from home?

A    Currently, me being in here, I'm not allowed to take my ADHD medication.  And due to anxiety and stuff like that, I requested that I be allowed to take that medication.

Q    I see.  So what was it about that selection of medication that made you request it?

A    It was something that I had been prescribed in the past.

Q    But in the past I think you said it didn't have an impact on you, and so you didn't refill it; correct?

A    Correct.  And it doesn't have an impact to this day, but it was something I was prescribed.  And anything that would help with anxiety, you know, I'm willing to give it a shot. But I have not talked with this doctor up here about it.  I've been meaning to get with the doctor and talk about something for anxiety and my PTSD and stuff like that, but I have not.

Q    Okay.  So your doctor from home prescribed the Lexapro, and then you came here?

A    Like I said, I'm not 100 percent sure on when he prescribed it to me.  But I did have leftover prescription from the Lexapro that I -- my wife had brought it here for me.

Q    Okay.  So then presumably if it was leftover prescription, then it was within the last year that it was prescribed to you, or the --

A    Correct.

Q    -- prescription would have expired; correct?

A    Correct.

Q    And so when I asked you about time frame, that just -- you didn't remember that?

A    No.  I -- what are you talking about, that time frame?

Q    Well, sure.  I had asked you do you recall the time frame when you were on it.  You weren't sure.  But now you're telling me your wife brought an unexpired prescription medication up here for you.

A    I'm not sure if it was expired or not.

Q    Well, would you agree with me the facility wouldn't let you take it if it was expired?

A    I don't know their policies or practice.  I mean, for alls I know, it was the doctor who got my prescription and wrote me another prescription.

Q    Okay.  But you've had no conversations with the doctor here?

A    I have had a conversation withe doctor, but it was in

reference to a chemical burn on my hand.

Q    But it's your -- is it your belief though that the doctor is still allowing you to take that medication without having spoken to you about your mental health?

A    Yes, sir.

Q    While you're here, have you spoken to any mental health counselors?

A    No, sir.

Q    After this incident, did you speak to any mental health counselors?

A    I do not recall.

Q    Okay.  Now, tell me a little bit -- what was it that prompted, I guess if you were that young, your parents to say something's going on?  He needs to, you know, be looked at for ADHD or medication.

A    From my understanding, it was -- I was having issues with focusing in school and completing tasks, more so being like a class clown and stuff like that.

Q    Am I correct with the condition of ADHD, the brain is not able to properly process all the different information coming in?  Is that your understanding?

A    I'm not sure.  Alls I know is I have problems focusing on stuff.

Q    And so explain that to me.  You have problems focusing on stuff.  What does that look like, feel like?

A    Like, I start -- like, I'll start a task, and I have troubles completing that task.  I can't sit down for long periods of time.  I get, like -- so anxiety I would say, not really like anxiety.  But I just feel like -- somewhat uncomfortable and want to go do something else.  I can't focus on a task for, you know, too long.

Q    Is it you're distracted by other things or --

A    Yes, sir.  I'm supposed -- I'm sorry for interrupting your question.  Go ahead.

Q    No, no, no.  I'm just saying is it something where you're distracted by other things, or you just are sitting there looking at this and can't focus on it?

A    No.  I'm distracted by just the minor little things.  Like, anytime people walk back and forth behind you, I get distracted on that, stuff like that.

Q    All right.  And do you feel jumpy or --

A    No, sir.

Q    Do things startle you or --

A    No, sir.

Q    Do you feel, I think you said, anxious?

A    I wouldn't necessarily call it, like, anxious, but it's like I just focus on something else.  I'm like -- well, I call it squirrel syndrome.  It's like, squirrel.  So --

Q    Okay, fair enough.  That's good.  Okay.  So -- and when you're on the medication, explain the difference.

A    I'm able to focus on tasks. And, like I said, typically at the sheriff's office, I would take my medication whenever I had a lot of reports to do or when I was doing reports and stuff like that.

Q    But when the doctor prescribed it to you, they didn't prescribe it to you to start and stop the way in which you're using it; correct?

A    Correct. But it was my understanding -- I had spoke with him, and he was aware that, you know, I've taken it off and on. He said that he had typically prescribed it for college students who would only take it, like -- or that medication was prescribed to college students on -- for people who have issue focusing on tests or studying for tests. So, to my knowledge, that's what -- you know, I could take it off and on.

Q    Was there a discussion as far as what tasks it would be appropriate to use the medication for --

A    No, sir.

Q    I'm sorry -- and what tasks that it wouldn't be?

A    No, sir, it wasn't.

Q    Was there a discussion about your job performance and the types of responsibilities that you had with respect to using this medication?

A    Yes, sir, I'm pretty sure there was. I mean, he knew I was a law enforcement officer and stuff like that.

Q    Do you remember what he said about that?

A    No, sir.  I mean, it was more so me just letting him know, you know, that I mainly take it whenever I have a lot of reports or a lot of stuff over my head and stuff like that.

Q    A lot of stuff over your head meaning?

A    Like, approving other people's reports and having a lot of paperwork to get done.

Q    Okay.  What about on patrol though?  I mean, when you're on or off the medication, how -- did you see any difference?

A    No, sir.

Q    Okay.  So you disclose the -- at least the Adderall to the sheriff's office.  Do they tell you, Hey, we need to monitor this, make sure you're taking it?

A    No, sir.  I know, like, whenever I'm -- I'd be up at the sheriff's office and joking around or something like that. Someone would be sitting there saying, you know, like, You need to take your medicine, and you need to calm down, or something like that to that effect.

Q    Okay.  So other -- so coworkers noticed you get a little hyper?

A    Yes, sir.

Q    And they would tell you in a joking manner to take your medicine?

A    Yes, sir.

Q    Do you remember who those -- were they subordinates?  Were they your supervisors?

A    I'm sure it was both.  I mean --

Q    So they noticed a difference in your demeanor or behavior when you weren't taking the medication?

A    Yes, sir.

Q    And other than that -- we'll call that supervision.  Other than that, was there any other type of supervision of your medication?

A    No, sir.

Q    And I guess you would agree with me that really wasn't supervision.  That was just in passing they would see it, and they would say, Hey.

A    Yes, sir.

Q    Okay.  So at no point in time did the sheriff, for instance, say, Listen, you're carrying a gun.  You have serious responsibilities.  It's my understanding you need to be on this medication, so I need you to check in daily that you've taken it.  Or I need you to take a drug test every month, or anything like that?

A    No, sir.

Q    Did the sheriff ever speak to you about the fact that you're on Adderall?

A    I'm sure he had, but I'm not sure of, like, the situation or what about that.

Q    Okay, when you say you're sure he had, why are you sure that he did?

A    I mean, because I was prescribed Adderall.  I'm sure he would have talked to me.  I mean --

Q    But you have no recollection of this?

A    Not the specifics of -- I mean, other than him sitting there joking like, oh, you need to go work on your reports.  Take your medicine.

Q    Okay.  So the extent of the conversation with the sheriff was basically a joke about the medication and you needing to take some; correct?

A    Yes, sir.

Q    All right.  There was never a, Listen, you know, we need to have a formal, supervisory-type process over your medication?

A    No, sir.

Q    Or we need to have a, you know, a formal, set supervision of your mental health?

A    No, sir.  There was an incident where -- in Oklahoma where I had to go to a -- I believe it was a psychologist or a therapist and speak with them and then had to be found fit for duty.

Q    Okay.

A    But we had a talk -- I mean, he talked about that.

Q    All right.  And am I correct that was, what, a year or two before the incident that we're here to talk about?

A    I'm not sure the exact dates or times.  I think it was '16

or '17 maybe.

Q   Okay.  And, actually, you went to the ER.  And then weren't you admitted to a psychiatric facility?

A   Yes, sir.

Q   Okay, so it wasn't just that you had to talk to a psychologist.  It was -- you were inpatient at a psychiatric facility?

A   Yes, sir.

Q   And roughly how long were you inpatient?

A   It was a 72-hour hold.

Q   All right, so was that -- that was involuntary; correct?

A   Yes, sir, from my knowledge.

Q   From what?

A   From my knowledge, yes.

Q   All right, so --

A   I'm able to just leave.  So --

Q   Okay.  And am I correct that all started because of an incident while you were on vacation?

A   Yes, sir.  I believe you're talking about -- yes.

Q   You were in Oklahoma on vacation visiting family?

A   Yes, sir.

Q   What family were you visiting?

A   My family on my side, my aunt, my grandmother.

Q   Okay.  And your family was with you?

A   Yes, sir.

Q    And they observed behavior that concerned them; correct?

A    Yes, sir.

Q    And what was the behavior that they observed?

A    I had real bad anxiety.  I felt that they were out to harm me.  I had actually went to my aunt and told her that I just don't feel right.  Something doesn't feel right.

Q    Okay.  In fact, you were paranoid that someone was going to physically harm you; correct?

A    Yes, sir.

Q    And was it a specific person of whom you were paranoid?

A    It was everybody.  I mean, we went to Walmart, and I felt like everybody was out to get me there and -- nobody in general.  It was just everybody.

Q    Okay.  And if I recall -- I pulled the documents.  It's my understanding that you sued Walgreens and that your were prescribed 20 milligrams but given 30 milligrams.

A    Yes, sir.  If I remember correctly, yes.

Q    Whatever happened to that litigation?

A    I had signed a nondisclosure agreement, and they -- ultimately, we settled outside of court.

Q    Okay.  Well, I appreciate the nondisclosure agreement.

A    Yes, sir.

Q    But here I'm going to ask you to disclose it.  What was the end result?

        MR. NEWCOMB:  We're going to object without a

court order.

MR. JACOB:  You can -- well, you can object, and we can have a court rule on it later.  We'll keep it confidential until then.  But we are going to have the answer.

MR. NEWCOMB:  Will you indemnify it if Walgreens comes back to recover it?

MR. JACOB:  No, I'm not going to indemnify it. It's going to be sealed.

MR. NEWCOMB:  I think we can reserve the -- since it's a nondisclosure agreement, if the court says he has to disclose it, we can.  But --

MR. JACOB:  You going to fly me back down here to do this deposition?

MR. NEWCOMB:  No.  I'm just asking you --

MR. STEVENS:  Devon, what are you asking?  Are you asking for the terms of the agreement?

MR. JACOB:  I want to know the end result was.

MR. STEVENS:  Well, he said it was settled outside of court.  Specifically, are you asking for the terms of the agreement, the outcome of the case?

Q    (Mr. Jacob continuing)  Was there an admission that they gave you the wrong script?

MR. STEVENS:  Do you know?

THE WITNESS:  I don't know if they ever admitted

it.  I mean, they -- I mean, ultimately, yeah.

MR. STEVENS:  I mean, they settled it with you.

THE WITNESS:  Yes, sir.  No, I know.

MR. STEVENS:  Do you know, I mean, the terms of the agreement?

THE WITNESS:  No, not -- I don't have that agreement in front of me.

MR. STEVENS:  I would -- let's try to be careful about the terms of the agreement.  I mean, he's willing to talk about allegations in the case.  Anything that's subject to the nondisclosure agreement, I think we need to be careful about.

MR. JACOB:  All right.  Let's do this, if you will.  You're not going to object to me raising this later and bringing this issue to the court and letting the court decide whether they disclose --

MR. NEWCOMB:  No.  I think -- I --

MR. JACOB:  So we can leave it open in that sense?

MR. NEWCOMB:  What I'm understanding you're asking is he told you they settled it.  And then as I understood your next question -- and my objection wasn't that they settled it, that there's a lawsuit.  That was all public -- is what was the amount of the settlement.

MR. JACOB:  I don't care about the amount.  What I'm trying to get at is whether there's any admissions in there that, yes, in fact this happened.  I'm trying to get to the merits of it.

MR. NEWCOMB:  I think -- I --

MR. STEVENS:  Yeah, typically a settlement agreement --

MR. NEWCOMB:  There's four lawyers in this room.  And I have never had, in 50 years of practice, a settlement where the defendant --

MR. STEVENS:  Right.

MR. NEWCOMB:  -- admitted wrongdoing even if they paid money.

MR. JACOB:  Well, that's fine.  But with nondisclosure, I don't know that.  So we'll revisit it.  You'll agree that we leave this open, at least on that issue?

MR. STEVENS:  Yeah.  I mean, I have no -- I mean, if the court wants to say, yeah, he needs to talk about the terms of settlement agreement, that's fine.

MR. JACOB:  Okay.

MR. NEWCOMB:  Yeah, that's fine.

MR. JACOB:  Because I -- basically, what I want to dig down to is whether there was any ultimate

evidence that in fact what the allegation was happened. But I agree. I don't need to putter around here until the court does, as long as you'll allow me to leave that kind of question open.

MR. NEWCOMB: Yeah. I just didn't want to violate the --

MR. JACOB: Fair enough. All right, so we're going to move on on that.

THE WITNESS: Can we take a break?

MR. JACOB: Yes. Sure.

(WHEREUPON, after a break was taken, the proceedings were resumed as follows, to-wit:)

BY MR. JACOB:

Q   Okay, sir. We just had an opportunity for a break. You prepared to continue?

A   Yes, sir.

Q   All right. So we were talking about the incident in Oklahoma. I wanted to explore a little bit more. I know you said, you know, in Walmart you felt a certain way, at your family's home you felt a certain way. What exactly went on at the home though that had you end up at the ER?

A   I don't recall exactly, like, what specific thing. I mean, we were just cooking out or something like that, and I just felt like they were out to get me.

Q   Okay. Had you had that experience before?

A     No, sir.

Q     Okay.  Because I know you had described one of the things that you would feel sometimes without the medication was anxiety.

A     What do you mean by without the medication and anxiety?

Q     That sometimes that the ADHD would cause a feeling of anxiety.

A     Just on paperwork and stuff, you know, paperwork, me having a lot of paperwork over my head or, you know, having a lot of paperwork to do and stuff like that, just anxiety like that, nothing in general other than that.

Q     Had you ever had an experience where you felt similar type paranoia?

A     No, sir.

Q     And since that time, have you had an experience like that?

A     No, sir.

Q     Did you barricade yourself in somewhere?

A     No, sir.

Q     Did you physically grab ahold of anybody or anything?

A     No, sir.

Q     Were the police involved?

A     No, sir, not that I'm aware.  No, they were.  They -- whenever I went to tell my aunt that, you know, I don't feel right, that I need to go to the doctor, whenever we went to the ER they -- I don't -- they -- I never saw them.  But at some

point in time, I believe they came up there.  And my wife had said that came up there, and they retrieved my firearm from the emergency room.  And then they ultimately later on gave it back to her.

Q   I see.  Okay.  So they got involved because the fact that you're a law enforcement officer with a firearm.

A   Yes, sir.

Q   And it's your understanding that they, for at least a period of time, held onto your firearm?

A   I'm not 100 percent sure on that, but I'm assuming they did.

Q   And then at some point, your wife was given your firearm, and you guys returned back?

A   Yes, sir.

Q   Do you know if the firearm was returned the same day?

A   No, sir, I do not.

Q   And do you remember which hospital it was that you went to?

A   No, sir, I do not.

Q   Is that something that you would be able to discover?

A   Yes, sir.  I should have all documentation and stuff like that in my house, I believe.

Q   And then you indicated -- or we discussed the fact that you went to a psychiatric facility for an involuntary hold for a period of time.

A    Yes, sir.  72 hours, I believe.

Q    And do you know which facility that was?

A    No, sir.  I know it was in, I believe, in Midwest City.

Q    I'm sorry?

A    Oklahoma.  Midwest City --

Q    Midwest.

A    -- in Oklahoma.

Q    Okay.  And were you released on schedule so to speak?

A    What do you mean released on schedule?

Q    Meaning a 72-hour hold but they didn't try to hold you longer.

A    No, sir.  If I remember correctly, I believe I was released earlier.  Well, actually, I should have been.  I'm not 100 percent sure on that though.

Q    All right.  And while you're at the facility, what did they do with you?

A    Just -- I had a room of my own, and they had a big day room.  I was able to come and go, read a couple of books. That's pretty much it.

Q    And do you recall how many nights you were there?

A    I think it was two nights.

Q    And how about in the ER?  Were you there for a night?

A    One night.

Q    Were you taken to the ER by ambulance?

A    No, sir.

Q    Were you taken to the psychiatric facility by ambulance?

A    No, sir.  I was taken to the psychiatric hospital by law enforcement.

Q    I see.  So you did see law enforcement?

A    Yes, sir.  I'm sorry.

Q    That's all right.

A    I'm sorry.

Q    No, that's okay.  Do you know if law enforcement was involved in signing off on the involuntary hold?

A    No, sir.  And back to your question whenever you ask me if law enforcement was involved --

Q    Sure.

A    -- I misunderstood that question.  I thought you had meant at that point.

Q    No.

A    It's whenever I went to the emergency room.

Q    It's okay.  I appreciate the clarification.

A    Yes, sir.

Q    And that's fine if, you know, in the future you -- something like that, just let me know.

A    Yes, sir.

Q    And I'll let you correct the answer.  I don't think you're trying to play games or --

A    Yes, sir.

Q    -- anything.  But I do appreciate the clarification.

A    Yes, sir.

Q    Other than that instance in Oklahoma seeing law enforcement, did you see the law enforcement any other time?

A    No, sir.

Q    Were law enforcement involved with you at any other point during your life, as far as a mental health issue?

A    No, sir, not that I'm aware of.

Q    Okay.  Have you had any other -- did you spend any other time at a psychiatric facility at any point in your life?

A    No, sir, not that I recall.

Q    I notice you keep saying not that you recall.  I mean, in my opinion, it's not something you would forget.

A    No, I wouldn't.  I understand that.

Q    But is -- are you telling me then that there's a chance that there was.  But --

A    If it was anything, it would be whenever I was younger.

Q    I see.  Okay.

A    Yes, sir.  But nothing pertaining to this incident or that -- this time frame while I worked at the sheriff's office.

Q    Okay, all right.  How about within the ten years before you went to work for the sheriff's office?

A    No, sir.

Q    And how about any other police contact at all except for by nature of your job as a law enforcement officer?  Have you had contact with law enforcement officers?

A     Sure.  I've been stopped a couple times and a couple times whenever I was a kid or so.  But it's for riding four-wheelers and stuff like that.

Q     Fair enough.  But nothing because of a behavioral issue other than the four-wheelers --

A     Yeah.

Q     -- and things like that?

A     Correct.

Q     Okay.  Never had the police called on you?

A     Correct.

Q     Ever taken a ride in an ambulance?

A     Yes, sir.

Q     And for what?

A     Doing CPR on people in the back of the ambulance and stuff like that related to the fire department.

Q     How about where you were the patient?

A     No, sir, not that I recall.

Q     Again, something that I probably wouldn't --

A     Yeah.

Q     -- forget about.

A     Yeah.  No.  But I'm sorry.  I'm just kind of nervous and, you know, being in a small room and --

Q     Sure, sure.

A     -- being away from family and stuff like that.

Q     Understood, understood.  What do you think -- if I spoke

to your wife, what do you think she would say about that incident in Oklahoma? Anything more than you've shared with us?

A    No, sir.

Q    Because I know you said at one point that your wife felt like you needed to be on medication, and she didn't feel that she needed to be on medication. So it sounds like at times she perceives you maybe differently than you perceive yourself?

A    That's something you would have to ask her.

Q    Okay. Has she made any comments to you about the Oklahoma incident?

A    No, sir.

Q    Any observations that she had about it?

A    No. Other than that she just knew that I was different and that something was up.

Q    Okay. How long a period of time did it last that you felt different in Oklahoma?

A    I'm not 100 percent sure on exactly, like, when it started. But I know once we got to Oklahoma and went into, like, Walmart, I just started feeling like everybody was out to get me. And, yeah, I'm assuming it was right as we got there.

Q    Okay.

A    A little bit before, I mean, maybe feeling a little anxious or something like that.

Q    Sure.

A    But I don't recall all the details on it.

Q    Sure.  And then from the onset of the feelings until you end up in the ER, roughly how much time do you think we're talking about?

A    Maybe four hours, five hours, give or take.

Q    So it's not, like, the next day or something like that?

A    No, sir, not immediately.  I mean, not immediately.  But once I realize that something's not right, that -- and, you know, I spoke to my aunt about it and had her take me to the hospital.

Q    So your aunt took you?

A    Yes, sir.

Q    Why didn't your wife take you?

A    I don't recall.

Q    Did your wife end up in the ER with you though?

A    Yes, sir.  She came up there later on, to my knowledge.

Q    Was your wife at your family's home when this was occurring?

A    Yes, sir.

Q    What type of Adderall were you taking at the time? Extended release, immediate release?

A    I'm not sure there's a difference.  I mean, it's immediate.  I take one-and-a-half, 30-milligram pills in the morning and one and a half in the afternoon.

Q    That's what you presently take?  Or, no.  Actually, you

said you're not on it now; right?

A    Yeah, correct.

Q    Back then though you were taking 30 milligrams at a time?

A    Yes, sir.

Q    Okay, not 20 milligrams?

A    No, sir.

Q    Okay.  And when did -- what do you think in relation to that trip you picked up the script in question?

A    I can't even guesstimate.

Q    Meaning the refill.

A    I want to say it was a week or so prior maybe.

Q    All right.  You had been taking it as prescribed just not realizing it was a different dose?

A    Correct.

Q    Okay.  Did you ever crush the pills and snort them?

A    No, sir.

Q    Is that -- did you ever become addicted to the Adderall?

A    I'm not -- I can't say that from, like, when I was a kid or anything like that.  But, no.

Q    Okay.  I mean, was it something that you were using recreationally?

A    What do you mean by "recreationally"?

Q    Meaning off script.  Just --

A    No, sir.

Q    Okay.  But I think you also said it was something that you

weren't taking regularly.  You would take it when you felt you needed it, and then not take it.

A    Correct.  Is that what you mean by off script?

Q    No.  Sometimes people get ahold of pills and use pills recreationally like they do alcohol.

A    No, sir.

Q    And it was 30 milligrams twice a day; correct?

A    Yes, sir.

Q    But the lawsuit that you filed said that the 30 milligrams was not the correct dosage.

A    What do you mean?

Q    Well, the lawsuit that I read said that you were prescribed 20 and that you were given 30.

A    Yes, sir.  I take one-and-a-half, 20-milligram pills a day -- or in the morning and then one in the afternoon.

Q    Oh, I see.

A    I take a total of 30.

Q    I see what you're saying.  So -- but since they gave you the larger pill, when you were taking it, it ended up --

A    Yeah.  I was taking one and a half, and that was more.

Q    I see what you mean.  Okay.  So basically 150 percent of what you're supposed to be taking then?

A    I'm not good at math.  So, yeah, I'm assuming.

Q    All right.  Okay.  I'm just trying to figure that out in my head.  I think I did my math wrong.  Okay, sounds good.  Had

Q you -- what was the dose that you originally started on? Do you know?

A No, sir.

Q And what was the dose that you ended on? Do you know?

A What do you mean by "ended on"?

Q Well, you're not taking it presently. So --

A Correct.

Q -- what was the highest dose that you recall being prescribed?

A 30 milligrams. 60 milligrams a day.

Q Okay, so eventually you did go to 30 milligrams?

A No, sir. I still took -- I've always been prescribed 20-milligram pills. I take one and a half in the morning, which would make 30 milligrams in the morning, 30 in the afternoon for a total of 60.

Q Okay. I thought you meant that you increased to --

A No, sir.

Q Okay. So that was always the dose that you recall?

A Yes, sir.

Q And it wasn't something that was eventually increased over the years?

A No, sir.

Q But you could go from taking -- so you're saying you took a total of how much per day?

A 60.

Q   60.   And the therapeutic range is up to 60 is my understanding for Adderall immediate release.  But if you're taking it more than once a day, then it probably was immediate release not extended release.  Because I think extended release is once a day.  Is that your understanding?

A   Yes, sir.  I'm not a physician, but I'm assuming.

Q   Okay.  But you could actually go periods of time of taking nothing and then take your 60 milligrams and not have a reaction; correct?

A   Yes, sir.  Other than the only thing I notice is being able to focus on doing paperwork and stuff like that.

Q   And so when you would be off it, you didn't have the hallucinations, paranoia, and any of that; correct?

A   What are you talking about hallucinations, paranoia?  I've never -- other than when I was at Oklahoma?

Q   Right.  That's what I'm talking about.  You didn't have any of that when you're --

A   No, sir.

Q   -- completely off the meds?  And you didn't have that when you were on the correct script; correct?

A   Correct.

Q   And -- but you did have that when you were taking it above what was prescribed?

A   From my understanding, yes, sir.

Q   So my understanding in speaking with a medical

professional about this medicine is that the increase in dosage
was actually not very significant from a therapeutic
standpoint, as far as what you ended up taking, and that it
probably wouldn't have had such a significant effect on you.
Did anyone ever discuss that with you?

A    No, sir.

Q    And also that it would be unlikely that if somebody was
that sensitive to Adderall that a physician would put them
right back onto what's considered a relatively minor, lower
dose of Adderall if you're that sensitive to it.  Was that ever
discussed with you?

A    No, sir.  I don't recall any of that.

Q    Did you file that lawsuit just to try to protect your job?

A    No, sir.

Q    And after all this happened with the medication in
Oklahoma, what's the time frame from the Oklahoma incident to
you come back to work?

A    What do you mean by "come back to work"?  Like, because I
was on -- if I remember correctly, it was administrative leave
for maybe a month.  Not sure -- so I was paid during the whole
time, but I was on administrative leave.

Q    Okay.  Why were you on administrative leave for a month
though if it was simply a mistaken, you know, prescription
overdose that was out of your system relatively quickly if it's
immediate release?

A    The sheriff's office wanted me to get a -- do a fit-for-duty and spoke to a psychiatrist and stuff like that.

Q    And what -- tell me about that process a little bit.

A    I went to a psychiatrist, and the sheriff's office had gave her documentation or something, a fit-for-duty thing.  And to my knowledge, I just spoke with her about the incident, and she referred me to a different therapist or something like that, if I remember correctly.  I had to speak with him, and he's the one that actually done that fit-for-duty.

Q    Okay.  The -- do you know whether it was a psychologist or psychiatrist?

A    I don't.

Q    Okay, that's fine.  Do you remember who that person was though, the original one you were referred to?

A    I'm not sure what her first name was.  Dr. Fowler.

Q    I'm sorry?

A    Dr. Fowler.

Q    Fowlder?

A    Fowler.

Q    Fowler.

            MR. NEWCOMB:  Fowler.

            MR. JACOB:  Fowler, okay.

            MR. NEWCOMB:  O-R.

            MR. JACOB:  O-R.  Got it.  All right.

            MR. NEWCOMB:  I mean -- Joyce Fowler.

MR. JACOB: George Fowler, okay.

MR. NEWCOMB: No. Joyce.

MR. JACOB: Joyce Fowler. All right, thank you.

Q    (Mr. Jacob continuing) So Joyce Fowler sees you at the request of the sheriff; correct?

A    Yes, sir.

Q    And then Joyce Fowler refers you to another doctor?

A    Yes, sir, if I remember correctly.

Q    And do you remember who that was?

A    No, sir. I don't know his name off the top of my head.

Q    Okay. But that was the one who was supposed to perform the fit-for-duty evaluation?

A    Yes, sir, if I remember correctly.

Q    Do you know why Fowler didn't just do that?

A    No, sir, I do not.

Q    I mean, do you know why she said, I need to refer you to someone else?

A    I don't recall that. I think it might have been just due to stuff, like, that happened on the job and job-related stuff. He just wanted me to talk to him and get somebody to talk to me. I know that he was -- if I remember correctly, he was more so his line of expertise for first responders and law enforcement and stuff like that.

Q    I see. Do you know how Fowler was originally selected?

A    No, sir, I was not. I'm not sure how that was picked.

Q     And how many times do you think you had these appointments with Fowler and the other person included?

A     If I remember correctly, the -- I might have met with Joyce Fowler, Dr. Fowler, maybe two times.  And I think I met with the other guy four or five, not 100 percent sure on that.

Q     So even after the Oklahoma incident involving the prescription issue, you weren't immediately cleared once the medication was out of your system?

A     No, sir.

Q     Do you know why it was that you weren't immediately cleared after the medication got out of your system?

A     No, sir, I do not.

Q     And was that something that the sheriff ever spoke to you about?

A     Other than just doing the -- sending me for the fitness for duty and stuff like that, I'm not sure what we would have talked about.  But I'm sure he talked to me at that point in time, advising me of the fitness for duty and stuff like that, what I needed to do to get back fit for duty.

Q     What did he say you needed to do to get back fit for duty?

A     To go speak with her and get a -- have a psych -- you know, a psych eval and then have a fitness for duty -- approved for fitness for duty.

Q     Did he explain why he was sending you if the issue was, or believed to have been at that time, basically an improper

script?

A    I'm sure he did, but I don't recall that conversation.

Q    Do you know whether that incident resulted in an internal affairs investigation?

A    I'm not aware of that.  I was never provided any documents regarding an internal affairs investigation.

Q    Okay.  Do you know whether that incident simply resulted in an investigation even if it wasn't classified as an internal affairs investigation?

A    No, sir, not to my knowledge.

Q    And while you indicated that you know there was at least a conversation with the sheriff about the need to go for the fit-for-duty evaluation, do you know whether there was further conversations with the sheriff, or you just don't know?

A    I just don't know.  I mean, I know I would have told him about the incident, but other than that, I don't recall any other conversations or --

Q    Okay.  And when you say, "I would have told him about the incident," you would have told him everything that you told me here today?

A    I'm sure probably would have been in more detail, because at the time I would have remembered, you know, known more stuff.  But it's been a while since that incident.

Q    But, I mean, there was no reason that you can think of that you would have not told him about the paranoia and those

types of things?

A    Correct.

Q    And did the sheriff ever ask you, if you recall, you know, This was apparently a prescription mistake, and I sent you for, you know, this evaluation? But I'm being told you're not coming back for a month. Did he ever say, What's that about?

A    What do you mean by --

Q    Well, again, my assumption -- and again, I'm assuming -- would be that if it was just a, you know, misscript or whatever that, you know, if I was the sheriff sending you, I would expect you to be cleared pretty darn quickly, you know, within a day or two. Did he ever ask you, Why is this taking a month?

A    No. He -- it's my understanding that I was going to -- it was going to be some time to -- that she was wanting to talk to that other therapist about incidents related to my job and stuff like that, from my understanding. So, I mean, I'm pretty sure he was aware of how long it would take.

Q    Okay. Now, you say, "incidents related to your job." What other incidents?

A    If I remember correctly, we -- prior to the Oklahoma incident, we had had a lot of -- it was summertime, and I think we had had, like, three or four infant drownings and toddler drownings that I was a part of and investigated.

Q    Okay. That understandably would have an impact on you?

A    Yes, sir.

Q    Okay.  And had you told the sheriff or the sheriff's office before you were sent for the fit-for-duty that, hey, I'm struggling with these incidents?

A    It wasn't more so a struggling deal.  It was -- I think it was more so -- if I recall correctly, on Joyce Fowler, she kind of just asked, you know, what our daily routines are, what type of stuff has happened here recently.  And it was one of those things where she just wanted me to go talk to somebody who had been in those situations.

It wasn't anything that was affecting my job duties or performance as a law enforcement officer.  I've gotten pretty good at compartmentalizing stuff like that.  Now, after the situation, you know, I'd pull off to the side of the road and bawl my eyes out.  But as to other daily tasks, you know, it would just be that incident when I was off by myself and that.  I was done with it.

Q    Sure.  Okay.  The day of the incident, am I correct you had not been taking Adderall for a period of time?

A    Yes, sir.

Q    And I think it was -- what was it, like, 12 days you hadn't been taking it?

A    I'm not 100 percent sure on the exact days.

Q    Do you have any idea how many days?

A    This happened on Monday night or Tuesday morning; correct?

Q    I believe that's correct.

A    Yeah.  So the weekend prior would have been our short week.  So I believe I went to the academy.  The weekend prior I had taken off.  So, yeah, it would have been roughly, oh, about eight or nine days.

Q    Okay.  And am I correct -- maybe I'm remembering it wrong, but I thought at the trial you indicated that you had lost your medication?

A    Yes, sir.

Q    Tell me a little bit about that.

A    While we were in Hot Springs at the fire convention, we were staying at a hotel.  And I had went to one of their pubs or the water distillery and alcohol distillery there.  And whenever we were leaving, one of the bags actually busted in my -- one of the tubs that we got it in, carrying it in.  And I had thrown that bag away, and I'm assuming the medication is in there.

Q    I see.  And you had tried to refill it, but it was too soon to refill?

A    No, sir, I didn't try to refill it.  I knew that I was -- had a prescription coming up to be filled.

Q    Oh, okay.  I misunderstood that.

A    And typically, if you -- the way we do it, anytime someone has medication like that, they have to call in a police report and do all that.  And so I just knew that it would be time to be refilled.  So --

Q    So you did report that to the police, the lost medication?

A    No, sir.

Q    All right, I'm confused.  Explain.

A    That's -- typically, whenever there's a Schedule II narcotic or something like that and you lose your medication, typically for you to be able to refill it, a doctor -- from my understanding, a doctor would have to have a police report or something like that --

Q    Oh, okay.

A    -- to fill it for a lost or stolen medication.  So I knew that my prescription was up for refill soon.  So --

Q    I see.  Okay.  And how did you know that there would need to be a police report in order to get the early refill?

A    Because we took reports all the time for people that had lost or stolen medication and stuff like that.

Q    And had this happened to you previously where you would try to refill, and it would get rejected because it's too early?

A    No, sir, not that I recall.

Q    Okay.  What pharmacy did you use regularly for your Adderall?

A    Heartland is what I use now.  It was, I think, Walmart at the time maybe.

Q    Okay.  Walmart where?

A    In Cabot.

Q    Is there only one in Cabot?  I just don't know --

A    There's two.  It would be the supercenter.

Q    Okay.  Do you know what road that's on?

A    John Harden Drive or Willie Ray.

Q    Okay.  And then you said Heartland?

A    Heartland in Cabot.

Q    Also in Cabot.

A    Yes, sir.

Q    Is there only one?

A    Yes, sir.

Q    Okay.  What made you switch from one to the other?

A    Walmart, typically they wouldn't have the medication in stock whenever I tried filling it.

Q    Sure.  Did you need the medication from the time you lost it until the time it was eventually refilled?

A    No, sir.

Q    And again, it's not something you were selling your pills to anyone else; correct?

A    No, sir.

Q    And it's not something that you were binging on on vacation?

A    No, sir.

Q    And you don't believe that you were addicted to your medication?

A    No, sir.  I mean, I would stop and -- stop taking it and

be fine. So --

Q And did you report to the sheriff that you had lost your script?

A No, sir.

Q Your script -- I'm sorry. That was a poor question on my part. Did you report to the sheriff's office that you had lost what remained of your prescription bottle?

A I do not recall that.

Q Is that something that you would have been required to report?

A No, sir, I do not believe so.

Q And would you have been required to report the starting and stopping of the medication?

A I do not believe so.

Q So let's go to the night in question. You're on patrol; correct?

A Yes, sir.

Q You're the street supervisor; correct?

A Yes, sir.

Q Nathan Rice is within a few miles of you and your subordinate; correct?

A Yes, sir.

Q And I believe Deputy Ramm was also on your shift; correct?

A Correct. But from the night of the incident, I believe that, if I recall correctly, she was -- I thought she was on

her way home or up at the sheriff's office off duty.

Q    Okay.  And what's her first name again?

A    Jessica, I believe.  I don't remember.

Q    I don't feel bad forgetting it then if you worked with her too and --

A    Yeah.

Q    Okay.  So at some point in time, tell me how it is you came into contact with the vehicle that Hunter Brittain was in.

A    I was actually in route to back Deputy Ramm on her -- Deputy Rice up on a call.  I was traveling, I believe, it was Highway 89 South and topped the hill.  And I noticed that the vehicle -- the pickup truck was sitting stopped on -- I believe it was Forbus Road.

Q    Okay.

A    On Forbus Road in the west and eastbound side with also the back end of the pickup truck hanging out in the northbound lane of Highway 89.

Q    Okay.  And tell me -- what was your perceptions, conclusions, thought process at that point?

A    It was 3:00 in the morning.  That's a high crime area. Typically, we recover a lot of stolen vehicles that have been stolen from outside of the county in that area.  Very unusual for a vehicle to be just stopped in the middle of the road blocking, you know, three lanes of travel.

I noticed a lot of smoke from, I'm assuming, the direction

that they just came up.  Northbound Highway 89 there was smoke as if, you know, someone might have been burning tires or squealing tires.  It was just very unusual.

Q   So it wasn't that the vehicle was smoking.  It was you saw smoke in the area?

A   No.  The vehicle was smoking as well.

Q   Oh, the vehicle was, okay.  Did you see from where in the vehicle, on the vehicle, the smoke was coming from?

A   I could not tell.

Q   And when you say smoke, I mean, it's dark out.  But, I mean, how did you --

A   There's a street light on that corner.

Q   Okay.  And you -- I mean, a lot of smoke, little smoke?

A   I mean, I could still -- I could see the vehicle and the smoke coming from the vehicle.  So, I mean, it wasn't like it was covering up the whole truck.

Q   Was it something, you know, lingering in the air or continuing to come out of the vehicle?

A   The stuff that was coming up northbound on Highway 89, it was still lingering, but it was dis -- or dispersing.  And then the stuff in the truck, it was coming from the vehicle, if I recall correctly.

Q   Okay, and could you see who was in the vehicle or how many people were in the vehicle?

A   No, sir, I could not.

Q    And could you -- did you notice anything in particular about the vehicle other than the smoke and its positioning?

A    A white pickup truck.  As I passed by, I noticed that the reverse lights had came on.

Q    Okay.  So you pass by, I guess, perpendicularly to the roadway that it's on?

A    Yes, sir.

Q    Okay.  And so you pass by, and you see this.  And then what do you do?

A    I just got an uneasy feeling.  Like I said, you know, it was 3:00 in the morning.  We've recovered a lot of stolen vehicles.  There was a lot of drug trafficking.  I had felt maybe that the vehicle had been stolen and was damaged prior to the theft or during the theft.

So I had kind of slow-rolled by it.  But, you know, with the smoke and stuff as I was coming by it, you know, the smoke -- but from the back.  I really couldn't see a whole lot.  I just noticed that those reverse lights had came on, so I slow-rolled past them and then continued southbound on Highway 89.

Q    Now, why is it though that your thought process just went to stolen and, yeah, something happened during that?

A    Well, I mean, it was 3:00 in the morning.  We've had a lot of stolen vehicles in that area.  If I remember correctly, we had had a lot of vehicle break-ins and theft of vehicles hit there recently in that area.  And we had also just -- Deputy

Rice -- I was on my way down there to assist him on a suspicious vehicle, if I remember correctly.

Q    Wasn't the suspicious vehicle though, like, in a location that's about five miles from there?

A    I'm not sure.  I can't recall that, but I know that typically Forbus Road and -- I'm having trouble recalling the road that's adjacent to Forbus Road.  But that's a main drag to where people can get from Military Road up Kerr Station and cut through that road and get on Forbus to kind of avoid the police.

Q    Okay.  And am I correct the vehicle -- the suspicious vehicle that Rice had been dispatched to, he didn't locate anything?  He had cleared that incident; correct?

A    Yes, sir, to my knowledge.

Q    There was no description of vehicle available in that, was there.

A    I don't recall.

Q    I mean, did you have any reason to believe at that point that one was connected to the other?

A    No, sir.  But typically if you have a suspicious vehicle call and then you happen to see a vehicle 3:00 in the morning, I mean, it's something that you definitely check out.

Q    Okay.  Did you have -- did you believe at that time that you had reason to stop the vehicle right then?

A    Yes, sir.

Q    And so why didn't you?

A    I had noticed that they put it in reverse.  And with it being a stolen vehicle, I wanted -- at that time, I had kind of asked Deputy Rice to start my way, if I remember correctly.  So that way -- if the vehicle ran, they typically try to get to I-40.  If they go south and if they go north, they try to go towards Cabot.  So that way if they tried to take off or something like that, he would be ahead of them to put spikes out, or I can notify Cabot.  And I noticed them putting their reverse lights on, so I was trying to see what was going on, which way they were heading.

Q    You said, "being a stolen vehicle."  It wasn't a stolen vehicle though.

A    Correct.

Q    So -- but you were responding already as if it was.

A    No, sir.  It was just my suspicions.

Q    Okay.  And then what happens?

A    If I remember correctly, I had traveled down Highway 89.  There's a church.  I don't recall the name of the church, maybe Mount Pleasant Baptist or something like that.  And I had pulled in the first drive keeping an eye on the vehicle in my rearview and my side-view mirrors and then continued slow-rolling northbound in the parking lot to the second entrance.  I noticed the vehicle started southbound heading my direction.  So I pulled into that second entrance or pulled to get ready to

where I could pull out behind the vehicle.

Q    I see.  Did the movement of the vehicle or the occupants give you any indication that they had seen you?

A    I do not recall.  I -- our vehicles -- I was in a completely, fully marked sheriff's department pickup truck with a -- Lonoke County Sheriff's Department on the side of it with reflective lettering.  The way I would have been positioned, it would have been like this, and they would have came down past me parallel.  So I'm assuming they saw me.  As they were coming down, I had noticed that the vehicle went left of center a couple times, and it was very loud with lots of smoke.

Q    Loud and smoke, just those two items, would that be sufficient to stop them?

A    No, sir, not just those.

Q    Okay.  So what was it other than those that you believe rose to the level where you could lawfully stop the vehicle?

A    It was them obstructing the highway, being stopped in the middle of two lanes, blocking two lanes and then -- well, three lanes.

Q    Okay.  The vehicle comes by you, but you don't turn your emergency light on at that point?

A    No, sir.

Q    And what was the reasoning for that?

A    I was going to get behind the vehicle and follow the vehicle and kind of get a -- try to get a read on the vehicle

and the license plate.

Q    And did you?

A    Yes, sir.

Q    And so tell me about that.

A    Whenever I pulled out, I pulled out behind the vehicle.  I watched the vehicle pass by me.  I didn't notice any occupants or anything, how many people were in the vehicle.  I pulled in behind them, noticed that they had went left of center a couple times as well while I was trying to get the license plate.  It was real smoky.

I was able to obtain a license plate and give it to dispatch, and they had gave me the return.  I'm not sure the exact name that it returned to at the time, but I just remembered that it was -- came back to -- out of McRae, which is approximately -- I believe it's 30 miles maybe, 40 miles in different county north of where it was currently located.

Q    But again, you talked about the road it had been on as being a thoroughfare, correct, a main drag?

A    It's not necessarily a main drag.  It's a main drag for -- criminals tend to use it.

Q    And what are you basing that on?

A    Especially at night.  Because I typically think that law enforcement stick to the major roads and arteries.  And so they try to take back roads, and it is somewhat of a back road.  The road that he was -- those two roads that cross each other.

Now, Highway 89 is a main highway.

Q   And so 89 would take you to McRae or no?

A   No, sir.  Yeah.  No.  Highway 89 will take you out towards Faulkner County, and you get on Highway 5, if I remember correctly.  I mean, there's a couple of ways he could have went.  But -- or you can go -- but, no, it doesn't take you directly to McRae.

Q   But it's one of the roads you would use to access the path to get to McRae though; correct?

A   Correct.

Q   All right.  So the fact that the vehicle is registered in a location that's 30 miles from there, that's not unlawful though; correct?

A   Correct.

Q   And the fact that it's on a road on the path that would take one back towards McRae, that's also not unlawful; correct?

A   Correct.

Q   All right.  And at this point you now know that the vehicle is not stolen, or at least not reported stolen; correct?

A   Correct.

Q   All right.  Could you see how many occupants were in the vehicle at that point?

A   No, sir.

Q   And so what do you do next?

A    Well, with the vehicle being out of a totally different county, like, 30-some miles, almost 40 miles if I'm not mistaken, away, it being 3:00 in the morning in a high crime area with us having all this crime -- and it just recently happened, if I remember correctly -- it was definitely out of place and very suspicious. I had noticed the vehicle go completely left of center to the point where it was more than halfway into the opposite lane of traffic. And so I was going to initiate a traffic stop on him.

Q    Okay. And what happened next?

A    I advised -- typically in law enforcement, we tried to project an estimated safe spot that we -- that -- or any reasonable person would pull off the road, give them enough ample time to pull off the road, slow down from the speed that they're doing, pull off the road whenever we light them up.

So I had advised SO that I was going to be conducting a traffic stop on that vehicle at -- not 100 percent sure the name of the road. I believe it was Tower Loop or Yates Lane. And it was enough to where the vehicle had ample opportunity to pull over and stop. I initiated my blue lights to initiate a traffic stop, which consists of turning all the emergency lights on on the vehicle, no siren, and lighting the vehicle up.

Q    And then what happened?

A    The vehicle continued southbound in its lane of travel.

When I lit them up, they kind of stomped on the gas. And the truck got really, really loud. And then they slowed down, went left of center completely into the opposite lane of traffic. And I ultimately came to a complete stop in the northbound lane of travel as well as partially in that ditch.

Q    Okay, and then what happened?

A    As I went to exit the vehicle, they took off. He stomped on the gas and went from the ditch line, northbound lane of traffic back into his normal lane of travel.

Q    And then what happened?

A    As I was going to pick up my radio to advise SO that I had one fleeing on me, I'm not 100 percent sure exactly what happened. I think I had dropped my mic or -- where my mic was, the mic holder, it was a loose mic holder. So whenever I went to get out of the vehicle, I think I just left it sitting on the console. So whenever I went to take off, it fell on the floor or something like that. As I want to go grab my mic, he whipped into the Mahoney parking lot.

Q    And then what happened?

A    When he whipped into the Mahoney parking lot, he turned. I guess it would be west, completely turned into the parking lot. And I ultimately pulled in behind him.

Q    Okay.

MR. STEVENS:  Devon, before you ask your next question, can we take a break?  Are you good with

that?

MR. JACOB:  Yeah.

MR. STEVENS:  Okay.

(WHEREUPON, after a break was taken, the

proceedings were resumed as follows, to-wit:)

BY MR. JACOB:

Q    Sir, you've had an opportunity for a break.  Are you prepared to continue?

A    Yes.

Q    Okay.  So at the time of the traffic stop, you've already had it reported back that it's at least not reported stolen.

A    Yes, sir.

Q    Okay.  Your vehicle, how is it set up, as far as -- did it have a camera?

A    No, sir.

Q    But you guys had body cameras?

A    Yes, sir.

Q    And tell me a little bit about the body camera.  I know there was this issue about how long it could keep a charge and therefore how, you know, different officers were using it in operation.

A    Yes, sir.  If I remember correctly at the time, the battery life span for the camera or certain cameras were -- some of them would only last -- the ones that I had dealt with would typically only last about eight hours, six to eight

hours, which our shifts are 12 hours. So we never really kept them on the whole shift. We were unable to. We would turn them off, and then turn them on whenever we had a public interaction.

Q Okay. When -- I spoke to Nathan Rice. He indicated that he didn't have this issue with his camera not lasting for the full shift, but he also said he may have been issued a different model or a newer model. Are you aware at that time whether there were a different model of cameras being used by different officers in the department?

A I'm sure there was, but I'm not sure to the extent.

Q Is this something, this battery, this charge issue that was reported in writing as a complaint to anybody that you're aware of?

A I'm not sure if it was ever documented in writing. I know that they were aware of it by verbal communication and stuff like that.

Q And you said, "they were aware of it." Just so we're clear on the record, who would "they" have been?

A Well, I know that I had reported it to my supervisor. And my supervisor was aware of it, because he was also having issues with this camera.

Q And again, just so we're clear on the record, your supervisor was?

A Lieutenant Langley or -- and I also believe Sergeant

Portale.  He was after Lieutenant Langley.

Q    And were both of them having this issue with their cameras?

A    At some point in time I know that they both had.

Q    And was there any plan to remedy the issue?

A    Go back to your question before.

Q    Sure.

A    It is my knowledge that they were aware that the cameras were -- I'm not 100 percent sure.  I know that one of them for sure was having issues but not sure about the other one.

Q    Okay.  And the one that you're sure was having it was?

A    It would have been Lieutenant Langley.

Q    Langley.  And you know that because he told you this, or you observed it happen to him?

A    We had talked about the cameras being crappy.  And --

Q    Okay.  I saw that eventually, ultimately you're terminated because of the alleged failure to use the camera properly; correct?

A    Correct.

Q    Were you surprised that that was the reason for the termination?

A    What do you mean by "surprised"?

Q    Well, when you heard you're being terminated for failing to use the camera, was -- were you like, What the?  Or was --

A    Yes.  To a point, yes.  But then again, no.  Because

technically, per policy, I followed the policy. Well, immediately once I noticed that there's something -- or I thought that something -- because I did not know what -- at what point in time what it had recorded or not, because I was never able to see the actual video. I just know that at one point in time during the incident, when I went to go turn on my handheld radio to advise SO that, you know, shots had been fired, when I had looked down to turn my radio on, I noticed that my camera was blinking.

At the time, I'm not sure what color it was, been recorded. I can't recall that. But I noticed that the camera, that when it's in record mode, it's a different color than what it is in standby mode. And I had noticed that it was in standby mode. So upon my lieutenant's arrival on scene, I immediately notified him that there was a fault with the camera that had said might not have recorded the whole incident, which per our policy, that's what you're supposed to do.

Q    Okay. Now, when during that incident -- from the moment you saw the vehicle all the way through the shooting, at what point should the camera, per policy, have been turned on?

A    Typically, it's before any civilian interaction. But, you know, any civilian interaction could have been us getting out at the gas station and stuff like that. And it was our practice -- we wouldn't turn it on when we we're going to, you know, a gas station or just, you know, out mingling amongst

civilians. It's typically whenever you were arriving on a call.

And for traffic-stop-related incidents, we -- it was our practice at the time to -- whenever we would get out of the vehicle, prior to us making our approach on the vehicle, we're taught in the academy to observe the vehicle for a couple of seconds, look for any movement or anything like that that would be a threat to us and also plan our approach on the vehicle.

So whenever we would exit our vehicle, we would typically turn our camera on, allow it the five to eight seconds, whatever the boot-up time is, while we're watching the vehicle. And then -- but prior to us making our approach, we would initiate it to start recording.

Q    Okay. If I remember correctly, Nathan Rice indicated that as soon as he knew he was going to do a traffic stop, he would turn it on. Where would he have learned that?

A    That might have been something that was implemented afterwards, but typically our practice was that.

Q    And you say "our practice." Do you mean your shift?

A    No. That's the way that I was trained whenever we had the cameras, and it's the way we had always done it, to my knowledge.

Q    And when you say when you were trained, trained during FTO?

A    I don't recall exactly if we had the cameras at the time.

I know at one point we had -- I want to say they were Scorpion cameras or something. It was just a little clip-on, micro camera. And I don't even remember how we used those. But that's just the way, from my knowledge, and the way that we had always done it.

Q    Okay. But do you know whether you were trained to do it that way, or the practice just developed that way?

A    I don't recall on the training stuff, but I know that that was the practice that we typically done that. That was also so that, you know, officers took their time while approaching the vehicle and just didn't jump out and go up to the vehicle.

Q    Okay. And as you think back on the incident, do you believe that you had tried to turn it on before and that it just didn't turn on or what?

A    No, sir. During the process of me watching the vehicle, I was focusing on the vehicle and situational awareness. And ultimately, I had went to turn the camera on and started it to record or went through the motions of it as I was exiting my vehicle with a rapid-evolving situation.

Q    Okay. But you noticed after the shots fired that it wasn't recording.

A    Correct.

Q    So are you saying you did try to turn it on?

A    Yes, sir.

Q    I see. And you specifically recall that?

A    Yes, sir.

Q    Okay.  Was it -- do you know whether it was powered down completely, as in off?

A    Yes, sir.

Q    And why would it have been completely off?

A    Because we -- at the time due to the battery life and stuff like that, we would have -- leave it off.

Q    I see.  Well, if it was left off --

A    Yes, sir.

Q    -- and you tried to power it on, then how would it ever have gotten into standby mode?

A    Can you reask that question?

Q    Yeah.  I mean, if you tried to turn it on and didn't, then it would still be off when you noticed it; correct?

A    No.  From my understanding, from what I remember, whenever I -- as I was exiting the vehicle, I had flipped the switch to turn it on and then immediately double-tapped it, which flipping the switch turns it on.  Then put it in standby mode.  And then double-tapping it, if I recall correctly, would start the recording.

Q    I see, okay.  Do you know whether there was supposed to be a period of time where we need to boot up before you could then start it to record?

A    About five to eight seconds.  I'm not 100 percent sure on the exact boot-up time, but there's a delay.

Q    All right.  So you flick it on, and then you wait the five to eight seconds?

A    No, sir.  There's a rapid-evolving situation.  I didn't have the time for that.  I just -- while I was trying to turn my camera and stuff on, I was trying to deal with the incident at hand, giving verbal commands and stuff like that.

Q    Okay, so you -- your testimony is you flick it on, and then you double-tap it.  But if you double-tapped it before the five to eight seconds, didn't you know it wasn't going to do anything?

A    I'm not sure.  I had just had that camera issued to me, so I wasn't familiar with it.  I mean, I'm not sure what the boot-up process was.  I know on my old camera that's what the boot-up process was.

Q    All right.  But I guess what I'm saying though is you're telling me that you knew you needed five to eight seconds for it to boot up before you could double-tap.

A    I knew there was a delay.  Yes, sir.

Q    But you're also telling me that you also knew that you flicked it and immediately double-tapped it.

A    Yes, sir.

Q    So I guess what was the point of double-tapping if you knew it was going to have no effect?

A    I didn't know what was going to go on.

Q    But explain it to me.  Didn't know what was going to go

on?

A    I mean, it was a rapid-evolving situation.  I didn't even have time to put my vehicle in park before the subject had jumped out of the vehicle.  So in the process of me having to slam my vehicle in park, get out of my car -- I'm paying attention on him.  I wasn't focused on the camera.  I just flipped the switch and double-tapped it.  I wasn't thinking about that boot-up process or anything like that at the time.

Q    Okay.  And if you weren't thinking about it, how do you know that you flipped the switch and double-tapped right away?

A    I know I did that.

Q    And why is it that you're certain you did that?

A    Because that's our practice and our training, the way that I've always done it.  Typically, we wait until we get to the quarter panel of our vehicle and observe the vehicle on a traffic stop.  So typically whenever I go to exit my vehicle in a situation like this, I'll flip it on, double-tap it.  And, for instance, if it wasn't recording, later on I would continue double-tapping it later on just to make sure.

Q    But if you double-tapped it when it was already recording, wouldn't it shut it off, put it back in standby mode?

A    No, sir.  If I remember correctly, the model camera we had, I believe you had to hold it down for a period of time. I'm not sure the exact amount of time.  But you had to hold it down for it to stop recording.  So if you just double-tap it

and you kept double-tapping it, it wouldn't do anything.  It would just make sure that it was recording.

Q    I see.  So you call in the traffic stop out on the roadway; correct?

A    Yes, sir.

Q    And then do you recall calling in that -- the vehicle fleeing?

A    No, sir.  I told you whenever I was in the process after they took off from the initial traffic stop where they had came to a stop partially in the ditch and halfway in the opposite lane going my lane of travel, they had -- whenever we had taken off, I think I just set my mic -- I don't recall 100 percent. I had set my mic on the --

Q    Oh, that's right.

A    -- deal or whatever, and it had slid off.

Q    That's right.  I apologize.  Did you relay to anybody at that scene after the shooting that they had initially stopped partly in the ditch?

A    I'm sure I would have, but I don't recall 100 percent on explaining.  But I went in -- from what I recall, I went into detail on what -- to my lieutenant at the time what happened.

Q    I mean, do you know if anyone went down and photographed that area to see if there was a tire print from their vehicle down in the ditch area?

A    Well, back to your previous question on talked to anybody

at the incident, although I -- it wouldn't have been at the incident. I was going to say I talked to state police later on and advised them of that. I'm not sure if they sent anybody out there and took photos of that or what they did.

Q Okay. And did you say that when they had stopped, you started to get out of the vehicle? And then they started to go again?

A Yes, sir.

Q And when they started to go again, did you say that the vehicle accelerated?

A Yes, sir.

Q Rapidly?

A Yes, sir. Well, it sounded like it was rapidly accelerating.

Q Roughly -- I mean, were you able to estimate the speed that they left the stop?

A Not that I can recall right now.

Q And how far did they go between leaving the initial stop and then turning into the driveway?

A I don't recall that right now.

Q I mean, is it a mile? Is it a few feet?

A A couple-hundred yards maybe, 300 yards.

Q Okay.

A It was enough to where they got back into -- partially back into their lane of travel.

Q    Because -- I mean, have you experienced where sometimes people stop, and then they're nervous where they stop, whatever.  And they see a safer place, and so they go?  I mean, was that all they were doing, or did you --

A    Well, on typical traffic stops, people don't -- they typically, nine times out of ten, will hit our estimated stop location -- which this stop, for this stop incident, it was -- I projected they would have turned on -- I believe it's Tower Loop or Yates Lane, which was, I can't guess, maybe a quarter-mile or so from where they initially stopped.

And typically, people don't cross opposite lanes of traffic and stop partially in the opposite lane of traffic and then in the ditch.  Yes, people do all the time, typically will stop and then see that there's a safer location and pull into that location.  But never has anybody pulled, went left of center, and stopped in the opposite land of traffic and in the ditch.  That was very unusual.

Q    And if you had been operating your body camera in the same manner that Nathan Rice said was his practice, then you would have recorded all of this --

A    No, sir.

Q    -- correct?  Well, Nathan Rice again said that -- again, if I recall correctly, he would turn it on as soon as he realized he was going to be making a traffic stop.

A    He might do that now.  I'm not sure what --

Q    And he's your -- or was your subordinate presumably.  I mean, he referred to you as a mentor.

A    Yes, sir.

Q    So presumably would have learned the practice from other people on your shift.

A    Yes, sir.

Q    But you're telling me that that's not the practice that you recall using and not the practice that you recall teaching anybody?

A    No, sir.

Q    Do you know if anybody else used the same practice that Nathan did?

A    Jessica Ramm and a majority of the other deputies that worked at the sheriff's office.

Q    They used the same method as Nathan?

A    No.  They used the method that I was talking about.

Q    Okay.

A    I can't say anything about the methods now or how he does it now.  But --

Q    I'm not talking about now.  I'm talking about then.

A    Yeah.  If I remember correctly, I had just gotten an FTO and Jessica Ramm or something like that.  And matter of fact, her body camera from the incident, she had turned her body camera on right as she was exiting the vehicle, which is typically what we would do.

Payne v. Davis, et al.

92

Q Okay. So you did see her body camera, but you didn't see your video?

A No, I did see my video. But I haven't reviewed it or anything like that.

Q Okay, I'm not sure I understand. You saw it but didn't review it. What do you mean by that?

A Talking about for this deal, this interview.

Q Oh, I see. So you're saying you've seen it previously. You're saying --

A Yes.

Q -- you didn't review it for today.

A Yes.

Q I see. Fair enough. So tell me what happens next. I understand this is not the easy part. But you put the vehicle in park I think you said, and then you described it as a rapidly-evolving situation.

A Yes, sir. So after -- with all the stuff that's happened on to this point and him whip it -- he whipped into the parking lot. When he pulled into the parking lot, before I could even get my vehicle positioned behind his vehicle -- or I was positioned behind his vehicle. But properly, typically we try to do, you know, five, ten feet behind the vehicle in a safe position.

Before I could even begin to get into that positioning, the vehicle -- I had noticed the vehicle started -- or he had

jumped out from the vehicle. Mr. Brittain jumped from the vehicle with such purpose that he slipped on the gravel trying to get traction to run back towards me. I noticed that the vehicle was rolling towards me at this time. When I noticed him go to jump out of the vehicle, I had to slam my vehicle into park, open my door. As I was rolling out of the vehicle, which is getting out, stepping out of the vehicle, I had went through the motions of turning my body camera on while I'm giving him verbal commands to stay in the vehicle.

And then he didn't acknowledge a verbal command. And at this point he was adamant on getting back towards me, that I told him to return to his vehicle and never acknowledged anything that I had said. And at this point, I realized that he started to go for the bed of the truck. And once one hand went into the bed of the truck, he -- I advised him to stop. Show me your hands. Let me see your hands. When the other hand went in there and it was coming up, it was like he was coming up with a rifle. I feared for my life that I thought he was going to start shooting through the tailgate and then bring up a rifle.

And I fired one time. Whenever I went to go fire again, I noticed that his -- whatever he was getting out of the bed of the truck had went flying through the air. So at that point in time, the threat was neutralized. The threat had been stopped, so he was no longer a threat to me.

Q    Okay, let's talk about this a little bit.  So you talked about five to ten feet behind his vehicle was the preferred location.

A    Yes, sir.  Typically.

Q    So you drove up on his vehicle and then were going to back up to five to ten feet?

A    What do you -- no.  Typically -- I mean, it varies from location to location.  Typically, if we're on the road, we like to position five to ten feet behind the vehicle.  I believe I was -- at the time whenever I had to throw it in the park, I was almost 20 feet or so, if not more, behind the vehicle.  I'm not sure of the exact number before I actually had to slam it in park to get out.  But yeah, it's typically five to ten feet. And then we do certain things if we're on the road and stuff like that.

Q    Did his vehicle end up impacting your vehicle?

A    Yes, sir.

Q    And that's because the vehicle rolled, what, 20 feet?

A    Immediately, whenever he would exit from the vehicle, the vehicle started rolling back towards me.

Q    Okay.  The vehicle then rolled after you had already shot him?

A    Correct.  It continued rolling and ultimately hit the front of my vehicle.

Q    And it rolled while there was a passenger still in the

vehicle; correct?

A    Correct.

Q    And it rolled -- how far then do you think from where it initially stopped into your vehicle?

A    It would have been whatever the measurement was from the 15 to 20 feet.

Q    Okay.  So you're saying you actually hadn't closed within the --

A    No, sir.

Q    -- whatever, the five to ten feet before you put it in park?

A    Correct.

Q    And you said he jumped out with such purpose that he slipped or tripped.  What -- describe that.

A    Let me see how to put this.  I would say it almost like someone going to jump off of, like, a four-wheeler or something like that trying to flee.  And they slip on the gravel, but their leg extends all the way out, as like trying to get traction and wasn't able to get traction.

Q    Okay.  Why are you describing it as with such -- with purpose or such purpose?

A    Because at this time, I felt like he was trying to harm me at that point.  The vehicle -- I don't know why he didn't just put the vehicle in park.  I felt that he was trying to hurt me with such intent or was -- had such intent on causing me harm

that he didn't care about putting the vehicle in the park, didn't care if it rolled into me.

Q    Okay.  And that was an assumption you were making based on what you were seeing?

A    Yes, sir.  That and all the facts and all the stuff that led up to it from what happened prior to the incident.

Q    So he jumps out of the vehicle.  And tell me what that looks like, as far as -- is his door completely open?

A    Yes, sir.  Wide open.

Q    And did you see him open the door?

A    What do you mean by "see him"?

Q    Well, I mean --

A    I was from the back.  I mean, I witnessed him hop out of the vehicle.

Q    I'm sorry.  Say that again.

A    I witnessed him hop out of the vehicle.

Q    All right, but did you see the door open as he was doing it is what I'm saying?

A    Yes, sir.  When it was about midway.

Q    And what about your intercom?  Had you gotten on there to give any commands?

A    No, sir.

Q    So he jumps out how?  Is it forward?  Is it to the side?

A    To the side.

Q    And do you remember -- was it, you know, like a jump with

both legs, or was it, you know, one and then the other?

A   I don't recall all that.

Q   You didn't see anything in his hands at that time though?

A   No, sir.

Q   Did he say anything to you?

A   No, sir.

Q   Did he look at you?

A   Not that I can recall.

Q   Do you remember where he was looking?

A   Kind of -- it might have been towards me, but it was kind of towards the corner of the back bed of his truck.

Q   Okay.  He slips.  Does he fall completely on the ground?

A   No, sir.  He caught his self.

Q   And then the next motion, what's he do?  Because now he's facing -- his back is, what, to the -- to his own vehicle?

A   Back to the door of his vehicle.

Q   The back is to the door.  Okay, so he's jumping towards the back of his vehicle?  How -- would that be correct?

A   He had spun out of the vehicle, so his door was like this.  This is his truck.  This is the door.  Whenever he got out, he was like this.  And then his back was facing his door, and his front would have been towards me.

Q   I see.  And then -- and at that moment, he lands.  He's caught himself.  He lands.  Where are his hands, arms at that point in time?

A    If I remember correctly, he had to use his hands to catch himself -- one hand to catch his self from falling.  And then he's running along -- or running with or walking with the vehicle, running, walking beside the vehicle towards me.

Q    And the speed, do you remember that?

A    No, sir.  It was a roll.

Q    So --

A    He caught -- picked up speed as it was rolling.

Q    So what -- was he running or walking, or you just don't remember?

A    I don't remember for sure, but he was keeping up pace and then more so with the vehicle.

Q    And his focus, was he on you or on the vehicle -- on his vehicle?

A    He was completely facing towards me with his head kind of cocked towards the back of the truck, like, the taillight of the truck, from what I recall.  So I don't know if he was looking at me or the bed, but his head was faced at that angle.

Q    Okay.  And he hadn't been reaching on his own person for anything at that point?

A    Not that I recall.

Q    He's not yelling anything at you or saying anything at you?

A    No, sir.

Q    And at some point, he's -- I think you described it as

reaching into the bed of the truck.

A     Yes, sir.

Q     And not the backseat of the truck where the doors open but the actual bed of the truck?

A     Yes, sir.

Q     And he reaches, I think you said, with the right arm first?

A     I'm not 100 percent sure on exactly which arm.  I just know that he went in the bed of the truck.

Q     All right.  And the truck is still moving while he's in --

A     Yes, sir.

Q     -- the bed of the truck?

A     Yes, sir.

Q     Okay.  Is the truck dragging him, or is he keeping pace?

A     No.  He's keeping pace with the truck.

Q     And at some point I think you said he had both arms in the bed.

A     Yes, sir.

Q     And you couldn't see his hands though?

A     No, sir.

Q     But then you said that you were concerned he was going to shoot through the bed of the truck?

A     Yes, sir.

Q     How did you --

A     Or come up firing from the bed of the truck.

Q    How did you get to that point?  I mean, that's a -- to shoot through the bed of the truck, how did that come about?

A    Well, I mean, when we go through the academy and stuff like that and training, you know, bullets go through walls. Bullets can go through things.  And typically we are reacting to something that somebody already knows.  At this point, the vehicle is rolling back to me.  He had -- wasn't following any verbal commands, hasn't acknowledged me.

If I remember correctly, the passenger's hands had came out the window, so I know that he acknowledged my commands.  He went to go step out while I was giving verbal commands.  He got back in the vehicle or shut the door.  I'm not sure if he ever actually physically got out of the vehicle.  But he did open the door to go get out and ultimately shut the door back.

Q    Let's pause here for a minute.  Didn't that actually happen after the shooting?

A    No.  From what I recall, he had actually opened the door. As soon as Hunter's door had came open and then I started giving verbal commands -- and he had shut the door back or pulled the door back to -- and at some point his hands had came out of the vehicle.

Q    Why -- did you know that Landon Crowder, another boy, was on the property watching and at least part of it watching it unfold?

A    No.  From my understanding -- or from what I know now is

that -- if it's the right one, I know one of them was trying to get into the back window of his grandma's house or his uncle's house. And then the other one was, I want to say, 300-, 400- something yards away sweeping a shop, from my understanding.

Q   Okay, are you aware though that the trying to get in the window of his grandmother's house was after the shooting had already occurred?

A   I don't recall that right now, but I just know at some point that's what had happened.

Q   Okay. Why is it that neither Landon Crowder nor Jordan heard you give any commands?

A   I have no idea.

Q   And yet, Landon Crowder said that he heard you yell, Shots fired.

A   I do not know why he said that.

Q   Okay. And you're certain you gave commands?

A   Yes, sir.

Q   And what commands do you recall giving?

A   Well, typically in situations like this, anytime --

Q   Had this happened before?

A   No, not like this. But, like, someone getting out of the vehicle, it is our practice -- and what we are trained to do is immediately -- you try to keep them in the vehicle on a traffic stop. That's the safest place for them to be. So you try to keep them contained in their vehicle. So when someone goes to

open the door, you immediately give them a command to stay in the vehicle.

Typically, they follow that command and stay in the vehicle. In this case, he didn't. He was already mostly out of the vehicle when I told him to return -- or stay in his vehicle. And then when I told him to return to his vehicle, he was -- didn't acknowledge me or anything like that. And then by that time, his hand -- one hand or a hand went into the bed of the truck. So I started giving him show-me-your-hand commands.

In the academy, we're taught that the hands are what kill you, that if you can't see your hands, you know, that's a threat. I mean, that's considered a threat, if they're not following your commands. And he was not complying with those commands.

Q    So -- I'm sorry. I thought you were done.

A    So -- and, I mean, the hands are what kill you. It's not going to be, you know, the looks or anything like that. And that's the way that I've done any -- on any incident, any traffic stop where somebody wouldn't show me their hands, you know, they -- you know, you always ask to see the hands. And anytime someone exits a vehicle, you always ask them to return to the vehicle. So I know 100 percent that that's what I had told him and advised to him, yelling, to stay in the vehicle and then to show me his hands.

Q    And when he didn't show his hands, your fear was he was going to bring up a weapon and shoot it at you?

A    Correct.  At this point, the vehicle was already rolling backwards.  I don't know why he didn't just put it in park.  Or any reasonable person would have just put it in park and stayed in the vehicle.  Or, you know, at least if he was having issues, which I did not know at the time -- apparently he was having issues with the transmission or something -- that typically whenever there have been people that had car trouble or something like that to that effect, they stayed on the brake, didn't exit the vehicle, especially in an aggressive manner.

But, yes, that's what -- all those combined and him not following my verbal commands, I mean, that's -- anybody will sit there and tell you.  That's what they pound into us at the academy, that the hands will kill you and that -- you know, someone not being compliant and not following your commands with the vehicle rolling back towards me, I felt that he was ultimately going to kill me that morning.

Q    Okay.  And again, it's not that he was bringing his hands out.  It was the fact that he wasn't listening, and he could have brought something out to shoot me; correct?

A    The way he was coming up with his hands -- like I said, it was dark.  But with him coming up with both, alls I could see was the top portion of his body, from what I remember.  And it

was as if someone was going to bring up a rifle.

Q    As if --

A    Or --

Q    As if --

A    Yes, sir.

Q    -- someone was going to bring it up.

A    Yes, sir.

Q    So it's not that it was happening.  It was as if they -- he could have.

A    I felt that it was happening, that he was bringing up a rifle, and he was going to start shooting at me.

Q    Okay.  You said it's dark, but there's a big light out there.  I've been out there.

A    Yes, sir.

Q    So --

A    I don't recall the exact lighting conditions.  I just know that it was dark.  The way he would have been facing that, he would have been projecting a shadow on the bed of the truck. The bed of the truck is dark.  The only thing I could see were, like I said, you know, is what position -- somewhat position of his arms.

Q    And was positioned as if --

A    He was coming up with a rifle.

Q    Okay.  But he hadn't come up with a rifle.

A    Correct.

Q    And he hadn't come up yet.  It was as if he could come up with a rifle.

A    Yes, sir.

Q    All right.  And in fact, in the academy, they teach you -- because I've been through the academy.  They teach you that you don't shoot someone just because you can't see the hands; correct?

A    Correct.

Q    In fact, you don't shoot until you verify the threat; correct?

A    Not necessarily.

Q    Really?

A    We -- if there's -- the totality of everything together added up made me feel like I was threatened.

Q    Made you feel that you were threatened.  But am I correct the rules of engagement are you verify you have a threat; correct?

A    From my understanding, yes, sir.

Q    Okay.  And at that point, you had concluded that this was threatening to you.

A    Yes, sir.

Q    But you had not verified there was a threat, because it had not come up yet; correct?

A    The totality of the situation, I felt that it was a threat.

Q    Yeah.  I understand that you felt it was a threat.

A    Yes, sir.

Q    But what I'm saying is you hadn't verified it was a threat.

A    I did not see a weapon or anything like that.

Q    Okay.  And you took the shot?

A    Yes, sir.

Q    All right.  And then I think you said that whatever it was that you thought he was going to come up with, in fact, after you shot, did go flying through the air.

A    Something went flying through the air.  Like I said, I'm not 100 percent sure if that's exactly what he was going to -- through or going to get.  That's just what came up.

Q    So you don't know why this thing went flying through the air, because you don't even know if he touched it.  Is that what you're saying?

A    Well, no.  I'm assuming that he touched it, because it came -- it fell out of the back of the -- I mean, came up.

Q    Okay.  So then it was what he grabbed onto; correct?

            MR. STEVENS:  Object to form.

Q    (Mr. Jacob continuing)  Correct?

            MR. STEVENS:  Go ahead.

A    Yes.

Q    (Mr. Jacob continuing)  All right, so he grabbed something, and it flew through the air.  And at that moment you

didn't know what it was?

A    Correct.

Q    And ultimately you believed it to be an oil jug, did you not?

A    No, sir.  I didn't know at that point in time that that's what that was until after the fact whenever -- I think I might -- not 100 percent sure, but I believe I got a look at it prior to Nathan arriving or right after Nathan arrived.  I'm not 100 percent sure.

Q    So you -- it's as if he's going to come up with what you believed was going to be a weapon; correct?

A    Correct.

Q    And then you don't verify that it is a weapon; correct?

        MR. STEVENS:  Object to form.

A    Correct.

Q    (Mr. Jacob continuing)  And then you take the shot; correct?

A    Yes, sir.

Q    What happens next?  What exactly do you see happening next?

A    He fell to the ground.

Q    And did he say anything as he got hit?

A    Never said anything.

Q    And presumably though at some point you approach him?

A    Yes, sir.

Q    And what did you see?

A    Him laying there in a pool of blood and coughing.

Q    Okay.  Were his eyes open?

A    I don't recall any of that.

Q    Did it sound like he was struggling to breathe?

A    Yes, sir.

Q    I think I had heard somebody -- it may have been you at the trial.  I don't know -- but gurgling?

A    Yes, sir.

Q    Like choking?

A    Yes, sir.

Q    Any moaning?

A    I don't recall that.  I'm sure there was.

Q    Okay.  So it looked like, at least for a few moments, he was not comfortable; correct?

A    Yes, sir.

Q    In pain; correct?

A    Yes, sir.

Q    All right.  And then eventually does he stop moving?

A    No, sir.  Whenever I -- I mean, eventually, yes.  But when he was gurgling and stuff, I placed him in a recovery position. I have some medical knowledge, medical training that -- and had people in the past that had kind of, like, car -- bad car accidents and stuff like that who are basically aspirating and choking on their own blood.  So -- excuse me.

Q    Sure.  It's okay.  Take a moment.

A    Whenever I had noticed that, at some point I place him in a recovery position, which would allow any drainage, any blood draining to hopefully come out of his mouth and not go into his lungs to help him with breathing.  And whenever Nathan or the other officers that arrived on scene -- I believe I was pulled back by Nathan.  At some point he was still breathing and gurgling, but there was blood.  The blood was flowing out onto the ground instead of down into his lungs.

Q    So you did the best to help?

A    I tried to.  I mean, this is the last thing that I ever thought that I would have to do.  I mean, when I got into law enforcement, I never wanted to sit there and take anybody's life.  That's the last thing -- you don't do it for that.  You do it to help people.  That's all I've ever done is wanted to help people.  Can we take a break, please?

Q    Sure, sure.

                    (WHEREUPON, after a break was taken, the
              proceedings were resumed as follows, to-wit:)

BY MR. JACOB:

Q    Okay, sir.  You've had an opportunity for a break.  Are you prepared to continue?

A    Yes, sir.  Can I clarify something?

Q    Absolutely.

A    Your previous question you had asked -- someone had said

something about that you had stated or thought that you had stated that at the academy you are trained to wait until you see a weapon to --

Q   No.  I said verify the threat.

A   Yes, sir.

Q   Right.

A   I just make sure you didn't say that they had -- we had to physically see a weapon --

Q   No, no.

A   -- to be a threat.

Q   So you agree with me the training if to verify the threat?

A   Yes.

Q   Okay.  So going back to the point where -- the shots fired, am I correct Nathan Rice is not there when the shot is initially fired?

A   Correct.

Q   You call out shots fired; correct?

A   Yes, sir.

Q   And then Nathan is the first deputy to respond; correct?

A   Yes, sir.

Q   And then I think also -- I just blanked out on her name, the other deputy --

A   Jessica Ramm?

Q   Yes.  She also shows up but after Rice; correct?

A   Yes, I believe so.

Q   So before -- after the shot but before Nathan Rice gets there, what are you doing?

A   Trying to assess the situation and calm down, processing everything and ultimately waiting for backup.  Because at this point in time, I still don't know what's going on 100 percent other than that the threat at the time is taken care of.

Q   The perceived threat?

A   Yes, sir.

Q   At what point in time did you realize that Hunter was not coming up with a weapon?

A   I'm not sure what point in time it was that I noticed that it was a jug.  I don't recall exactly at what point in time it was.  I believe it was -- I don't recall.

Q   Okay.  Do you at least know -- was it before Nathan Rice arrived?

A   I do not know.  I do remember that.

Q   So the shots fired.  And do you reposition where you're located?

A   Yes, sir.  So initially, I knew that there was a passenger in the vehicle.  I was giving verbal commands and that he stayed in the vehicle.  So I retreated to the back of my vehicle for cover.  Like I said, I didn't know what was going on at that point.  So there was still a possibility of a threat there.  I retreated to the back of the vehicle.  The passenger was following my commands.  Anytime -- like, his hands would

get lower or something like that to where I couldn't see him. I was continuously giving verbal commands, and he was obliging to my commands.

Q    And then Nathan Rice shows up.

A    Yes, sir.

Q    What, if anything, do you say to Nathan?

A    Typically, in those situations, a major incident, working to detain everybody on the scene that is a part of the situation and hold them for investigation purposes.  So at that time, I had him -- if I recall correctly, I had told him to get the passenger out, ordered the passenger out.  And he would -- ultimately ordered the passenger out and detained him and placed him in -- I think it was his car or his pickup truck at the time.

Q    In his patrol vehicle?

A    Yes, sir, his patrol vehicle.

Q    And does he do that?

A    Yes, sir, from what I recall.

Q    And do you recall -- did you participate in having the passenger get out, or were you covering Hunter?

A    If I remember correctly, I was covering the vehicle.  It might have been from the passenger side.  I'm not 100 percent sure on that though.

Q    And do you recall -- did Nathan stay at his vehicle?  Did he come to your vehicle?

A    No.  He typically would have came up to my vehicle since my vehicle was the incident vehicle, vehicle at the incident. So he would have came up to my passenger side for cover and -- or gave him verbal commands, get out of the vehicle and walk back towards him.

Q    Okay.  Now, I heard you say he would have.  Do you recall him doing that?

A    Not 100 percent sure on that.

Q    But that is at least the procedure that he should have followed; is that fair?

A    Yes, sir, to my knowledge.

Q    Do you recall watching him as he took the passenger out?

A    I don't remember everything in detail.  But I'm assuming that I would have other than watching the vehicle and make sure there was no -- we're not sure if there was anybody else in the vehicle at the time.  So --

Q    Any other conversation between Nathan and you?

A    I'm sure there was, but I don't recall it.  I know at one point after we cleared the vehicle and stuff, you know, I was telling him we had -- we needed to render aid.  And if I recall correctly, I had made a couple of trips to the front of my vehicle, to my passenger side, to the back of my vehicle and drop my tailgate just thinking of anything that I could possibly do to save him.

But I'm sure there was conversation between me and Nathan

relating to that. And then other than him just telling me that everything is going to be okay and -- afterwards maybe it was him or Ramm that I had talked to. But I don't recall 100 percent on that right now.

Q   Okay. Am I correct, due to the potential safety issue, after the shots fired, you don't go right to Hunter?

A   Correct.

Q   You stay back. You wait for backup.

A   Yes, sir.

Q   And then you still stayed back while the passenger is secured?

A   Yes, sir.

Q   And then the vehicle is at least visually cleared for other occupants; correct?

A   Correct.

Q   And only then do -- does anybody approach the person who's on the ground; correct?

A   If I remember correctly, yes, sir.

Q   And that's because, again, you need to make sure the scene is safe before you then approach, in this case, Hunter; correct?

A   Yes, sir.

Q   All right, so then you approach Hunter. And then that's when you described the suffering that you saw him experiencing; correct?

A    Yes, sir.  The suffering that you explained, the gurgling and stuff like that.

Q    Okay.  So there's been a period of time then that has already lapsed while presumably Hunter is suffering there before you even approach and find him suffering; correct?

A    Yes, sir.

Q    All right, do you see him moving at all?

A    Yes, sir.

Q    And tell me a little bit about that.

A    If I remember correctly, he was -- he flopped over from -- I believe it would have been his back to his stomach or vice versa.

Q    Okay, and that's before you approached?

A    Yes, sir, if I remember.

Q    And can you hear the moaning from where you are, or is it not until you get up to him that you hear it?

A    I'm not sure if I heard any moaning, but I know I had heard gurgling and stuff like that.

Q    But it at least was clear to you that he was in pain at that time?

A    Yes, sir.

Q    Okay.  Did you see any facial expressions of his?

A    No, sir, not from where I was at.

Q    Did his condition change as you're up with him?

A    When you talk about facial expressions, back to that

question.  While I was standing at my vehicle waiting for the scene to be -- you know, us take care of the passenger and then us clear the vehicle for safety, officer safety, after that incident, I did notice his face and stuff like that.  But I don't recall any facial expressions or anything like that other than the hearing the noises and stuff like that.  As for this question, could you ask it one more time?

Q     Well, let me just follow up on what you just said.

A     Sorry.

Q     So how was it that you knew that he's in pain at that time?

A     The sounds that he was making and the gurgling and then obviously, clearly the blood puddle and stuff like that.

Q     So it was clear from what you were seeing and hearing that Hunter Brittain was appreciating the fact that he was in pain, at least for that period of time?

A     Say it again.  That I could what?

Q     From what you were observing and hearing, it was clear to you that Hunter Brittain was basically appreciating that he's feeling pain at that period of time?

A     I don't know if that's worded right.  You say he appreciating?

Q     No.  Meaning that he was experiencing pain.

A     Oh, yes, sir.  He was.

MR. OWENS:  Object to form.

Q     (Mr. Jacob continuing)  Okay.  So was there anything that could be done to alleviate his pain, do you think?

A     Not in my capabilities at the time.

Q     Did -- was there any communication between Nathan and yourself to Hunter to try to soothe him and calm him?

A     I don't remember anything that I can recall right now.

Q     Did it seem like Hunter's pain was alleviated when you maneuvered him in different ways?

A     The gurgling had stopped and the blood.  Like I said, the flow of the blood was coming from his mouth onto the ground.

Q     And he seemed to at least be a little bit more comfortable when he was on his side?

A     Able to breathe a little bit better, yes, sir.

Q     Okay.  Stopped struggling?

A     I don't know if he stopped struggling.  But, I mean, it helped.

Q     Okay.  And so then -- so now it's Nathan and you with Hunter.  What do you do -- I think you described the turning him on his side.  But anything else medically that you do?

A     Go back prior to Nathan arriving.

Q     Sure.  Sorry.

A     I'm -- I immediately requested an ambulance and, you know, first aid to come to the scene.  So I had done that.  And then after the vehicle was cleared, I put him in a recovery position.  Like I had said, to answer this question, I was just

trying to think of anything that I could do to try to help him. So I was going back and forth to my vehicle thinking -- because I typically keep a medical kit in the back and a small first aid kit in the front. But there was nothing that I could do other than lay him in a recovery position to help his breathing. You can't put a tourniquet or anything like that on where the gunshot was.

Q     And where -- were you able to see where the gunshot was?

A     No, sir, not at the time. Due to his clothing and stuff like that, I just see the blood.

Q     And where did you see the blood on him?

A     If I recall correctly, it was on his neck and on the ground.

Q     And on his neck, the right side?

A     If I remember correctly.

Q     And then on the ground, do you remember how much?

A     No, sir, I don't.

Q     I mean, I think you had described it as a puddle. Was it, you know, bigger than a basketball or --

A     No, sir. I mean, it was a small puddle, if I remember correctly.

Q     Okay.

A     Now, later on I think I didn't -- or I can't even say that. Because I'm not sure if I went back up there afterwards.

Q     Could you see him bleeding, or you just saw blood?

A    Just saw his blood.

Q    Did you see any other wounds on him?

A    No, sir, not to my knowledge.

Q    And then you talked about the recovering position.  You talked about Nathan being up there with him.  Did you guys do anything else medically with him?

A    I don't recall anything.  I know that -- I believe it was one of the Cabot police officers that were on scene.  One of the Cabot police officers that came on the scene had eventually flipped him over on his back.  And then ultimately he had stopped breathing.  And I can't remember who performed CPR or at what point in time that was.  But once it was noticed that he wasn't breathing, they started CPR.

Q    Okay.  Did you participate in the CPR?

A    I don't recall anything.  I can't recall that.

Q    Do you know if Nathan participated in the CPR?

A    I don't recall that either.

Q    And do you recall when in these events occurring that you then went away from Hunter back towards the vehicle where Jordan was?

A    No, sir.  I'm not -- I just know that I think it was Rice that came over and pulled me away and told me to sit down and calm down.  I mean, it's a stressful situation.

Q    Sure, sure.  But by then there's other people tending to Hunter?

A    Yes, sir, if I remember correctly.

Q    Do you know anything about a helicopter transport?

A    I remember me telling Nathan that, if I correctly -- if I remember correctly, telling Nathan to go ahead and launch an air evac, or I advised SO to launch air evac.  I'm not sure if he was stable enough for air evac.  So I'm not sure if he's transported by ambulance or by helicopter.

Q    Okay.  When he left the scene with medical personnel, do you know -- was he stable at that point?

A    I did not believe so.

Q    Do you know if he had a pulse at that point?

A    I don't recall.

Q    Okay.  So if I asked you about his medical condition, you don't know anything at that point?

A    No, sir, I don't.

Q    And did you see them remove Hunter from the scene?

A    I'm not sure if I physically, visibly saw him.  But I know, you know, I saw the ambulance pull away.  So I know that they removed him from the scene, but I'm not sure if I actually witnessed it or not.

Q    Sure.  And so what happens next?  So Hunter is leaving the scene.  Who then talks to you first, other than -- we've covered Nathan; right?  Is there anything else that you said or he said to you?

A    Not that I can recall.  I know he was just consoling me

and telling me it was going to be okay. And then at some point in time I had talked to Jessica Ramm, or she had talked to me and was consoling me.

Q   Do you remember what the conversation was with Jessica?

A   No, sir, I do not.

Q   And then who else do you speak with there that you recall?

A   Upon -- I believe it was -- I sat in the patrol vehicle. I want to say it was Jessica Ramm, Deputy Ramm's patrol vehicle. I sat in her front passenger seat. And it was either the sheriff or the lieutenant that had came -- got on scene and came up and talked to me at that point in time. That's whenever I asked him if it was all right for me to turn off my body camera, and he said yes.

Q   And do you recall who that was, or you're just not sure?

A   It was either Lieutenant Langley -- I'm pretty sure it was Lieutenant Langley.

Q   When is the first time you recall seeing the sheriff at the scene?

A   Oh. I don't recall. I know he was there and showed up at some point in time. And he came up, consoled me and stuff like that. But I'm not sure what time that he had showed up.

Q   Do you remember if it was light or dark out?

A   I'm pretty sure it's still dark.

Q   And did you have any interaction with Jordan King after he's secured?

A    If I remember correctly, I think I was -- someone was -- I was going to go sit in someone's patrol car.  I believe it was Nathan Rice's patrol car.  And -- someone's patrol car.  And I was getting in the front passenger seat, and I had noticed that someone was in the back.  I'm not sure who it was at the time or anything like that.  But once I had noticed that there was somebody in the back, that's when we went and got in the other patrol car.

Q    I see.

A    To the best of my knowledge.

Q    So it may have been Jordan, and so you went to a different vehicle?

A    Yes, sir.

Q    But you can't say with certainty it was Jordan?

A    Yes, sir.

Q    You knew Jordan was handcuffed; correct?

A    If that was the passenger, yes, sir.

Q    No.  I mean just in general at the scene, you -- oh, I see what you're saying.  Yeah.  I'll represent to you that Jordan was the passenger.  Sorry.  And you knew that that he had been handcuffed?

A    Yes, sir.

Q    Okay.  Did you ever ask about his well being?

A    I believe so, not for -- not, like, after the incident or anything like that.  I knew he was okay from the way that he

walked back and didn't have any injuries or anything like that. But, yeah. I had asked how everybody was doing later on.

Q But, I mean, more so when the shooting happens, you're the highest-ranking supervisor. You instruct Nathan Rice to take the passenger into custody. He's in custody. Do you then communicate as the highest-ranking supervisor to the next supervisor, hey, we took one in custody?

A Yes, sir.

Q And who do you communicate that to?

A If I recall, Lieutenant Langley. He would have been my supervisor.

Q Did he ever ask you, Why is he in custody?

A I don't recall that. But I also -- if I remember correctly, we had advised SO that we had one detained.

Q Okay. When you advised that you had one detained to the supervisor though, did you indicate that he's in handcuffs still?

A I don't recall. But typically when we detain folks, that means that they're in handcuffs.

Q And do you recall if anyone asked you, Does he need to remain in handcuffs?

A No, nobody asked me anything like that.

Q Did anyone ask you, Is he detained because he engaged in criminal conduct?

A I'm not 100 percent sure on any of it. But if I recall

correctly, I did advise him that he was detained for investigative purposes. Because typically our policy at the time, anytime somebody, like I had explained earlier, was involved in a major incident, they -- you detain everybody who's involved or a possible witness. So that way they can be questioned later on by CID.

Q    And so, just to be clear then, since you said detained means handcuffs, or at least there's an understanding that it means handcuffs, is it your testimony that the policy of the Lonoke County Sheriff's Office was even witnesses would be handcuffed if the scene was significant?

A    To my knowledge.

Q    So there didn't necessarily have to be probable cause that they were engaged in criminal conduct in order to be handcuffed?

A    I have not -- I'm not 100 percent sure on the policy, but that was typically the practice that --

Q    So regardless of --

A    -- I --

Q    I'm sorry. Go ahead.

A    Sorry. Not necessarily detained, like, with handcuffs on or anything like that. But they're not allowed to go until they speak to CID.

Q    I guess I asked a different way. Was Jordan left in handcuffs pursuant to Lonoke's policy?

A    No.  At that time, whenever he was placed in handcuffs, we still didn't know the total -- I still didn't know the totality of the situation that was going on.  So he was detained for our safety.  So that way, we can finish clearing the vehicle and make sure there was no other persons in the vehicle and ultimately taking care of whatever threat that was there.

Q    Right.  And I'm not taking issue with the initial handcuffing.

A    Yes, sir.

Q    My question is once the -- once it's determined that this wasn't -- that Hunter and Jordan weren't engaged in criminal conduct, was he still in handcuffs though after that pursuant to Lonoke's policy?

A    I'm not sure on that.  I'm not sure at what point in time he was taken out of handcuffs or anything like that.  I was placed in a vehicle and sat in a vehicle.  And once I got out of Jessica Ramm's vehicle, the lieutenant took me to his, and I sat in his vehicle.

Q    Was it your understanding though that Lonoke's policy did not require that handcuffs be removed from Jordan once it was determined that there was no criminal conduct involved?

A    Ask the question one more time.  I'm sorry.

Q    Was it your understanding that Lonoke County's policy did not require that the handcuffs that had been applied be removed once it was determined that there was no criminal conduct?

A    Correct.  Not to my knowledge.

Q    Okay.  And had the policy said handcuffs need to come off at that point, either you would have taken them off, or you would have directed or told somebody, hey, he needs to come out of handcuffs; correct?

A    Yes, sir.

Q    So I think you said you talked to the lieutenant. Eventually the sheriff you believe you spoke to as well; is that correct?

A    Yes, sir.

Q    But the nature -- the full nature of the conversation is you don't recall as you sit here?

A    No, sir.

Q    Except for that you believe it was the lieutenant who gave you permission to turn off the body camera?

A    Yes, sir.  I remember that.

Q    Okay.  And then at some point does somebody switch out your weapon?

A    Yes, sir.

Q    Do you remember who that was?

A    No, sir, I don't remember.

Q    But they don't take your weapon; correct?  Well, they take the one that was involved in the shooting, but they do allow you to remain armed; correct?

A    Yes, sir.

Q    And then are you transported to the police department, or do you go there yourself?  Sheriff's office.  I'm sorry.

A    No.  They -- I stayed in the lieutenant's vehicle.  And later on while I was sitting there or whatever I had contacted PBA.  And then --

Q    And just -- I'm sorry.  For the record, PBA is?

A    Police -- an official advocate, or I believe that's what it is.

Q    Okay.

A    If I recall correctly, I had spoke to a state trooper on scene, one of the special investigators or whatever.  And he had told the sheriff -- or told somebody to take me home and that they would set up an interview at a later date.  So I think it was Sergeant Portale at the time that transported me to the house.

Q    Okay.  So was it an actual more informal interview, and then you're sent home and then scheduled for a formal interview?

A    I'm not 100 percent sure on what -- if I gave an interview or anything like that on scene to state police or anything like that.  I gave a rundown of the incident to the lieutenant, if I remember correctly.  It wasn't full depth in detail.  But I don't recall giving one to state police.  That's just what they had told me to do, and I tried to oblige.

Q    And before you leave the scene, has anybody given you

Miranda warnings or Garrity warnings?

A    Not that I recall or anything like that.

Q    Did you feel that you were free to leave before you gave either of these statements or any of these statements at the scene?

A    No.  I ultimately knew that I was going to be there and do whatever they needed me to do, and I was going to do as I was told.  So --

Q    Okay.  Did you feel compelled to provide any statements at any point in time?

A    No, sir, not that I recall.  I know that at the time, I had contacted PBA.  They had an attorney get with me, and he had said to --

MR. NEWCOMB:  Object to --

Q    (Mr. Jacob continuing)  Yeah.  Don't say anything that the attorney said.  Yeah.

MR. JACOB:  Same time.  Don't say anything.

MR. NEWCOMB:  That was pretty quick, simultaneous.

MR. JACOB:  Yeah, I don't know anything the attorney told you.

Same team on that one.

Q    (Mr. Jacob continuing)  Okay, so --

A    If I -- if they would have asked me for a statement or whatever, I would have complied with whatever.

Q    I see, okay.  Yeah.  I'm going to switch gears a little bit.  I'm going to show you some -- if I can get to it.  I'm going to show you some documents that were previously marked at a deposition of the sheriff.  I'm not going to be attaching these, because they have already been verified.  But I'm going to ask you if you've seen them, if you know what they are.  And the first one is Exhibit Number 3.  Do you know what that is?

A    If I remember correctly, the policy and procedure for chain of command at the time.

Q    And is that a document you recall seeing?

A    Yes, sir.  I'm not 100 percent sure if it was this exact document.  But, yes, I remember seeing something to this extent.

Q    And was that the hierarchy that was in place in '21 when this incident occurred, to the best of your knowledge?

A    Yes, sir.

Q    Okay.  I'm going to show you document marked Exhibit Number 4.  Do you know what that is?

A    Yes, sir.  It looks like the mission statements that I used.  I don't remember it being that small.  But, yes, sir.  I think I remember seeing -- I'm not 100 percent sure on the exact -- everything in detail.  But I remember seeing something to this effect.

Q    Okay.  Now, when you say that small, do you mean the typeface, or do you mean the length of the writing?

A    Probably the typeface.  I want to say it was on, like, two different pages or something.

Q    I see, okay.

A    But I'm not 100 percent sure on that.

Q    Okay.  Let me show you a document marked Exhibit Number 5. Do you know what that is?

A    Code of ethics.

Q    Okay.  And do you recall seeing that before?

A    Yes, sir, I believe so.  Like I said, I'm not sure if it's this exact document.  But if I remember correctly, yes, sir. It's an ethics deal, but I think it was on a different page with something else.

Q    And is it your belief that the code of ethics governed your job at the time?

A    Yes, sir.

Q    Do you recall ever seeing a job description for your position?

A    If I did, it would have been a long time ago.  I think there was something written in the policy that kind of just broke it down.  But I don't remember it word for word or exactly what it was.

Q    Okay.  Let me show you a document marked Exhibit Number 6. Do you know what that is?

A    Psychological examination.  Yes, sir.

Q    It's a policy; correct?

A    Yes, sir.

Q    And the policy at the county?

A    Yes, sir, to my knowledge.

Q    And do you believe that that also governed your employment when you were there?

A    Yes, sir.

Q    Okay.  Do you recall having a psychological and physical examination pursuant to becoming employed?

A    Yes, sir.

Q    And then -- I'm sorry.

A    I don't recall one prior to becoming employed as a detention officer.  But once I got promoted to transport, since I was required to carry a firearm and stuff like that, they required me to do so.

Q    Okay.  And then how about when you switched over to patrol?  Do you know if you had another?

A    I do not recall.  I might have, but I'm not 100 percent sure on that.

Q    And then I think you've already mentioned that there was that incident, the Oklahoma incident, which did lead to another type of evaluation.

A    Yes, sir.

Q    Okay.  Any other psychological evaluations?

A    Not that I'm aware of or that I can recall.

Q    Fair enough.  I'll show you a document marked Exhibit

Number 7.  Do you know what that is?

A    Sworn officer's drug testing.

Q    And is that a county policy that was in effect in '21 when you were employed?

A    Yes, sir, I believe so.

Q    Okay.  And the Oklahoma incident, was that self-reported by you, or was that reported by the Oklahoma Police Department?

A    If I remember correctly, it was reported by the police department or the hospital.

Q    Okay.

A    I'm not 100 percent sure on it if they contacted the Oklahoma City Police Department and then the city police department contacted my agency or what.

Q    Okay.  And the reason it would have been reported by them and not you initially?

A    Immediately -- well, I mean, once I had went to the hospital and done the intake and told them what was going on and stuff and surrendered my firearm to the security guard, I don't really recall a whole bunch after that.  They took me to the back and sedated me or something to that effect.  And --

Q    Okay.  And then did you contact your employment, or did your employment contact you about the incident?

A    If I remember correctly, I would contacted them.

Q    And so you reported it basically the first opportunity you're medically able to?

A    Yes, sir.

Q    All right.  Show you a document marked Exhibit Number 8.
Do you know what that is?

A    Intoxicant nonprescription drugs.

Q    And is that a policy that governed your employment at the
time?

A    Yes, sir, to my knowledge, or something to that effect.

Q    Okay.  Well, do you want to take a look at it and see if
there are any terms in there that you do not recall being in
effect?

A    I don't remember the policy physically.  So, I mean, that
could have been something different.  But I'm not 100 percent
sure.

Q    Okay.  With respect to that then -- one second here.
Would you look at under prescribed drugs.  One through four, do
you recall -- even if you don't recall that specific policy, do
you recall those being policy items that were in effect?

A    Yes, sir.

Q    Okay.  And same thing with subsection two, or I should say
Roman numeral two.

          MR. STEVENS:  Do you know if this was part of
     it, the physician care?

          MR. JACOB:  Yeah.  And the A through D under
     there.

A    I'm not 100 percent sure on these right here.  From my

understanding, what I remember about the policy, it was to just notify the supervisor. I didn't know anything about a letter or anything like that, to my knowledge.

Q Okay, and what -- just since you said, "these right here," you're talking about Roman numeral two and then A through D; correct?

A Yes, sir.

Q Okay.

A From what I recall.

Q Okay. But, in fact, as you testified, you did notify your supervisor that you were taking Adderall; correct?

A Yes, sir. They were aware of that.

Q And then after that, there was no procedure put in place by the sheriff to monitor your continual taking of that medication; correct?

A No, sir, not that I'm aware of.

Q Show you a document marked Exhibit Number 9. Is this the county policy that was in effect during your employment?

A Yes, sir. It looks like it.

Q And what policy is that?

A The training and training requirements.

Q Okay. And that basically is governing the -- or explaining the mandatory training that is required for the position?

A Yes, sir, I believe so.

Q    Okay.  And then also, I believe it also talks about the ability to obtain additional training; correct?  I think this is the one.  Yes.

A    Okay.  Yes, sir.

Q    Other than the mandatory training, did you request or receive additional training that was specialized in a particular area?

A    From what I recall, I know that there was a few times that I had requested to go to certain training, especially whenever I was a canine handler and a few other classes that -- but due to manpower and stuff like that, we were denied to go to those.

Q    Okay.  Was there ever a time when there wasn't enough funding to even provide the mandatory training?

A    Not that I recall.  But I know that there was a deal with funding and something about training.  But I don't recall all the details on it.

Q    Okay.  Showing you a document marked Exhibit Number 10.  Do you know that is?

A    Fire time -- or firearms training and qualifications.

Q    And was that a county policy in effect during your employment?

A    Yes, sir.  There was one.

Q    Your firearm, would you qualify with it?

A    Yes, sir.  We qualified once a year.

Q    And the firearm that was used in the shooting, was that

owned by you or owned by the county?

A     Owned by the county.

Q     So was it a firearm that was issued to you?

A     Yes, sir.

Q     And the type of rounds that you were using in that gun, were those issued to you by the county?

A     Yes, sir.

Q     So standard?

A     From what I recall, yes, sir.

Q     Standard issue?

A     Yes, sir.

Q     Do you recall what -- the type of rounds you were using?

A     .45.  I'm not sure the brand of the ammunition or anything like that.

Q     Were they modified in any way or --

A     I know they were hollow-points.

Q     Okay.  All right, show you a document marked Exhibit Number 11.  Do you know what that is?

A     The use of force.

Q     The use of force policy from the county that was in effect during your employment?

A     I recognize this one.  I'm not sure about this one right here.  For some reason, I'm thinking that the -- it looks familiar.  It's just I think there are more pages or something. I'd have to -- I don't have my policy and stuff, but I have the

policies on the thumb drive that I had at the time --

Q    Okay.

A    -- at my house.  So --

Q    And that's something you can produce then in litigation if your counsel agrees to do so?

A    Yes, sir.  I believe so.

Q    And just so we're clear, because you said I recognize that but not this.  I'm just going to put that on the record here. The one that you -- am I correct the subject control supplement is the document you're not sure if you recall seeing?

A    I remember this part but not the chemical agent use or anything below that.  I remembered this -- that other form that we used for, like, TASER and stuff like that.

Q    Okay, so to explain further then on the record, you recall the top part of the subject control supplement up to the chemical agent use?

A    Yes, sir.  Let me clarify.

Q    Sure.

A    From my understanding, this was -- the only one that I've ever actually filled out was this part here.  I don't --

            MR. NEWCOMB:  Michael, describe.  You're

        pointing at it.  We're reading.  So maybe describe

        what you're pointing at.

A    The use of force -- or use of force, TASER, and supplement report on this.  I remember filling this out for when people

were tased and stuff like that.  But I do not recognize this one.  This I recognize from some sort of format, but I want to say that these were combined together.  But I'm not 100 percent sure on that.

Q   (Mr. Jacob continuing)  Okay.  And as far as the one that you're saying you did not recognize, at least not in this format, it's this -- what's it called?

A   Chemical agent use?

Q   The chemical agent use.  But you do recall in some format the subject control supplement?

A   Yes, sir.

Q   Okay.

A   I'm not sure if they were just -- if they just printed it on the same page or what.  But this looks kind of a little bit different from the one I normally do.  But --

Q   Okay, fair enough.  When do you recall being required to use the use-of-force report and that TASER supplement report?

A   I couldn't describe an incident that I can recall right now.

Q   Show you document marked Exhibit Number 12.  Do you know what that is?

A   Use of deadly force -- or use of force, non-deadly.  Sorry.

Q   Non-deadly force, okay.

A   Yes, sir.  Non-deadly.

Q   And that's the county policy in effect during your employment or at least in 2021?

A   Yes, sir.  Other than like I said, you know, it kind of looks smaller, different from the one I'm used to seeing. So --

Q   Okay.  I'll show you a document marked Exhibit Number 13. Do you know what that is?

A   Yes, sir.  Response to resistance.

Q   And it's a policy that was in effect in 2021?

A   Like I said, other than it looking different -- without me having my stuff to go over or anything like that, I can't say 100 percent sure.  But, I mean, there was a policy like this, to my knowledge.

Q   Okay.  And within this document, if you flip back a page I think it is -- or maybe one more page.  I apologize.  The second page.  Am I correct under C on page two it talks about deadly force; correct?

A   Yes, sir.

Q   Are you aware of any other deadly force policy that was in effect in 2021, or is that the only deadly force policy statement that you recall?

A   No.  If I remember correctly, there was actually a deadly force policy that was where it said up here, deadly force.

Q   Okay, and do -- you believe though that that was in effect in '21?

A    I'm not 100 percent sure on that.

Q    Okay.

A    But I knew that it had its own subchapter under the policy, if I remember correctly.

Q    Okay.  Show you document marked Exhibit Number 14.  Do you know what that is?

A    Body-worn camera, recording equipment.

Q    Okay.  And is that the policy that ultimately led to your termination?

A    Ultimately, it is the policy.  But like I said, you know, I'm not 100 percent sure on if it's exact, word for word, from what I had at the time.

Q    Okay.

A    But we did have a body-worn policy.

Q    I'll show you a document marked Exhibit Number 15.  Do you know what that is?

A    Patrol functions.

Q    That a county policy that was in effect in '21?

A    Yes, sir.  We had one in effect.  I guess I don't -- I can't be for sure if it's the exact same policy.

Q    Sure.

A    But, I mean, it seems like it has the stuff that was in the policy.

Q    I'll show you a document marked Exhibit Number 16.  Do you know what that is?

A    Yes, sir.

Q    And what is that?

A    Enforcement of traffic.

Q    And is that a county policy that was in effect in 2021?

A    Yes, sir.  Other than -- well, I can't confirm 100 percent word for word without my deal.

Q    Okay.  Show you a document marked Exhibit Number 17.  Do you know what that is?

A    Juvenile procedures.

Q    And was that a policy in effect in 2021?

A    Yes, sir, to the best of my knowledge.

Q    Show you a document marked Exhibit Number 18.  Do you know that is?

A    Arrest procedures.

Q    And was that a policy in effect in 2021?

A    Yes, sir, to my -- best of my knowledge.

Q    Show you a document marked Exhibit Number 19.  Do you know what that is?

A    Offense incident, report-writing procedures.

Q    And was that a policy in effect in '21?

A    Yes, sir, to the best of my knowledge.

Q    If you take a moment with that policy, is there anything that exempts deadly-force incidents from the report-writing requirements in the policy?

A    I do not recall any of those in the one that I had.  If

you would like me to read through all this, I mean, I can.

Q    Well, yeah.  I mean, if you'd like to.

A    But typically, no.  There was -- I mean, any report -- there should have been a report and stuff done on it.

Q    Okay.  And so you would agree with me that the policy in effect in '21 was that it doesn't matter who ultimately is investigating the incident; the fact is whoever's involved in the incident is required by policy to prepare the proper paperwork?

A    Yes, sir, to the best of my knowledge.

Q    Okay.  If I told you that that didn't happen in this case, would that surprise you?

A    For some reason, I was thinking that there was a report.  But I did not do any physical report or anything like that.

Q    Okay.  Show you a document marked Exhibit Number 20.  Have you seen that document?

A    Personnel conference memo.

Q    And was that a policy in effect in '21?

A    Yes, sir, to the best of my knowledge.

Q    Would you agree with me if an officer is involved in the use of force, that officer should be preparing a written report pursuant to Lonoke County policy?

MR. NEWCOMB:  Objection as to the form of the question.

A    Yes, sir.

Q    (Mr. Jacob continuing)  Can you think of any reason why, in this case, you were not asked to prepare a written report?

A    I have no idea, sir.

Q    Show you a document marked Exhibit Number 21.  Is that a document that you're familiar with?

A    Investigation, internal affairs.

Q    And is that a policy that was in effect in '21?

A    Yes, sir, to the best of my knowledge.

Q    Now, would you agree with me that any deadly-force incident, there should be an internal affairs investigation?

A    Yes, sir.

Q    And would you agree with me that when an incident is investigated through internal affairs, the complete incident should be investigated?

A    Yes, sir.

Q    Okay.  Would you agree with me that just because an incident is not recorded does not mean that an investigation cannot occur?

A    Yes, sir.

Q    So, for instance, take this incident for example.  The fact that the actual shooting was not captured on video does not mean that the incident cannot be investigated?

A    Correct.

Q    Would you agree with me that the scope of a criminal investigation is not focused on whether the department's

policies are violated but rather whether criminal statutes were violated?

A   Yes, sir.

Q   And would you agree with me that an internal investigation is focused on whether training and policies are violated and could result in a referral for a criminal investigation?

A   Possibly.  Yes, sir.

Q   Okay.

A   Can we take a break?

Q   Yes.  Sure.

(WHEREUPON, after a break was taken, the proceedings were resumed as follows, to-wit:)

BY MR. JACOB:

Q   Okay, sir.  You got an opportunity for a break.

A   Yes, sir.

Q   Ready to continue?

A   Yes, sir.

Q   Switching gears a little bit before we finish this up, what is your understanding about what the legal standard is as far as what's lawful force?

A   What do you mean by "understanding"?

Q   Right.  Do you have an understanding?

A   We have a use-of-force continuum.

Q   Okay, tell me a little bit about that.

A   It's basically one step above what they're doing.  So you

have officer presence, verbal commands, and then hands-on or strong force, hand-on compliance.  Then there's a use of nonlethal weapons like impact weapons, TASERs, pepper spray, stuff like that.  And then there's deadly force.

Q    And am I correct though, there's no rule that you have to start and go through every level?

A    Correct.

Q    You can start at whatever level is appropriate --

A    For the situation.

Q    -- for the situation?

A    Yes, sir.

Q    Okay.  What did you carry on your duty belt?

A    It would have been a TASER, a mag pouch with two magazines, a baton, two pairs of handcuffs, a glove pouch, my TASER, and then my duty weapon, if I remember correctly.

Q    And then how about in the vehicle itself?  Any additional weapons?

A    Yes, sir.  I carried a personal rifle that I qualified with at the sheriff's office and then a shotgun, a county-issued shotgun.

Q    Okay.  Did you -- I didn't hear it.  Did you say you carried an ASP too, like, a baton?

A    Yes, sir.

Q    Okay.  Would you agree with me that a law enforcement officer is only allowed to use objectively reasonable force?

A    Yes, sir.

Q    And so you're not allowed to use any more force than is reasonably necessary?

A    Yes, sir.

Q    Would you agree with me that in this case, as it turned out, there was excessive force?

MR. OWENS:  Object to form.

MR. NEWCOMB:  I'm sorry.  Could you repeat that? I couldn't hear you.

MR. JACOB:  Sure.  I said would he agree with me that in case, there ended up being excessive force?

MR. OWENS:  Object to form.

MR. NEWCOMB:  Objection as to form of the question.

A    No, sir, I would not.

Q    (Mr. Jacob continuing)  Okay.

A    I would not agree with you.

Q    Okay.  Show you a document marked Exhibit Number 23.  Do you know what that is?

A    Policy offenses and disciplinary action.

Q    And was that a policy in effect in '21 when you are employed?

A    Yes, sir, to the best of my knowledge.

Q    I'll show you document marked Exhibit Number 25.  Have you seen that?

A    I remember seeing some of this but not, like, all of this in complete detail.  That is, I believe, the initial report that we got from their internals deal.  It was only a couple of pages.  It wasn't a complete -- it hadn't been finalized at the time.

Q    Okay.  And when you say, "we got" --

A    I received a copy of it and provided it to my attorney.

Q    I see.  So --

A    Or the sheriff's office provided it to my attorney.

Q    Is it your belief then -- do these first two pages appear to be what you've seen?

A    Yes, sir.

Q    Okay.  Have you had an opportunity to read through the -- that document?  I mean, obviously that's a copy of it, but have you read through it?

A    I did.  I don't remember all that's in it.  But, yes, I did.  The documents were provided for me.

Q    Okay.  Were you surprised to see that the investigation essentially stopped after it was determined that the shooting wasn't recorded?

A    No, sir.  I didn't know the investigation was stopped after it was --

Q    So this document, it says that -- in the conclusion it says that I personally spoke with Sergeant Davis regarding his refusal to use his body-worn camera.  On 10-2-17, I gave a

notice of reprimand to Sergeant Davis, then Deputy Davis, in violation of Policy 14-8 of the sheriff's office policy. I wrote that several emails had been sent out regarding the use of the body-worn cameras and their importance of such. I also wrote that I had spoken with Lieutenant Langley, then Sergeant Langley, on more than one occasion regarding the same issue.

Recommendation, after looking at all the facts and information received, it is my belief that once again Sergeant Davis refused to follow policy. I firmly believe that Sergeant Davis had plenty of time to activate his camera before this incident occurred but failed to do so. As stated above, had he at least powered the camera up, it would have captured the entire incident. After consideration of all the facts, it is my recommendation that Sergeant Davis be terminated from the Lonoke County Sheriff's Office.

And as you know, you were ultimately terminated for the body camera violation; correct?

A    Yes, sir.

Q    This report doesn't discuss anything about the shooting. It just merely discusses the support for termination pursuant to the body camera violation.

A    Yes, sir, it does.

Q    And yet, this was the internal affairs investigation into the shooting. Are you surprised that there's no discussion about whether there was any policy violations or whether there

was any deficiencies in policies or training that led to the shooting?

A    I was -- from my understanding, there was a full investigation done.  And ultimately this is what I was terminated for, was for violating the policy.

Q    I spoke to the sheriff under oath.  And what he said was that the state police were asked to do the criminal investigation and that they, being Lonoke County, was doing an internal affairs investigation as to policies and training issues, determined that the body camera was not activated.  And because it wasn't activated, terminated your employment, and that there was, I believe as he said, no reason to investigate the matter further.

A    Okay.  I wasn't aware of anything.  That would be between him and y'all.

Q    Does that surprise you though that there was no further investigation into the actual -- or that the internal affairs investigation didn't cover the actual shooting and whether there could be training deficiencies or policy deficiencies that could have been corrected to better the department?

A    No.  I mean, it doesn't surprise me.  I know in the past that officers -- anytime that there's been an officer-involved shooting, they do just make sure that you know that certain policies are followed, and that's it.  I'm not sure how much of -- I mean, I'm not sure about all of the links of internal

Q Okay. I'm telling you the sheriff has admitted that they haven't --

A Well --

Q -- that the internal affairs investigation, as it relates to policies and training, ended once it was determined that there was no recording of the incident.

A Oh. Yeah. I mean, I guess that would surprise me.

Q And what I noticed was too that the investigation relied on a 2017, when you weren't even a sergeant yet, notice of reprimand; correct?

A That's the only time that I've actually been written up. And if I remember correctly, it was -- I believe it was shortly after we had gotten the cameras. So, I mean, they had sent out a general advisory. It wasn't just me, and it wasn't just me going out of my way not to record incidents. It was all of us trying to get used to having to turn the cameras on and basically build up that repetition of turning them on and doing that.

Q Right. So they have a 2017 notice of reprimand, and then they've attached a 2017 email where they're basically reminding everyone to use the cameras.

A Yes, sir. I remember those emails.

Q A 2018 email again reminding everyone to use the cameras,

a 2020 email attaching the new policy, and then there's a -- interestingly a undated memo that says that the first week of June of '21 that you were spoken to in regards to using your body camera and reminded that your shift needs to use it. But that just happens to coincide with the same month of the incident.

A    Yes, sir.

Q    And then that is also used to support your termination.

A    Yes, sir.

Q    To me, it seems like the body camera termination reason was a good way to not have to investigate the underlying shooting and for the sheriff to be able to easily terminate your employment. Did you have any conclusions about that?

A    I mean, I knew that I was terminated under, you know, false termination. Because I know I was writ-up (sic) one time for the body cameras. But as for the reasoning or anything behind it, I can't speculate or begin to say if it was just a reason not to do any investigation on the issue. I thought that from my -- I thought it was a complete investigation.

Q    Do you think that there was maybe some concern on the sheriff's part that this whole medication issue, the failure to -- his failure to monitor your mental health and the medication during your employment, that some of that may have come back to haunt him if the investigation continued?

            MR. OWENS: Object to form.

A     I don't know.  I can't speculate that or say that.

Q     (Mr. Jacob continuing)  I noticed then -- this was my error when I attached it apparently before.  Right.  I attached three pages to the exhibit that didn't really belong.  So I'm just going to put that on the record right now.  Apparently, I attached the general liability, claims-made protection summary to the tech page.  So I apologize for that.  It didn't belong on the internal affairs investigation.

I also -- I'm going to separately mark these two actually. I'm going to continue with my numbering though.  We were up to 26 -- or 27 and 28.  Showing you a document marked Exhibit Number 27.  Do you know what that is?

A     A notice of employment termination to Aaron Humes.

(WHEREUPON, Exhibit 27 was marked for identification and is attached hereto.)

Q     Okay.  Had you heard about that incident?

A     Yes, sir.

Q     And what was that -- is this the -- I'm sorry.  Let me make sure I'm giving you the right document here.  What can you tell me about this incident?

A     From what -- I'm not sure if goes into detail.  But if I remember correctly, it was in relation to shooting a dog.  He didn't have his body camera on.  Not 100 percent sure on the exact details.  But from my recollection, it was -- he responded to a -- I want to say it was a dog-abuse call or

animal neglect and -- about a dog tied up on a run outside and it being cold and raining or snowing or something like that.

And during the time he tried to undo the dog from the tree or wherever it was tied up, because it didn't have access to move on the run properly -- and run under the trailer to get shelter from the rain. And whenever he was trying to do that -- the dog also had happened to be a vicious dog that we had served dog warrants on. And I can't remember if he had unattached it or just got it free. And then the dog came up to bite him, and he ultimately shot the dog.

Q   Okay. And am I correct that in here it doesn't explain the reason for the termination other than the loss of confidence in the employee; correct?

A   Yes, sir, according to that document.

Q   Okay. And yet, it's been represented to me that the main reason was for not activating his body camera.

A   Correct.

Q   Show you a document marked Exhibit Number 28. Do you know what that is?

A   Yes, sir.

Q   And what is that?

A   That is my notice of termination.

Q   And in that document it does reference the body camera; correct?

A   Yes, sir.

(WHEREUPON, Exhibit 28 was marked for identification and is attached hereto.)

Q   It doesn't talk about a loss of confidence for you shooting Hunter Brittain; correct?

A   No, sir.

Q   Just give me one minute here.  Did the cars have computers in them?

A   No.  Like, the mounted computers that we can do our reports and stuff on?

Q   Correct.

A   No, sir.

Q   One second here.  Did the cars have some sort of, like, text messaging capability between cars?

A   No, sir.

Q   Did you guys take a computer with you in the car when you went?

A   There were some times that I'd have my personal laptop, and I could do E-crash reports on it, just the crash reports. And that's the only thing.

Q   Okay.  Did you ever use any communication software in your computer related to your employment?

A   No, sir.

Q   Hang on a second here.  I apologize.  You had work email?

A   Yes, sir.

Q   And you had access to work email even while you were on

administrative leave; correct?

A    To my knowledge, I'm not sure exactly the extent of how long I had it.  But I know at some point in time it was terminated, and I wasn't able to get on it.

Q    And did you use your work email for personal stuff as well?

A    No, sir, not that I recall.

Q    Did you use personal email for work stuff?

A    No, sir, not that I recall.

Q    Did you ever search your work email for anything relating to this incident?

A    Maybe.  I'm not 100 percent sure if it was.  It was -- it might have been for like policies and stuff I think I had searched.

Q    Do you remember if you -- when you searched your email whether you were searching the various folders, such as your inbox, your sent box --

A    No, sir.

Q    -- delete box?

A    It was just a general search.

Q    And explain how that general search was conducted.

A    Just searching for policy.

Q    Okay.  Related to this incident?

A    No.  Well, I mean, I was searching it from this incident, but it was more so once I was terminated to find the policies

and -- I can't for sure say if it was that email. It was --
might have been on that jump drive.

Q    Okay.  So you believe you have documents related to your
employment on the jump drive?

A    It's the jump drive that they issued us from the county.

Q    And do you know what else, other than policies, would be
on that document?

A    I believe that was it.

Q    Or on that drive.  I'm sorry.  That would be it?

A    Yes, sir.

Q    Do you any other files in your home or anywhere else
related to your employment?

A    What do you mean by "files"?

Q    Any documents related to your employment that are in your
personal possession right now or frankly your lawyers'
possession.

A    Yes.

Q    What type?

A    Just the policy and stuff like that.

Q    Well, the stuff like that is what I'm interested in.
What's the stuff?

A    It's just the policies.  And I know I provided them copies
of the policies that we had at the time, copies of the internal
affairs report, and my termination letter that I had received.

Q    Anything else, you think?

A     Not that I'm aware of.

Q     Had you received a copy of the trial transcript from the criminal trial?

A     Yes, sir.

Q     So you have that in your possession?

A     Here I do.  Yes, sir.

Q     You have it actually here?

A     Yes, sir.

Q     Okay.  And it's of the testimony that was provided during the trial?

A     It's not the full transcript or anything like that.  It's just a copy of just my portion.

Q     I see.  So it's of your testimony?

A     Yes, sir.

Q     Okay.

            MR. JACOB:  I'm going to ask that that be produced.

            MR. NEWCOMB:  Just for the record, I -- the transcript of the trials of public record are available at the supreme court clerk's office that you can check out.

            MR. JACOB:  It was filed there or --

            MR. NEWCOMB:  Yes.

            MR. JACOB:  Oh, okay.  Fair enough.

Q     (Mr. Jacob continuing)  I just want to go through just

some quick background information.  I think we'll be done.
Your full legal name is?

A    Michael Christian Davis.

Q    Junior, senior, III?

A    No, sir.

Q    What city were you born in?

A    Oklahoma City.

Q    And what states have you resided in?

A    To my knowledge, it's just been Texas.  That was when I was a young kid.  And then here.

Q    Texas and Arkansas?

A    Yes, sir.  I was having to think of it, because I know we make a lot of trips back and forth to Oklahoma to visit my family.

Q    Understood, understood.  Have you read the federal complaint in this matter?

A    Not completely in detail.

Q    Anything that you saw in there from your memory that you feel is factually incorrect?

            MR. NEWCOMB:  Objection as to the form of the question.

A    Not that I recall.  I -- like I said, I haven't sat down, actually physically read the whole thing.

Q    (Mr. Jacob continuing)  Other than the body-worn-camera policy that you allegedly violated, are you aware of any other

policies that you may have violated during the incident in question?

A    No, sir.  I wouldn't even really say that I violated that policy.

Q    That's why I said allegedly.

A    Yes, sir.

Q    Same question with respect to training.  Are you aware of any training that you may have violated during the underlying incident?

A    No, sir, not that I'm aware of.

Q    You were ultimately convicted.  The conviction was upheld for what crime?

A    I think it was negligent homicide.

Q    And I'm going to assume you don't agree with the conviction?

A    Correct.

Q    Were you ever provided with any training, other than in the academy, on how to assess or verify perceived threats?

A    Not that I can remember.  I know at one point in time I believe they came to -- someone had came to the sheriff's office and put on a MILO simulator or some type of new training equipment or something like that.  But I can't say if I was a part of that or not.  I think, if I remember correctly, I happened to be working or was out of town on vacation or something like that.

Q   Do you recall receiving training?  I know it was pretty vague.  I'm trying to think.  When did you start in law enforcement?

A   2011 is when I became a detention officer, I believe.

Q   So it was -- I think it was still pretty big around then, like, the street survival courses.  Have you heard of that?

A   Yes, sir.

Q   Was that ever provided to you?

A   Yes, sir.  That -- I believe it was on -- at the academy they taught that.

Q   And am I correct the basis of that training is that every incident should be perceived as a potential deadly incident?

A   Yes, sir.

Q   Are you aware that now departments are backing off of that type of training, because it's discovered that it was making people a little too aggressive?

A   No, sir.  I'm not -- I haven't kept up to date on anything since my termination or --

Q   Have you heard of training referred to as "killology"?

A   Yes, sir.

Q   And --

A   Lieutenant Grossman?

Q   Yeah.

A   Yes, sir.

Q   Have you taken that training or received that training?

A    No, sir.  I have watched quite a few of his videos and stuff like that and the full deal on killology.  And -- but I've not actually been physically into one of his scenarios -- or seminars.

Q    Understood.  So you've reviewed some of the training materials but haven't formally taken a class?

A    Yes, sir.

Q    And was that -- were those materials made available to you through Lonoke County?

A    No, sir.  I think it was a YouTube video or something like that.

Q    But those types of videos and material, that was circulated through the department; correct?

A    Someone had -- I'm sure someone had showed it and referred me to it or something to that point.

Q    I mean, it was common knowledge.  I'm just trying to think of the time frame when you were a policeman.  That -- I mean, that type of material was regularly shared among officers?

A    Oh, yes, sir.

Q    And it was, in fact, very popular training; correct?

A    Yes, sir, from my understanding.  I know I had recommended it to some of the people that I was working side to side with and then some of the people that I had trained.

Q    Did the sheriff ever send people to that type of training?

A    Not that I recall.  But I don't know other than what I

requested training-wise.  I know I was never sent to it, but I never requested to go to it.

Q    I see.  But is that the type of training that could have been requested at the department?

A    I'm assuming so.

Q    Meaning the sheriff never said, We're not going to participate in street survivor or killology, that type of training; correct?

A    Yes, sir.

Q    Did you ever hear the sheriff talk about that type of training?

A    Not that I remember.

Q    Or how about any of the supervisors talk about that type of training?

A    I know that me and, like, my supervisors and stuff, we had talked -- were talking back and forth about it.

Q    And --

A    I don't remember what exactly we had talked about on it. But, you know, that's how I was referred the video and stuff like that.  But I don't remember who had done it.

Q    Okay.  But it wasn't anything that was not permitted in the department?

A    No, sir, not that I recall.

Q    And at least at the supervisory level, you know that there was discussion about the benefit of that type of training?

A    Can you reask the question?

Q    Yeah.  At least at the supervisory level -- because you said you weren't sure about the sheriff.

A    Uh-huh.

Q    But at the supervisory level, there was discussion about the benefit of that type of training?

A    I'm not sure if it was about the benefit.  Like I said, I'm not sure exactly what type of discussions we had.  But I know that -- like, it was typically something to -- along the lines of, like, hey, this material could be beneficial.  And watch it.

Q    Okay.  And was it ever suggested to you by any supervisor that you watch it?

A    Like I had said, someone had suggested it to me.  But I'm not -- I don't recall who.  I know we all pretty much watched it.  But --

Q    Okay.  At times you guys -- I'm assuming there were some down times you guys watched it at the county?

A    I remember at one point in time that the sheriff was trying to implement a briefing that you were talking about, trying to have -- to where we all come together and kind of when we had down time do somewhat of some training together.  And I believe that was one of the videos that we might have watched, but I can't be for sure.

Q    Okay.  And do you remember, was -- just because we talked

about it, too.  Was it the killology or the street survival that you think was the video?

A    I'm not sure.  I know it was something along the lines of both of those.  But --

Q    Okay.  Have you heard of Bulletproof Warrior?

A    The bulletproof mindset.

Q    Warrior Spirit, Warrior Cop?

A    Not any of those particular.  But I think there was something I watched.  It was the bulletproof mindset --

Q    Okay.

A    -- something like that.

Q    And was -- did you guys practice -- I know sometimes on night shift we would practice, like, role play scenarios.

A    Yes, sir.

Q    Did you guys do that there?

A    Yes, sir.  Especially whenever we were FTO.

Q    Okay.  And so were some of these street survival, killology-type tactics and mindset -- was that implemented into the FTO program?

A    Some of it was.

Q    Okay.  And that was to keep yourself safe; right?

A    Yes, sir.

Q    To get in the frame of mind that you could be killed at any time; correct?

A    Yes, sir.

Q   On the -- after the shooting, were you taken -- I just don't know.  I just don't remember.  Were you taken for a blood test?

A   I don't recall.  I think state police had done something.  But --

Q   Okay.  Anything in your system at that time?

A   No, sir, not that I recall.

Q   And do you know -- I know you -- I don't want to belabor the point.  But the Adderall, were you -- according to the doctor, were you supposed to be on it at that time and just not on it?

A   No, sir.  From my understanding, it was that I can take it when I needed to focus on things and not take it when I didn't.

Q   Okay.

A   To my knowledge.

Q   Okay.  Hang on just a second.  I knew you said that you were, you know, really trying to care for your subordinate officers, checking in with them, seeing how they were doing.  Was anyone doing that with you though?

A   They were.  I mean, we would call and check and see how each other were doing.  And --

Q   "They" being the subordinates?

A   Yes, sir.

Q   But how are your supervisors?

A   The lieutenant would occasionally, like, after we had a

stressful situation.  But it wasn't, like, on a day-to-day basis or anything like that.  I know we had talked for a little bit.  I'm not 100 percent sure.  But I remember something at one point in time, the lieutenant -- it might have been having to cover for shortage or something like that.  But the lieutenant was having to work over and would stay out until 7:00 or something.  And we were just talking BS with each other.  But, I mean, ultimately it wasn't just a, hey, you know how you doing?  It was just, What's up?  What's going on?  So --

Q    But there was never -- it sounds like you were -- you're pretty regular with your subordinates, checking on them --

A    Yes, sir.

Q    -- that that was a conscious action on your part?

A    Yes, sir.

Q    A way of supervising your subordinates.

A    Yes, sir.

Q    You understood that their mental well-being was part of supervision.

A    Yes, sir.

Q    And -- but you don't recall that being done with you?

A    No, sir.

Q    Okay.

         MR. JACOB:  I have no further questions.

         I don't know if you have any.

MR. NEWCOMB:  Don't have any.

MR. STEVENS:  Yeah, I don't have any.

(WHEREUPON, the proceedings were concluded in the matter at 4:49 p.m. on February 28, 2024.)

(WITNESS EXCUSED)

168

C E R T I F I C A T E

STATE OF ARKANSAS     )

                      )ss

COUNTY OF POPE        )


     I, AMANDA R. BROWN, Certified Court Reporter #741 and Notary Public, do hereby certify that the facts stated by me in the caption on the foregoing proceedings are true; and that the foregoing proceedings were reported verbatim through the use of the voice-writing method and thereafter transcribed by me or under my direct supervision to the best of my ability, taken at the time and place set out on the caption hereto.


     I FURTHER CERTIFY that I am not a relative or employee of any attorney or employed by the parties hereto, nor financially interested or otherwise, in the outcome of this action, and that I have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect impartiality, that requires me to relinquish control of an original deposition transcript or copies of the transcript before it is certified and delivered to the custodial attorney, or that requires me to provide any service not made available to all parties to the action.

C E R T I F I C A T E

(Continued)

I FURTHER CERTIFY that I am not knowingly identified on a preferred provider list, whether written or oral, for any litigant, insurance company, or third-party administrator involved in this matter.  This transcript is prepared at request of Counsel for the Plaintiffs; and all fees are billed directly to Counsel for the Plaintiffs and Defendants in compliance with Arkansas Board of Court Reporter Examiners Regulations Section 19.

WITNESS MY HAND AND SEAL this 14th day of March, 2024.


_____

AMANDA R. BROWN, CCR

Certified Court Reporter #741

My Commission Expires:  6-21-29

ARKANSAS DIAMOND COURT REPORTING - 501.319.4807

SCHEDULING@ARKDIAMONDCR.COM

ERRATA SHEET

Page        Line        Change:

                        To:

                        Reason:

Page        Line        Change:

                        To:

                        Reason:

Page        Line        Change:

                        To:

                        Reason:

Page        Line        Change:

                        To:

                        Reason:

Page        Line        Change:

                        To:

                        Reason:

Page        Line        Change:

                        To:

                        Reason:

Page        Line        Change:

                        To:

                        Reason:

_____   _____ Page _____ of _____

            WITNESS                    DATE

MICHAEL C. DAVIS

SIGNATURE PAGE

I, MICHAEL C. DAVIS, do hereby certify that I have read the foregoing 167 pages of typewritten transcript of my testimony, after necessary translation, given under oath on the 28th day of February, 2024, and that the said transcript and corrections, if any, that appear on the attached errata sheet(s), are true and correct to the best of my memory and belief.  Further, that I have signed my name to this signature page and authorize that the same be attached to the original transcript.

_____          _____

DATE                                              WITNESS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

STATE OF _____ )

COUNTY OF _____)

SUBSCRIBED AND SWORN to before me, a Notary Public in and for the aforesaid county and state on this the \_\_\_\_\_ day of _____, 2024.

_____

NOTARY PUBLIC

MY COMMISSION EXPIRES:

_____

| A | | | | |
|---|---|---|---|---|
| **Aaron** 152:13 | 127:16 143:21 | 123:14,15 | 106:25 120:5,5 | 25:21 |
| **ability** 23:11 | 149:17,18 | **advising** 61:18 | 120:6 | **anxiety** 19:3 |
| 135:2 168:11 | **adamant** 93:11 | **advisory** 150:16 | **al** 1:7,11 | 32:11,20,23 |
| **able** 5:20 34:20 | **ADD** 19:7 | **advocate** 127:7 | **alcohol** 55:5 | 35:3,4 41:4 |
| 36:1 40:16 | **added** 105:14 | **affairs** 62:4,6,9 | 65:12 | 46:4,5,7,10 |
| 47:20 48:18 | **Adderall** 20:4,7 | 143:6,10,13 | **allegation** 45:1 | **anxious** 35:20,21 |
| 57:11 66:6 | 20:18,20 24:15 | 148:23 149:9 | **allegations** 43:10 | 52:24 |
| 75:11 82:5 | 25:5,5 29:22,24 | 149:17 150:6 | **alleged** 81:17 | **anybody** 46:19 |
| 89:15 95:19 | 37:10 38:21 | 152:8 156:24 | **allegedly** 158:25 | 80:13 88:16,25 |
| 117:13 118:8 | 39:1 53:20 | **affect** 168:19 | 159:5 | 89:3 90:15 91:9 |
| 132:25 151:12 | 54:17 57:2 58:8 | **affidavit** 14:17 | **alleviate** 117:2 | 91:11 103:14 |
| 155:4 | 58:10 64:18 | **aforesaid** 171:19 | **alleviated** 117:7 | 113:15 114:16 |
| **above-** 4:3 | 66:21 134:11 | **afternoon** 17:6,7 | **allot** 14:12 | 127:25 |
| **Absolutely** | 165:9 | 53:24 55:15 | **allow** 12:18 45:4 | **anybody's** |
| 109:24 | **addicted** 54:17 | 56:14 | 83:10 109:3 | 109:13 |
| **abusive** 18:16,18 | 67:23 | **age** 19:23 20:15 | 126:23 | **anytime** 21:13 |
| **academy** 8:5 | **addition** 25:1 | **agency** 132:13 | **allowed** 32:10,12 | 31:7 35:14 |
| 10:19 11:17,19 | **additional** 135:2 | **agent** 137:11,16 | 124:22 145:25 | 65:22 101:19 |
| 12:5,6,9 65:2 | 135:6 145:16 | 138:8,9 | 146:2 | 102:22 111:25 |
| 83:6 100:3 | **ADHD** 19:5,6,11 | **aggressive** | **allowing** 34:3 | 124:3 149:22 |
| 102:11 103:16 | 19:15,20 21:6 | 103:11 160:16 | **alls** 33:20 34:22 | **apologize** 88:16 |
| 105:4,5 110:2 | 21:16 23:16 | **ago** 130:18 | 103:24 | 139:15 152:7 |
| 159:18 160:9 | 32:11 34:15,19 | **agree** 33:18 38:9 | **alter** 30:11 | 154:23 |
| **accelerated** | 46:6 | 44:16 45:2 | **AMANDA** 168:6 | **apparently** 27:21 |
| 89:10 | **adjacent** 72:7 | 110:11 142:5 | 169:15 | 63:4 103:7 |
| **accelerating** | **administrative** | 142:20 143:9 | **Ambien** 25:11 | 152:3,5 |
| 89:14 | 15:15 31:15 | 143:12,16,24 | **ambulance** 48:24 | **appear** 147:10 |
| **access** 76:8 153:4 | 58:19,21,22 | 144:4 145:24 | 49:1 51:11,14 | 171:6 |
| 154:25 | 155:1 | 146:5,10,17 | 117:22 120:7 | **APPEARANC...** |
| **accidents** 108:24 | **administrator** | 159:14 | 120:18 | 3:4 |
| **acknowledge** | 169:6 | **agreed** 27:21 | **ammunition** | **application** 20:24 |
| 93:10 102:7 | **admission** 42:22 | **agreement** 41:19 | 136:13 | 21:2,4 |
| **acknowledged** | **admissions** 44:3 | 41:21 42:11,17 | **amount** 43:24 | **applied** 125:24 |
| 93:12 100:8,10 | **admitted** 40:3 | 42:21 43:5,7,9 | 44:1 87:24 | **appointments** |
| **act** 8:18 | 42:25 44:12 | 43:12 44:7,20 | **ample** 77:14,19 | 61:1 |
| **acting** 8:11,13,17 | 150:3 | **agrees** 137:5 | **angle** 98:18 | **appreciate** 41:21 |
| **action** 146:20 | **adopted** 8:9 | **Ah** 11:10 | **animal** 153:1 | 49:17,25 |
| 166:14 168:16 | **adult** 25:6 | **ahead** 35:9 73:8 | **answer** 5:20 6:16 | **appreciating** |
| 168:18,23 | **adulthood** 21:24 | 106:22 120:4 | 7:1,7,12 42:5 | 116:15,19,22 |
| **activate** 148:10 | **advise** 78:11 82:7 | 124:20 | 49:22 117:25 | **approach** 83:5,8 |
| **activated** 149:10 | 124:1 | **ahold** 46:19 55:4 | **answers** 4:2 6:12 | 83:12 107:24 |
| 149:11 | **advised** 30:8,9 | **aid** 113:20 | 6:19 | 114:16,20,23 |
| **activating** 153:16 | 31:3,8 77:11,16 | 117:23 118:4 | **antianxiety** 25:23 | 115:5 |
| **actual** 82:5 99:4 | 89:3 93:15 | **air** 70:17 93:23 | **anticipate** 6:14 | **approached** |
| | 102:24 120:5 | 106:10,11,15 | **antidepressants** | 115:13 |

approaching 84:10
appropriate 28:4 36:16 145:8
approved 61:22
approving 37:5
approximately 11:8 26:25 75:15
area 10:11 16:23 69:20,22 70:5 71:23,25 77:4 88:23,24 135:7
arguments 27:16
Arkansas 1:2,20 1:22 2:12,17,24 3:24 4:6 11:1 24:4 158:11 168:2 169:10 169:24
arm 99:6,8
armed 126:24
arms 97:24 99:16 104:21
arrest 14:17 141:14
arrival 82:14
arrived 107:8 109:6 111:15
arriving 83:1 107:8 117:20
arteries 75:23
asked 14:5 28:13 28:16 33:10,13 64:6 73:4 109:25 120:13 121:12 123:2 123:20,22 124:24 128:24 143:2 149:7
asking 42:15,16 42:17,20 43:21
ASP 145:22
aspirating 108:24

assess 111:3 159:18
assist 72:1
associated 29:18
assume 6:1 27:22 159:14
assuming 10:1 20:17 23:15 28:5 47:10 52:21 55:23 57:6 63:8 65:15 69:25 74:9 106:17 113:13 150:1 162:5 163:17
assumption 63:8 96:3
attached 150:22 152:3,3,6,15 154:2 171:6,9
attaching 129:4 151:1
attention 87:6
attorney 2:15 128:12,16,21 147:7,9 168:15 168:22
attorneys 7:10 168:17
audible 6:18
aunt 40:23 41:5 46:23 53:9,11
authorize 171:9
available 72:15 157:20 161:8 168:23
Avenue 4:6
avoid 72:9
aware 36:9 46:22 50:7 62:5 63:17 80:8,14,16,18 80:21 81:8 101:5 131:24 134:12,16 139:19 149:14

157:1 158:25 159:7,10 160:14
awareness 84:16

**B**

B 3:12
back 14:5 30:7 35:14 42:7,13 47:3,13 49:10 51:14 54:3 58:9 58:17,18 61:19 61:20 63:6 69:9 69:16 71:17 75:14,24,24 76:16 78:9 79:11 81:6 84:12 87:21 88:25 89:24,25 93:3,11 94:5,20 96:13 97:11,15 97:16,17,18,21 98:16 100:7,12 100:14,19,20 101:2 103:18 106:18 109:7 110:13 111:21 111:24 113:5 113:22 114:8 114:10 115:11 115:25 117:20 118:2,3,24 119:10,19 122:5,7 123:1 132:20 139:14 151:23 158:13 162:16
background 158:1
backing 160:14
backseat 99:3
backup 111:4 114:8
backwards 103:4
bad 15:24 41:4

69:4 108:23
bag 65:15
bags 65:13
Baptist 73:20
barricade 46:17
based 96:3
basically 12:16 14:9 15:11 39:8 44:24 55:21 61:25 108:24 116:19 132:24 134:22 144:25 150:19,22
basing 75:21
basis 22:15 25:14 160:11 166:2
basketball 118:19
baton 145:14,22
battery 79:23 80:12 85:6
bawl 64:14
becoming 131:8 131:11
bed 93:14,15,22 97:11 98:18 99:1,4,9,12,17 99:22,25 100:2 102:8 104:18 104:19
BEHALF 2:2,8 2:19
behavior 38:2 41:1,3
behavioral 51:4
belabor 165:8
belief 31:4 34:2 130:13 147:10 148:8 171:8
believe 9:4 10:7 10:21 11:22 12:25 17:4,14 19:8,10,12 20:3 20:16 21:25 22:3 23:14 27:1

28:16 29:20,23 39:18 40:19 47:1,22 48:1,3 48:12 64:25 65:2 67:23 68:11,14,23,24 69:3,10,12 72:18,23 74:15 75:15 77:18 80:25 84:13 87:23 90:8 94:9 107:7 109:6 110:25 111:13 115:11 119:7 120:10 121:7 122:2,24 126:8 126:14 127:7 130:9 131:4 132:5 134:25 135:1 137:6 139:24 147:2 148:9 149:12 150:14 156:3,8 159:20 160:4,9 163:23
believed 27:17 61:25 107:3,11
bell 24:9
belong 152:4,7
belt 145:12
beneficial 163:10
benefit 162:25 163:6,7
best 6:12 8:18 109:10 122:10 129:15 141:11 141:16,21 142:10,19 143:8 146:23 168:11 171:7
better 6:6 20:4 117:13 149:20
big 9:8 48:17 104:12 160:5
bigger 16:9

| | | | | |
|---|---|---|---|---|
| 118:19 | **born** 158:6 | **burning** 70:2 | **CAMPBELL** | **causing** 30:12 |
| **billed** 169:8 | **bottle** 68:7 | **busted** 65:13 | 2:10 | 95:25 |
| **binging** 67:20 | **bounced** 12:14 | **butt** 16:18 | **canine** 17:4 | **cautioned** 5:5 |
| **bit** 12:11 17:19 | **box** 2:5,16,23 | | 135:10 | **CCR** 169:15 |
| 26:9 34:12 | 13:16 15:10,12 | **C** | **CANTRELL** | **center** 9:13,21,23 |
| 45:18 52:23 | 155:17,19 | **C** 1:11,15 2:1,8 | 2:11 | 9:24 10:13 |
| 59:3 65:9 79:18 | **boy** 100:22 | 3:6 4:1,2 5:1,3 | **capabilities** | 74:10 75:8 77:7 |
| 94:1 115:9 | **brain** 34:19 | 139:16 168:1,1 | 117:3 | 78:3 90:16 |
| 117:11,13 | **brake** 103:11 | 169:1,1 170:25 | **capability** 154:13 | **CENTRAL** 1:3 |
| 129:2 138:14 | **brand** 136:13 | 171:2 | **capacity** 8:12,17 | **certain** 12:17 |
| 144:18,24 | **break** 6:24 7:2 | **Cabot** 22:2 24:3 | 10:5 | 16:18 17:2 |
| 166:3 | 23:4 45:9,11,14 | 66:25 67:1,6,7 | **captain** 13:8,8 | 45:19,20 79:23 |
| **bite** 153:10 | 78:25 79:4,7 | 73:7,9 119:8,9 | **caption** 168:8,12 | 87:12 94:14 |
| **blanked** 110:21 | 109:16,18,21 | **call** 14:8 15:14 | **captured** 143:21 | 101:16 135:9 |
| **bleeding** 118:25 | 144:9,11,14 | 35:21,22 38:5 | 148:12 | 149:23 |
| **blinking** 82:9 | **break-ins** 71:24 | 65:23 69:10 | **car** 15:24 16:5 | **certainty** 122:14 |
| **blocking** 69:24 | **breathe** 108:5 | 72:21 83:2 88:3 | 87:5 103:9 | **CERTIFICATE** |
| 74:18 | 117:13 | 110:17 152:25 | 108:23,23 | 3:9 |
| **blood** 108:2,25 | **breathing** 109:5 | 165:20 | 112:13 122:2,3 | **certification** |
| 109:3,8,8 | 109:7 118:6 | **called** 51:9 138:7 | 122:3,8 154:15 | 10:16,16 |
| 116:13 117:9 | 119:11,13 | **calling** 9:14 88:6 | **care** 14:13 22:2 | **certifications** |
| 117:10 118:10 | **briefing** 13:24 | **calm** 37:16 111:3 | 44:1 96:1,2 | 10:23,25 |
| 118:11,25 | 14:9 163:20 | 117:5 119:23 | 111:6 116:2 | **certified** 12:9 |
| 119:1 165:2 | **briefings** 13:21 | **camera** 79:14,18 | 125:6 133:22 | 168:6,21 |
| **blue** 77:20 | 14:7 | 79:23 80:6,22 | 165:17 | 169:16 |
| **Board** 169:10 | **bring** 93:19 | 81:17,24 82:9 | **career** 9:8 | **certify** 168:7,14 |
| **body** 79:16,18 | 103:2 104:1,6 | 82:11,15,20 | **careful** 43:8,12 | 169:4 171:2 |
| 90:18 91:23,23 | **bringing** 43:15 | 83:10 84:3,17 | **carried** 145:18 | **chain** 15:8 129:9 |
| 92:1 93:8 | 103:20 104:10 | 86:5,11,13 87:6 | 145:22 | **chance** 50:14 |
| 103:25 121:13 | **Brittain** 1:7 5:16 | 87:22 90:18 | **carry** 17:13 | **change** 115:24 |
| 126:15 148:17 | 69:8 93:1 | 91:23,24 92:1 | 131:13 145:12 | 170:2,5,8,11,14 |
| 148:21 149:10 | 116:15,19 | 93:8 121:13 | **carrying** 38:14 | 170:17,20 |
| 151:4,10,16 | 154:4 | 126:15 140:7 | 65:14 | **changed** 17:2,2 |
| 152:23 153:16 | **broke** 130:20 | 147:25 148:10 | **cars** 154:6,12,13 | **changes** 13:18 |
| 153:23 | **brought** 33:3,15 | 148:12,17,21 | **case** 13:17 14:19 | **charge** 11:11 |
| **body-worn** 140:7 | 103:22 | 149:10 151:4 | 14:20 42:21 | 79:19 80:12 |
| 140:14 147:25 | **BROWN** 168:6 | 151:10 152:23 | 43:10 102:4 | **check** 15:17 16:1 |
| 148:4 | 169:15 | 153:16,23 | 114:20 142:11 | 31:21 38:16 |
| **body-worn-ca...** | **BS** 166:7 | **cameras** 79:16 | 143:2 146:5,11 | 72:22 157:21 |
| 158:24 | **build** 28:7 150:19 | 79:23 80:9 81:3 | **cases** 15:24 | 165:20 |
| **books** 48:18 | **bulletproof** 164:5 | 81:8,15 83:21 | **catch** 98:1,2 | **checking** 165:18 |
| **boot** 85:22 86:17 | 164:6,9 | 83:25 84:2 | **caught** 97:13,24 | 166:12 |
| **boot-** 86:12,13 | **bullets** 100:4,5 | 148:4 150:15 | 98:8 | **chemical** 34:1 |
| **boot-up** 83:11 | **bunch** 132:19 | 150:18,23,25 | **cause** 4:4 46:6 | 137:11,16 |
| 85:25 87:8 | **burn** 34:1 | 151:16 | 124:13 | 138:8,9 |

childhood 21:23
children 27:3
choking 108:10
108:25
CHRIS 2:9
Christian 5:12
158:3
church 4:5 73:19
73:19
CID 124:6,23
circulated 161:13
city 48:3,5
132:12,12
158:6,7
Civil 4:7
civilian 82:21,22
civilians 83:1
claims-made
152:6
clarification
49:17,25
clarify 109:23
137:17
class 34:18 161:6
classes 135:10
classified 62:8
clear 7:10 21:9
80:19,23
115:19 116:3
116:14,18
124:7 137:7
cleared 61:7,11
63:11 72:13
113:19 114:13
117:24
clearing 125:4
clearly 116:13
clerk's 157:20
Clinic 22:2 24:3
clip-on 84:2
close 18:4
closed 95:7
clothing 118:9
clown 34:18
cocked 98:16

code 130:7,13
coincide 151:5
cold 153:2
college 36:10,12
color 82:10,12
combined 103:13
138:3
come 13:1 48:18
58:17,18 70:18
99:25 100:2
104:24 105:1,1
105:23 106:9
107:10 109:4
112:25 117:23
126:2,4 151:23
163:21
comes 42:7 74:20
comfortable
16:20 108:15
117:11
coming 34:20
63:6 65:20 70:8
70:15,19,21
71:16 74:9
93:17,18
103:23,24
104:23 111:10
117:10
command 15:8
16:25 93:10
102:1,3 129:9
commands 86:6
93:9 96:21
100:8,10,11,19
101:11,16,18
102:10,14,15
103:14,17
111:20,25
112:2,3 113:4
145:1
comments 52:10
Commission
169:17 171:24
common 161:16
communicate

123:6,9
communication
13:14 80:16
117:4 154:20
community 9:15
company 169:6
compartmenta...
64:12
compelled 128:9
complaint 80:13
158:16
complete 14:20
78:4 143:13
147:2,4 151:19
completed 14:19
15:5
completely 9:19
57:19 74:5 77:7
78:3,21 85:3,5
96:8 97:12
98:15 158:17
completing 34:17
35:2
compliance
145:2 169:10
compliant 103:17
complied 128:25
comply 8:9
complying
102:14
computer 154:15
154:21
computers 154:6
154:8
concern 151:20
concerned 41:1
99:21
concluded 3:8
105:19 167:3
conclusion
147:23
conclusions
69:19 151:13
condition 5:23
34:19 115:24

120:13
conditions
104:16
conduct 123:24
124:14 125:12
125:21,25
conducted
155:21
conducting 77:16
conference
142:17
confidence
153:13 154:3
confidential 42:4
confirm 141:5
confused 66:3
connected 72:19
connection 16:14
16:19
conscious 166:14
consider 14:9
consideration
148:13
considered 30:14
58:9 102:13
consists 77:21
console 78:16
consoled 121:20
consoling 120:25
121:3
construction 9:6
contact 24:1
50:23,25 69:8
132:21,22
contacted 127:4
128:12 132:11
132:13,23
contained 101:25
continual 134:14
continue 6:19
45:15 79:8
87:18 109:22
144:16 152:10
continued 71:19
73:22 77:25

94:23 151:24
169:2
continuing 22:23
42:22 60:4
70:18 106:21
106:24 107:16
117:1 128:15
128:23 138:5
143:1 146:16
152:2 157:25
158:24
continuously
112:2
continuum
144:23
contract 168:17
control 137:9,15
138:10 168:20
convention 65:10
conversation
27:23,25 33:25
39:7 62:2,12
113:17,25
121:4 126:11
conversations
33:23 62:14,17
convicted 159:11
conviction
159:11,15
CONWAY 2:24
cooking 45:23
Cop 164:7
copies 156:22,23
168:21
copy 147:7,14
157:2,12
corner 70:12
97:11
correct 7:15,19
8:11 13:25 14:1
27:21 28:4
31:15,16,20
32:17,18 33:7,8
33:9 34:19 36:7
36:8 39:9,23

40:11,17 41:1,8 49:22 51:8,10 54:2,14 55:3,7 55:10 56:7 57:9 57:13,20,20,21 60:5 63:2 64:17 64:24,25 65:5 67:18 68:16,18 68:21,23,24 72:11,13 73:14 75:18 76:9,10 76:13,14,16,17 76:20,21 81:18 81:19 84:22 85:14 88:4 90:22 94:23 95:1,2,12 97:18 103:3,22 104:25 105:7,8 105:10,15,17 105:23 106:19 106:21 107:2 107:11,12,13 107:15,17 108:15,17 110:14,16,17 110:19,24 114:5,7,14,15 114:17,21,25 115:5 122:16 126:1,5,9,22,24 130:25 134:6 134:11,15 135:2 137:9 139:16,17 143:23 145:5,7 148:17 150:12 153:11,13,17 153:24 154:4 154:10 155:1 159:16 160:11 161:13,20 162:8 164:24 171:7
**corrected** 149:20

**correctional** 9:21 10:11,13
**corrections** 11:3 12:2 171:6
**correctly** 12:7,13 12:19 13:17 14:25 17:1 28:16 41:17 48:12 58:19 59:8 60:8,13,21 61:3 63:20 64:5 68:25 70:22 71:23 72:2 73:4 73:18 76:5 77:5 79:22 83:14 85:19 87:22 90:23 91:21 98:1 100:9 112:10,21 113:21 114:18 115:10 118:12 118:15,21 120:1,3,4 122:1 123:14 124:1 127:10,22 129:8 130:10 132:8,23 139:22 140:4 145:15 150:14 152:22 159:23
**coughing** 108:2
**counsel** 22:11 137:5 169:8,9
**counselors** 34:7 34:10
**county** 2:20 3:15 4:5 7:16 8:13 8:21 13:13 20:15 69:22 74:6 75:16 76:4 77:2 124:10 131:2 132:3 134:18 135:20 136:1,2,6,20 139:1 140:18

141:4 142:22 148:15 149:8 156:5 161:9 163:18 168:4 171:17,19
**county's** 8:8 125:23
**county-** 145:19
**couple** 48:18 51:1,1 74:11 75:8 76:5 83:6 113:21 147:3
**couple-hundred** 89:22
**courses** 160:6
**court** 1:1,20 3:9 3:24 6:10 11:11 11:12 41:20 42:1,3,11,20 43:15,16 44:19 45:3 157:20 168:6 169:10 169:16,24
**cover** 16:22 111:22 113:3 149:18 166:5
**covered** 31:10 120:23
**covering** 70:16 112:20,21
**coworkers** 37:18
**CPR** 51:14 119:11,13,14 119:16
**crappy** 81:15
**crash** 154:18
**crazy** 26:8
**crime** 69:20 77:3 77:4 159:12
**criminal** 18:13 123:24 124:14 125:11,21,25 143:24 144:1,6 149:7 157:3
**criminals** 75:20

**cross** 75:25 90:11
**Crowder** 100:22 101:10,13
**crush** 54:15
**cstevens@fc-la...** 2:13
**currently** 32:3,10 75:16
**custodial** 168:22
**custody** 123:5,5,7 123:12
**cut** 72:8

_____
**D**
_____

**D** 3:1 5:1 133:23 134:5
**dad** 18:16,18 23:14
**daily** 38:16 64:6 64:14
**Dallas** 22:1
**damaged** 71:13
**dark** 70:10 103:24 104:12 104:17,19 121:22,23
**darn** 63:11
**date** 11:22 127:13 160:17 170:24 171:13
**dates** 10:6 13:18 39:25
**Davis** 1:11,15 2:8 3:6 4:2 5:3,12 5:13 26:19,21 26:22 147:24 148:1,1,9,10,14 158:3 170:25 171:2
**day** 4:4 14:10 32:18 47:15 48:17 53:6 55:7 55:14 56:10,24 57:3,5 63:12 64:17 169:12

171:5,19
**day-to-day** 22:15 30:13 166:1
**days** 13:23 14:20 14:22,25 25:15 64:20,22,23 65:4
**deadly** 138:22 139:17,19,20 139:22,23 145:4 160:12
**deadly-force** 141:23 143:9
**deal** 15:23 64:4 86:5 88:15 92:7 130:11 135:14 141:6 147:3 161:2
**dealing** 22:16
**dealt** 79:24
**death** 5:15 15:23 15:23
**deaths** 16:4
**debriefing** 16:9
**decide** 43:16
**decided** 32:8
**decipher** 6:21
**defendant** 2:8 44:10
**Defendants** 1:11 2:19 169:9
**deficiencies** 149:1,19,19
**definitely** 72:22 77:5
**delay** 85:25 86:18
**delete** 155:19
**delivered** 168:21
**demeanor** 38:2
**denied** 135:11
**department** 9:13 51:15 74:5,6 80:10 127:1 132:7,9,12,13

149:20 161:13 162:4,22
**department's** 143:25
**departments** 160:14
**depending** 12:5
**depends** 14:16 21:20
**deposition** 1:13 4:2 5:13 6:1,3 42:14 129:4 168:20
**Depression** 19:3
**depth** 127:22
**deputies** 15:4 16:15,24 17:10 91:13
**deputy** 14:8 15:14 68:23 69:9,10 71:25 73:4 110:19,22 121:8 148:1
**describe** 95:14 137:21,22 138:18
**described** 46:2 92:15 98:25 114:24 117:18 118:18
**describing** 95:20
**description** 72:15 130:16
**detail** 62:21 88:21 113:13 127:22 129:22 147:2 152:21 158:17
**details** 29:15 53:1 135:16 152:24
**detain** 112:8 123:18 124:4
**detained** 112:12 123:14,15,23

124:1,7,21 125:3
**detention** 9:13,23 9:24 10:6,8 11:7 131:12 160:4
**determined** 125:10,21,25 147:19 149:10 150:7
**developed** 84:7
**Devon** 2:3 42:16 78:24
**diagnose** 23:16
**diagnosed** 19:10 19:11,15,16
**diagnoses** 19:13
**diagnosis** 29:18
**Diamond** 1:20 3:24 169:24
**difference** 22:17 28:18 35:25 37:8 38:2 53:22
**differences** 22:19
**different** 19:19 20:3 34:20 52:14,17 54:13 59:7 75:16 77:1 79:20 80:8,9,10 82:12 117:8 122:11 124:24 130:2,11 133:12 138:15 139:4,10
**differently** 52:8
**dig** 44:25
**direct** 168:11
**directed** 126:4
**direction** 69:25 73:24
**directly** 76:7 169:9
**dis** 70:20
**disciplinary** 146:20

**disclose** 31:5,6 37:10 41:23 42:12 43:16
**disclosed** 21:4,7 30:2,5,20,22
**discover** 47:20
**discovered** 160:15
**discuss** 58:5 148:19
**discussed** 47:23 58:11
**discusses** 148:20
**discussion** 36:15 36:20 148:24 162:25 163:5
**discussions** 163:8
**dishes** 27:14
**dispatch** 75:12
**dispatched** 72:12
**dispersing** 70:20
**distillery** 65:12 65:12
**distracted** 35:7 35:11,13,15
**district** 1:1,2 16:23
**ditch** 78:5,8 88:10,18,24 90:13,17
**DIVISION** 1:3
**djacob@jacobl...** 2:7
**doctor** 23:7 25:17,19 26:2 27:20,21,24 28:9,12 29:9 32:8,21,22,24 33:21,23,25 34:2 36:5 46:24 60:7 66:6,7 165:10
**doctors** 21:24,25 24:22 25:1
**document** 129:10

129:12,17 130:5,10,22 131:25 133:2 134:17 135:17 136:17 137:10 138:20 139:6 139:14 140:5 140:15,24 141:7,12,17 142:15,16 143:4,5 146:18 146:24 147:14 147:23 152:11 152:19 153:14 153:18,23 156:7
**documentation** 47:21 59:5
**documented** 80:15
**documents** 41:14 62:5 129:3 147:17 156:3 156:14
**dog** 152:22 153:1 153:3,7,7,8,9 153:10
**dog-abuse** 152:25
**doing** 5:24 6:18 8:18 9:12 12:19 21:11,18 27:14 28:17 36:3 51:14 57:11 61:15 77:15 90:4 96:17 111:2 113:7 123:2 144:25 149:8 150:19 165:18,19,21 166:9
**Dollar** 9:3
**door** 93:6 96:8,10 96:17 97:16,17 97:19,20,21

100:12,14,14 100:17,18,19 100:20 102:1
**doors** 99:3
**dosage** 55:10 58:1
**dose** 54:13 56:1,4 56:8,18 58:10
**double-tap** 86:8 86:17 87:17,25
**double-tapped** 85:17 86:8,20 87:7,10,20
**double-tapping** 85:19 86:22 87:19 88:1
**Dr** 23:23 24:9,13 25:1 59:15,17 61:4
**drag** 72:7 75:18 75:19,19
**dragging** 99:14
**drainage** 109:3
**draining** 109:4
**drew** 9:10
**drive** 13:6,8 67:4 73:21 137:1 156:2,4,5,9
**driveway** 89:19
**drop** 113:23
**dropped** 78:13
**drove** 94:5
**drownings** 63:22 63:23
**drug** 38:17 71:12 132:2
**drugs** 133:4,15
**due** 32:11 60:18 85:6 114:5 118:9 135:10
**duly** 5:5
**duties** 64:10
**duty** 14:11 15:25 16:24 39:20 59:2 61:16,18

61:19,20,22,23 69:1 145:12,15

**E**

**E** 2:1,1,21 3:1,12 5:1,1 168:1,1 169:1,1
**E-crash** 154:18
**earlier** 48:13 124:3
**early** 11:22 17:15 66:13,18
**easily** 151:12
**eastbound** 69:15
**EASTERN** 1:2
**easy** 92:14
**effect** 37:17 58:4 86:23 103:10 129:23 132:3 132:20 133:7 133:10,17 134:18 135:20 136:20 139:1,9 139:20,24 140:18,19 141:4,10,15,20 142:6,18 143:7 146:21
**effects** 30:12
**eight** 11:8 65:4 79:25,25 83:10 85:24 86:2,9,16
**either** 9:11 17:4,5 23:7 119:17 121:9,15 126:3 128:4
**electronic** 13:10
**email** 13:7,13,19 150:22,25 151:1 154:23 154:25 155:5,8 155:10,15 156:1
**emails** 148:3 150:24

**emergency** 47:3 49:16 74:21 77:21
**employed** 7:16 23:21 29:25 131:8,11 132:4 146:22 168:15
**employee** 153:13 168:14
**employment** 3:14 8:9 9:2 24:19 131:4 132:21 132:22 133:5 134:18 135:21 136:21 139:2 149:11 151:13 151:23 152:13 154:21 156:4 156:12,14
**encountering** 16:4
**ended** 55:19 56:4 56:5 58:3 146:11 150:7
**enforcement** 7:22 8:12,17,22 9:1,7,10,12,14 9:17 10:11 11:4 36:24 47:6 49:3 49:4,8,11 50:3 50:3,5,24,25 60:23 64:11 75:23 77:11 109:13 141:3 145:24 160:3
**engaged** 123:23 124:14 125:11
**engagement** 105:16
**enjoy** 9:14
**entire** 148:13
**entrance** 73:23 73:25
**equipment** 140:7 159:22

**ER** 40:2 45:21 46:25 48:22,24 53:3,15
**errata** 3:10 170:1 171:6
**error** 152:3
**especially** 75:22 103:11 135:9 164:16
**essentially** 15:16 147:19
**Estate** 1:6
**estimate** 89:15
**estimated** 77:12 90:6
**et** 1:7,11
**ethics** 130:7,11 130:13
**evac** 120:5,5,6
**eval** 61:22
**evaluation** 60:12 62:13 63:5 131:21
**evaluations** 131:23
**event** 31:17
**events** 119:18
**eventually** 56:11 56:20 67:15 81:16 108:19 108:20 119:9 126:8
**everybody** 41:11 41:12,13 52:20 112:8 123:2 124:4
**evidence** 45:1
**exact** 10:6 29:15 39:25 64:22 75:13 85:25 87:24 94:12 104:16 129:11 129:22 130:10 140:11,20 152:24

**exactly** 11:22 28:15 45:20,22 52:18 78:12 83:25 99:8 106:12 107:19 111:12 130:21 155:2 162:18 163:8
**examination** 3:7 3:8 5:9 130:24 131:8
**Examiners** 169:10
**example** 143:20
**excessive** 146:6 146:11
**excuse** 108:25
**EXCUSED** 167:5
**exempts** 141:23
**exercises** 18:7
**exhibit** 129:7,17 130:5,22 131:25 133:2 134:17 135:17 136:17 138:20 139:6 140:5,15 140:24 141:7 141:12,17 142:15 143:4 146:18,24 152:4,11,14 153:18 154:1
**EXHIBITS** 3:13
**exit** 78:7 83:9 87:16 94:19 103:11
**exiting** 84:18 85:16 91:24
**exits** 102:22
**expect** 63:11
**experience** 8:24 45:25 46:12,15
**experienced** 90:1
**experiencing** 114:24 116:23

**expertise** 60:22
**expired** 33:8,17 33:19
**Expires** 169:17 171:24
**explain** 7:6 11:6 11:10 12:12 22:19 26:9,11 26:13 34:24 35:25 61:24 66:3 86:25 137:14 153:11 155:21
**explained** 115:1 124:3
**explaining** 88:20 134:23
**explore** 45:18
**expressions** 115:22,25 116:5
**extended** 53:21 57:4,4
**extends** 95:18
**extent** 39:7 80:11 129:13 155:2
**eye** 73:21
**eyes** 64:14 108:3

**F**

**F** 168:1 169:1
**face** 116:4
**faced** 98:18
**facial** 115:22,25 116:5
**facility** 33:18 40:3,7 47:24 48:2,15 49:1 50:9
**facility's** 32:8
**facing** 97:15,21 98:15 104:17
**fact** 30:2 38:20 41:7 44:3 45:1 47:5,23 76:11

76:15 91:22 103:21 105:4,9 106:9 107:6 116:15 134:10 142:7 143:21 161:20
**facts** 96:5 148:7 148:13 168:7
**factually** 158:19
**failed** 148:11
**failing** 81:23
**failure** 81:17 151:21,22
**fair** 35:24 45:7 51:4 92:13 113:10 131:25 138:16 157:24
**fall** 97:12
**falling** 98:2
**false** 151:15
**familiar** 86:12 136:24 143:5
**family** 9:16 16:16 40:20,22,23,24 51:24 158:14
**family's** 45:20 53:17
**far** 36:15 50:6 58:3 79:13 89:18 95:3 96:8 138:5 144:20
**fast** 22:21
**Faulkner** 76:4
**fault** 7:5 82:15
**fear** 103:1
**feared** 93:18
**February** 1:16 4:4 167:4 171:5
**federal** 4:6 158:15
**feel** 16:19 34:25 35:4,16,20 41:6 41:6 46:3,23 52:6 69:4 105:14,15

128:3,9 158:19
**feeling** 46:6 52:20,23 71:10 116:20
**feelings** 53:2
**fees** 169:8
**feet** 89:21 92:22 94:2,6,9,11,13 94:18 95:6,10
**fell** 78:16 106:18 107:21
**felony** 14:17
**felt** 28:3 41:4,11 45:19,20,24 46:12 52:5,16 55:1 71:12 95:22,24 103:18 104:10 105:24 106:1
**fights** 27:15,15
**figure** 7:11 55:24
**file** 14:19,21 15:12 58:13
**filed** 55:9 157:22
**files** 156:11,13
**fill** 20:23 66:10
**filled** 28:15,20 65:20 137:20
**filling** 21:1 67:13 137:25
**finalized** 147:4
**financially** 168:15
**find** 115:5 155:25
**fine** 6:18,25 22:22,25 44:14 44:21,23 49:19 59:13 68:1
**finish** 6:12 125:4 144:18
**finished** 15:9
**fire** 9:12 51:15 65:10 93:21 135:19
**firearm** 47:2,6,9

47:12,15 131:13 132:18 135:23,25 136:3
**firearms** 135:19
**fired** 82:8 84:20 93:21 101:14 110:14,15,17 111:17 114:6
**firefighter** 9:11
**firing** 99:25
**FIRM** 2:22
**firmly** 148:9
**first** 5:5 6:10 8:21 14:20 20:3 59:15 60:22 69:2 73:21 99:7 110:19 117:23 118:3 120:22 121:17 129:7 132:24 147:10 151:2
**fit** 39:19 61:19,20
**fit-** 62:12
**fit-for-** 59:1
**fit-for-duty** 59:5 59:9 60:12 64:2
**fitness** 61:15,18 61:22,23
**five** 53:5 61:5 72:4 83:10 85:24 86:1,9,16 92:22 94:2,6,9 94:13 95:10
**flash-drive-type** 13:11
**flee** 95:17
**fleeing** 78:12 88:7
**flew** 106:25
**flick** 86:1,7
**flicked** 86:20
**flip** 87:17 139:14
**flipped** 85:16 87:7,10 119:10

**flipping** 85:18
**floor** 78:17
**flopped** 115:10
**flow** 117:10
**flowing** 109:8
**fly** 42:13
**flying** 93:23 106:10,11,14
**focus** 35:5,12,22 36:1 57:11 98:13 165:13
**focused** 87:6 143:25 144:5
**focusing** 21:18 21:22 34:17,22 34:24 36:13 84:16
**folders** 155:16
**folks** 9:15 123:18
**follow** 74:24 102:3 116:8 148:9
**followed** 82:1 113:10 149:24
**following** 100:7 102:14 103:14 103:17 111:25
**follows** 5:8 23:5 45:12 79:5 109:19 144:12
**foot** 25:13
**for-duty** 62:13
**Forbus** 69:13,15 72:6,7,9
**force** 136:19,20 137:24,24 138:22,22,24 139:17,19,20 139:23,23 142:21 144:20 145:2,4,25 146:2,6,11
**foregoing** 168:8 168:9 171:3
**forget** 29:11

50:12 51:20
**forgetting** 69:4
**form** 106:20 107:14 116:25 137:12 142:23 146:7,12,13 151:25 158:20
**formal** 39:12,15 127:17
**formally** 161:6
**format** 13:10 138:2,7,9
**forth** 35:14 118:2 158:13 162:16
**forward** 96:23
**found** 16:12 20:4 39:19
**four** 17:15 44:8 53:5 61:5 63:22 133:15
**four-wheeler** 95:16
**four-wheelers** 51:2,5
**Fowlder** 59:18
**Fowler** 59:15,17 59:19,20,21,22 59:25 60:1,3,4 60:7,14,24 61:2 61:4,4 64:5
**frame** 31:10 33:10,12,13 50:19 58:16 161:17 164:23
**frankly** 156:15
**free** 16:20 128:3 153:9
**front** 43:7 94:24 97:22 113:21 118:4 121:9 122:4
**FTO** 12:6,11,14 12:15,17,20 83:24 91:21 164:16,19

| | | | | |
|---|---|---|---|---|
| **FTOs** 12:14 | **given** 6:1,3 16:24 | 42:13 43:14 | **Grossman** | **hand-on** 145:2 |
| **full** 5:11 80:7 | 41:16 47:12 | 45:8 63:13,14 | 160:22 | **handcuffed** |
| 126:11 127:22 | 55:13 127:25 | 73:10 74:24 | **ground** 6:7 97:12 | 122:16,21 |
| 149:3 157:11 | 171:4 | 77:8,16 78:11 | 107:21 109:9 | 124:11,15 |
| 158:2 161:2 | **giving** 9:15 86:6 | 82:24 83:15 | 114:17 117:10 | **handcuffing** |
| **fully** 74:5 | 93:9 100:11,19 | 86:9,23,24,25 | 118:13,16 | 125:8 |
| **function** 21:21 | 101:18 102:9 | 88:11 89:2 | **growing** 18:15 | **handcuffs** 123:16 |
| **functions** 140:17 | 111:20 112:2 | 90:24 93:19 | **guard** 132:18 | 123:19,21 |
| **funding** 135:13 | 127:23 152:19 | 94:5 95:16 | **guess** 12:4 14:9 | 124:8,9,21,25 |
| 135:15 | **glove** 145:14 | 99:21 102:18 | 14:14 34:13 | 125:1,12,15,20 |
| **FUQUA** 2:10 | **go** 10:19 11:19 | 103:2,19 104:1 | 38:9 71:5 78:21 | 125:24 126:2,5 |
| **further** 62:13 | 12:6,9 13:8,21 | 104:6,11 106:9 | 86:15,22 90:9 | 145:14 |
| 137:14 149:13 | 14:5 15:10,24 | 106:12,13 | 124:24 140:19 | **handheld** 82:7 |
| 149:16 166:24 | 18:9,9 20:15 | 107:10,11 | 150:9 | **handler** 135:10 |
| 168:14 169:4 | 26:7,14 29:9 | 110:13 111:5 | **guessing** 7:11 | **hands** 6:11 93:16 |
| 171:8 | 30:7 35:5,9 | 111:22 114:2 | **guesstimate** 54:9 | 93:16 97:3,24 |
| **future** 49:19 | 39:5,18 46:24 | 118:2 121:1 | **guesstimation** | 98:1 99:19 |
| ——————— | 48:18 56:11,23 | 122:2 125:3 | 20:12 | 100:9,20 |
| **G** | 57:7 61:21 | 128:6,7 129:1,2 | **gum** 14:24 | 102:11,12,17 |
| **G** 5:1 | 62:12 64:8 | 129:3,4,5,17 | **gun** 38:14 136:5 | 102:20,21,25 |
| **games** 49:23 | 68:15 73:6,6,6 | 132:17 137:8 | **gunshot** 118:7,8 | 103:1,16,20,23 |
| **Garrity** 128:1 | 76:6 77:6 78:17 | 150:17 152:5,9 | **gurgling** 108:8 | 105:6 111:25 |
| **gas** 78:1,8 82:23 | 81:6 82:6 84:11 | 152:10 157:16 | 108:21 109:8 | **hands-on** 145:1 |
| 82:25 | 86:24,25 87:16 | 159:14 162:6 | 115:1,18 | **Hang** 154:23 |
| **gears** 17:19 | 89:6,9,18 90:3 | 166:9 | 116:12 117:9 | 165:16 |
| 129:1 144:18 | 93:5,14,21 | **good** 15:19,20,25 | **guy** 17:20 18:6 | **hanging** 69:16 |
| **general** 9:3 17:19 | 100:3,4,5,11,14 | 35:24 55:23,25 | 61:5 | **happen** 24:1 |
| 22:7 23:20 | 106:10,22 | 64:12 78:25 | **guys** 47:13 79:16 | 72:21 81:14 |
| 41:13 46:11 | 109:4 114:6 | 151:11 | 119:5 154:15 | 100:16 142:11 |
| 122:18 150:16 | 117:20 120:4 | **gotten** 28:15 32:1 | 163:17,18 | **happened** 16:7 |
| 152:6 155:20 | 122:2 124:20 | 64:11 85:11 | 164:12,15 | 41:18 44:3 45:2 |
| 155:21 | 124:22 127:2 | 91:21 96:20 | **gym** 18:9 | 58:15 60:19 |
| **generally** 12:12 | 135:9,11 | 150:15 | ——————— | 64:7,24 66:16 |
| 18:11 29:8 | 139:11 145:6 | **governed** 130:13 | **H** | 71:21 77:5,10 |
| **George** 60:1 | 157:25 162:2 | 131:4 133:5 | **H** 3:12 | 77:24 78:6,10 |
| **gestures** 6:20 | **goes** 9:7 101:25 | **governing** 134:22 | **half** 12:9 53:24 | 78:13,19 88:21 |
| **getting** 28:20 | 152:21 | **grab** 46:19 78:17 | 55:20 56:13 | 92:17 96:6 |
| 82:22 93:7,11 | **going** 6:1,6,11,13 | **grabbed** 106:19 | **halfway** 77:8 | 101:9,20 153:7 |
| 93:22 101:21 | 6:14,19 8:4,7 | 106:24 | 88:10 | 159:24 |
| 122:4 | 9:1 11:24 12:2 | **grandma's** 101:2 | **hallucinations** | **happening** 104:8 |
| **give** 6:7 13:8 | 15:18 16:21 | **grandmother** | 57:13,14 | 104:10 107:19 |
| 32:20 53:5 74:3 | 21:15 23:1,11 | 40:23 | **hand** 21:22 34:1 | **happens** 16:7 |
| 75:11 77:13 | 29:10,11 31:1 | **grandmother's** | 86:6 93:14,17 | 73:17 92:13 |
| 96:21 101:11 | 34:14 41:7,23 | 101:6 | 98:2 102:8,8,8 | 107:19 120:21 |
| 102:1 154:6 | 41:25 42:4,8,9 | **gravel** 93:2 95:17 | 169:12 | 123:3 151:5 |

| | | | | |
|---|---|---|---|---|
| **Harden** 67:4 | 38:11 64:2 | **huh-uh** 6:20 | 163:20 | **indemnify** 42:6,8 |
| **harm** 41:4,8 | 123:7 126:4 | **Humes** 152:13 | **implemented** | **indicate** 123:16 |
| 95:22,25 | 163:10 166:8 | **Hunter** 1:7 5:16 | 83:17 164:18 | **indicated** 47:23 |
| **Harps** 9:3 | **hierarchy** 129:14 | 69:8 111:9 | **importance** | 62:11 65:6 80:5 |
| **harsh** 16:17 | **high** 69:20 77:3 | 112:20 114:6 | 148:4 | 83:14 |
| **haunt** 151:24 | **highers** 15:12 | 114:20,23 | **improper** 61:25 | **indication** 74:3 |
| **head** 6:20 24:4 | **highest** 56:8 | 115:4 116:15 | **inbox** 155:17 | **infant** 15:23 16:4 |
| 37:3,4 46:9 | **highest-ranking** | 116:19 117:5 | **incident** 14:3,21 | 63:22 |
| 55:25 60:10 | 123:4,6 | 117:18 119:19 | 17:4 31:13,14 | **informal** 127:16 |
| 98:15,18 | **highway** 69:11 | 119:25 120:16 | 31:18 34:9 | **information** 24:1 |
| **heading** 73:11,24 | 69:17 70:1,19 | 120:21 125:11 | 39:17,24 40:18 | 27:20 34:20 |
| **health** 18:14,25 | 71:19 73:18 | 154:4 | 45:17 50:18 | 148:8 158:1 |
| 19:13 21:5 23:9 | 74:17 76:1,1,3 | **Hunter's** 100:18 | 52:2,11 58:16 | **initial** 88:9 89:18 |
| 25:20 28:22,25 | 76:4 | 117:7 | 59:6 61:6 62:3 | 125:7 147:2 |
| 29:10 34:4,6,9 | **hill** 69:11 | **hurt** 95:24 | 62:7,16,19,23 | **initially** 88:17 |
| 39:16 50:6 | **hired** 10:8 | **hyper** 37:19 | 63:21 64:15,17 | 90:10 95:4 |
| 151:22 | **hit** 71:24 90:6 | | 68:24 72:13 | 110:15 111:19 |
| **hear** 115:15,16 | 94:23 107:22 | **I** | 82:6,16,18 | 132:15 |
| 145:21 146:9 | **hold** 40:10 47:24 | | 84:12 86:5 89:1 | **initiate** 77:9,20 |
| 162:10 | 48:10,10 49:9 | **I-** 73:5 | 89:2 90:7 91:23 | 83:13 |
| **heard** 81:23 | 87:23,24 112:9 | **idea** 64:23 | 96:6 102:19 | **initiated** 77:20 |
| 101:11,13 | **holder** 78:14,14 | 101:12 143:3 | 112:7 113:2,2 | **injuries** 123:1 |
| 108:7 113:6 | **hollow-points** | **identification** | 116:4 122:24 | **inmates** 11:11 |
| 115:17,18 | 136:16 | 152:15 154:2 | 124:4 127:21 | **inpatient** 40:6,9 |
| 152:16 160:6 | **home** 12:14 16:2 | **identified** 3:13 | 129:15 131:20 | **instance** 38:14 |
| 160:19 164:5 | 16:20 32:9,24 | 169:4 | 131:20 132:6 | 50:2 87:18 |
| **hearing** 22:7 | 45:20,21 53:17 | **II** 30:11 66:4 | 132:22 138:18 | 143:20 |
| 116:6,14,18 | 69:1 127:12,17 | **III** 158:4 | 141:19 142:7,8 | **instruct** 123:4 |
| **heartburn** 25:9 | 156:11 | **immediate** 53:21 | 143:10,12,13 | **insurance** 169:6 |
| **Heartland** 66:22 | **homicide** 159:13 | 53:23 57:2,3 | 143:17,20,22 | **intake** 132:17 |
| 67:5,6 | **honest** 31:12 | 58:25 | 148:11,13 | **intend** 7:12 |
| **held** 7:20 47:9 | **hop** 96:13,16 | **immediately** | 150:8 151:6 | **intent** 95:25,25 |
| **helicopter** 120:2 | **hopefully** 109:4 | 31:14 53:7,7 | 152:16,20 | **interaction** 80:4 |
| 120:7 | **hospital** 47:17 | 61:7,10 82:2,15 | 155:11,23,24 | 82:21,22 |
| **help** 18:24 32:20 | 49:2 53:10 | 85:17 86:20 | 159:1,9 160:12 | 121:24 |
| 109:5,10,15,16 | 132:9,17 | 94:19 101:23 | 160:12 | **intercom** 96:20 |
| 118:1,5 | **Hot** 65:10 | 102:1 117:22 | **incidents** 63:15 | **interest** 168:18 |
| **helped** 117:16 | **hotel** 65:11 | 132:16 | 63:18,19 64:3 | **interested** 156:20 |
| **helping** 9:15 | **hours** 14:18 | **impact** 16:5 | 83:3 141:23 | 168:16 |
| **HEREINBEF...** | 17:15 48:1 53:5 | 18:22 21:16 | 150:17 | **interestingly** |
| 5:4 | 53:5 79:25 80:1 | 32:16,18 63:24 | **included** 61:2 | 151:2 |
| **hereto** 152:15 | 80:1 | 145:3 | **incorrect** 158:19 | **internal** 62:3,6,8 |
| 154:2 168:12 | **house** 47:22 | **impacting** 94:16 | **increase** 58:1 | 143:6,10,13 |
| 168:15 | 101:2,3,6 | **impartiality** | **increased** 56:16 | 144:4 148:23 |
| **hey** 28:9,12 37:11 | 127:15 137:3 | 168:19 | 56:20 | 149:9,17,25 |
| | | **implement** | | |

| | | | | |
|---|---|---|---|---|
| 150:6 152:8 156:23 | 136:10 148:6 151:18,21 | 60:19 63:15,18 64:10 130:14 130:16 | **KGB** 1:9 | 37:13,15 39:11 39:15 42:18,24 |
| **internals** 147:3 | **issued** 13:5 80:7 | **job-related** 60:19 | **kid** 51:2 54:18 158:10 | 42:25 43:3,4 |
| **interrupting** 35:8 | 86:11 136:3,6 | **John** 2:19,20 | **kids** 18:8 | 44:15 45:18,19 |
| **interview** 92:7 | 145:20 156:5 | 67:4 | **kill** 102:11,17 | 46:2,8,9,23 |
| 127:13,16,18 | **issues** 15:19 16:2 | **joke** 39:8 | 103:16,19 | 47:15 48:2,3 |
| 127:19 | 16:21 19:1,14 | **joking** 37:14,21 | **killed** 164:23 | 49:8,19,20 |
| **Intoxicant** 133:4 | 21:21 23:9 | 39:5 | **killology** 160:19 | 51:22 52:5,19 |
| **investigate** | 34:16 80:22 | **Jordan** 101:10 | 161:2 162:7 | 53:9 56:2,4 |
| 149:12 151:11 | 81:10 103:7,8 | 119:20 121:24 | 164:1 | 58:23 59:10 |
| **investigated** | 149:10 | 122:11,14,16 | **killology-type** | 60:10,14,16,21 |
| 63:23 143:13 | **items** 74:12 | 122:19 124:24 | 164:18 | 60:24 61:10,22 |
| 143:14,22 | 133:17 | 125:11,20 | **kind** 9:12 14:12 | 62:3,7,11,13,14 |
| **investigating** | | **Joyce** 59:25 60:2 | 25:10 45:4 | 62:15,15,22 |
| 142:7 | ——————— | 60:3,4,7 61:4 | 51:21 64:5 | 63:3,5,9,10,11 |
| **investigation** | **J** | 64:5 | 71:15 72:9 73:3 | 64:6,13,14 |
| 62:4,6,8,9 | **J** 1:5 | **judge** 14:18 | 74:25 78:1 | 66:12 67:1,3 |
| 112:9 143:6,10 | **Jacob** 2:3,4 3:7 | **jug** 107:3 111:12 | 97:10,10 98:15 | 69:24 70:2,17 |
| 143:17,25 | 5:10 22:22 23:3 | **jump** 13:6,8 | 108:23 130:19 | 71:10,15,16 |
| 144:4,6 147:18 | 23:6 42:2,8,13 | 22:21 84:11 | 138:14 139:3 | 72:5 76:18 |
| 147:21 148:23 | 42:18,22 43:13 | 93:5 95:16 | 163:21 | 79:18,20 80:15 |
| 149:4,8,9,17,18 | 43:18 44:1,14 | 96:25 156:2,4,5 | **King** 121:24 | 80:20 81:4,9,13 |
| 150:1,6,10 | 44:22,24 45:7 | **jumped** 87:4 | **kit** 118:3,4 | 82:3,5,7,22,25 |
| 151:18,19,24 | 45:10,13 59:22 | 93:1,1 95:13 | **knew** 9:11 36:23 | 82:25 84:1,6,8 |
| 152:8 | 59:24 60:1,3,4 | **jumping** 97:17 | 52:14 65:19,24 | 84:10 85:2,21 |
| **investigative** | 79:2,6 106:21 | **jumps** 96:7,23 | 66:10 83:15 | 86:9,13,24,25 |
| 124:2 | 106:24 107:16 | **jumpy** 35:16 | 86:16,18,19,23 | 87:10,11 88:22 |
| **investigators** | 109:20 117:1 | **June** 7:16 18:3 | 111:19 116:10 | 91:11 92:22 |
| 127:11 | 128:15,17,20 | 151:3 | 122:16,20,25 | 95:23 96:25 |
| **involuntary** | 128:23 133:23 | **Junior** 158:4 | 128:6 140:3 | 97:1 98:17 99:9 |
| 40:11 47:24 | 138:5 143:1 | **Juvenile** 141:9 | 151:14 165:16 | 100:4,10,22,25 |
| 49:9 | 144:13 146:10 | | **know** 6:18,24,25 | 101:1,8,15 |
| **involved** 9:21 | 146:16 152:2 | ——————— | 13:17 14:24 | 102:12,18,21 |
| 46:21 47:5 49:9 | 157:16,22,24 | **K** | 15:18,21,25 | 102:21,23 |
| 49:11 50:5 | 157:25 158:24 | **Kayla** 26:19,21 | 16:12,13,16,17 | 103:4,6,7,16 |
| 124:4,5 125:21 | 166:24 | 26:22 | 16:21 18:17 | 104:16,20 |
| 126:23 142:7 | **jail** 10:1,15 | **keep** 18:11 42:3 | 19:18 21:12,15 | 106:14,15 |
| 142:20 169:7 | **Jason** 2:21,22 | 50:11 79:19 | 21:23 23:8,9 | 107:1,5 108:8 |
| **involving** 61:6 | 23:23 | 101:23,25 | 24:1,4,6 26:1,7 | 111:5,14,16,22 |
| **issue** 29:10 36:12 | **Jessica** 69:3 | 118:3 164:21 | 26:11,13,14 | 113:18,19 |
| 43:15 44:17 | 91:13,22 | **keeping** 73:21 | 28:8 29:13 | 115:17 116:2 |
| 50:6 51:4 61:7 | 110:23 121:2,4 | 98:11 99:14,15 | 30:19 31:24 | 116:21 117:15 |
| 61:24 79:19 | 121:8 125:17 | **kept** 80:1 88:1 | 32:20 33:20,21 | 117:22 118:19 |
| 80:6,12 81:2,5 | **job** 6:18 9:13 | 160:17 | 34:14,22 35:6 | 119:7,16,21 |
| 114:5 125:7 | 16:8,17 36:20 | **Kerr** 72:8 | 36:9,14 37:1,2 | 120:2,9,11,14 |
| | 50:24 58:13 | | | |

120:18,18,18
120:25 121:19
125:2,2 128:11
128:20 129:6,7
129:18 130:6
130:23 131:16
132:1 133:3,21
134:2 135:8,14
135:18 136:16
136:18 138:20
139:3,7 140:6
140:10,16,25
141:8,12,17
146:19 147:21
148:16 149:21
149:23 151:14
151:15 152:1
152:12 153:18
155:3 156:6,22
158:12 159:19
160:1 161:21
161:25 162:1
162:15,19,24
163:9,15 164:3
164:12 165:2,8
165:8,17 166:2
166:8,25
**knowingly** 169:4
**knowledge** 20:5
24:7 29:4 36:13
40:12,14 53:16
59:6 62:10
72:14 81:8
83:22 84:4
108:22 113:11
119:3 122:10
124:12 126:1
129:15 131:3
133:7 134:3
139:13 141:11
141:16,21
142:10,19
143:8 146:23
155:2 158:9
161:16 165:15

**known** 62:22
**knows** 100:6

———————
**L**
———————
**lack** 6:6
**land** 90:16
**Landon** 100:22
101:10,13
**lands** 97:23,24
**lane** 1:21 69:17
77:8,18,25 78:3
78:4,8,9 88:11
88:11 89:25
90:9,12
**lanes** 69:24 74:18
74:18,19 90:11
**Langley** 30:10
80:25 81:1,12
81:13 121:15
121:16 123:10
148:5,6
**lapsed** 115:4
**laptop** 154:17
**larger** 55:19
**lasting** 80:6
**late** 11:23
**launch** 120:4,5
**law** 2:15,22 7:22
8:12,17,21 9:1
9:7,10,11,14,17
10:11 11:4
13:17,18 36:24
47:6 49:2,4,8
49:11 50:2,3,5
50:24,25 60:22
64:11 75:22
77:11 109:12
145:24 160:2
**lawful** 144:20
**lawfully** 74:16
**lawsuit** 43:23
55:9,12 58:13
**lawyers** 44:8
**lawyers'** 156:15
**lay** 23:12 118:5

**laying** 108:2
**lead** 131:20
**learned** 83:16
91:4
**leave** 31:15 40:16
43:18 44:16
45:4 58:19,21
58:22 85:7
127:25 128:3
155:1
**leaving** 65:13
89:18 120:21
**led** 96:6 140:8
149:1
**left** 74:10 75:8
77:7 78:3,15
85:8 89:16
90:15 120:8
124:24
**leftover** 33:2,4
**leg** 95:18
**legal** 8:5 144:19
158:2
**legs** 97:1
**length** 129:25
**let's** 18:15 43:8
43:13 68:15
94:1 100:15
**letter** 3:15 134:2
156:24
**lettering** 74:7
**letting** 37:1 43:16
**level** 74:16 145:6
145:8 162:24
163:2,5
**Lexapro** 25:24
25:25 26:3,3,5
26:10 28:9,21
29:18,21,24
30:2 31:19,25
32:3,6,24 33:3
**liability** 152:6
**license** 75:1,9,11
**lieutenant** 30:9
30:20 31:1

80:25 81:1,12
88:21 121:10
121:15,16
123:10 125:17
126:7,14
127:21 148:5
160:22 165:25
166:4,6
**lieutenant's**
82:14 127:3
**life** 16:21 50:6,9
79:23 85:6
93:18 109:14
**light** 70:12 74:21
77:15 104:12
121:22
**lighting** 77:22
104:16
**lights** 71:4,18
73:10 77:20,22
**line** 60:22 78:8
170:2,5,8,11,14
170:17,20
**lines** 163:10
164:3
**lingering** 70:17
70:20
**links** 149:25
**list** 169:5
**Listen** 38:14
39:11
**listening** 103:21
**lit** 78:1
**litigant** 169:6
**litigation** 2:4
5:15 41:18
137:4
**little** 1:22 2:12,17
12:11,16 17:19
18:10 26:9
34:12 35:13
37:18 45:18
52:23,23 59:3
65:9 70:13
79:18 84:2 94:1

115:9 117:11
117:13 129:1
138:14 144:18
144:24 160:16
166:2
**living** 20:11
**locate** 72:12
**located** 75:16
111:18
**location** 72:3
76:12 90:7,14
90:15 94:3,8,8
**long** 10:17 29:2,5
31:25 35:2,6
40:9 45:3 52:16
63:17 79:19
130:18 155:3
**longer** 48:11
93:25
**Lonoke** 2:20 3:15
7:16 8:13,21
10:3 20:15 74:6
124:10 125:23
142:22 148:15
149:8 161:9
**Lonoke's** 124:25
125:13,19
**look** 18:6 34:25
83:7 97:7 107:7
133:8,15
**looked** 34:14
82:8 108:14
**looking** 35:12
97:9 98:18
139:10 148:7
**looks** 96:8 102:18
129:19 134:19
136:23 138:14
139:4
**Loop** 77:18 90:9
**loose** 78:14
**lose** 66:5
**loss** 153:12 154:3
**lost** 65:6 66:1,10
66:15 67:14

68:2,6
**lot** 19:18 36:3
37:2,3,4,5 46:9
46:10 63:21
69:21,25 70:13
71:11,12,17,22
71:24 73:23
78:18,20,22
92:19,19
158:13
**lots** 74:11
**loud** 74:11,12
78:2
**lower** 58:9 112:1
**lungs** 109:5,9

_____

**M**

**M** 2:3
**mag** 145:13
**magazines**
145:14
**Mahoney** 78:18
78:20
**mailbox** 13:20
**main** 12:15 72:7
75:18,19,19
76:1 153:15
**major** 15:1 75:23
112:7 124:4
**majority** 91:13
**making** 7:9 83:5
83:12 90:24
96:3 116:12
160:15
**mandatory** 13:24
134:23 135:5
135:13
**maneuvered**
117:8
**manner** 37:21
90:19 103:12
**manpower**
135:11
**March** 169:12
**mark** 152:9

**marked** 74:5
129:3,17 130:5
130:22 131:25
133:2 134:17
135:17 136:17
138:20 139:6
140:5,15,24
141:7,12,17
142:15 143:4
146:18,24
152:11,14
153:18 154:1
**marriages** 26:14
**married** 26:16,22
26:25
**material** 161:12
161:18 163:10
**materials** 161:6,8
**math** 55:23,25
**matter** 91:22
142:6 149:13
158:16 167:4
169:7
**McDonald's** 9:3
**McGee** 24:9,9
**McRae** 75:14
76:2,7,9,16
**mean** 9:7 10:19
15:20 16:6,7
18:8,18,21 20:3
20:10 22:6
23:17 24:24
26:13 31:12
33:20 36:23
37:1,7 38:1
39:1,2,4,22
41:11 43:1,1,2
43:4,9 44:18,19
45:23 46:5 48:9
50:11 52:23
53:7,22 54:20
54:22 55:3,11
55:21 56:5
58:18 59:25
60:16 62:15,24

63:7,16 67:25
70:10,11,13,14
70:15 71:22
72:18,22 76:5
81:22 83:19
85:13 86:12
87:2 88:22
89:15,21 90:1,3
91:2 92:6 94:7
96:11,12,13
100:1,3 102:13
102:17 103:14
106:18 108:20
109:11,12
117:15 118:18
118:20 119:23
122:18 123:3
129:24,25
132:16 133:11
139:12 140:22
142:1,2,3
143:17,22
144:21 147:14
149:21,25
150:9,15
151:14 155:24
156:13 161:16
161:17 165:20
166:8
**meaning** 22:7
32:22 37:4
48:10 54:10,23
116:23 162:6
**means** 123:19
124:8,9
**meant** 49:13
56:16
**measurement**
95:5
**MECHANICS...**
2:6
**medical** 5:23
22:2 24:3 28:3
57:25 108:22
108:22 118:3

120:8,13
**medically** 117:19
119:6 132:25
**medicated** 21:17
27:18,19
**medication** 5:23
19:25 20:2
21:19,20 22:9
23:12 24:23
25:2,8 26:10
28:6,17,17,22
29:4,10,17 31:8
32:11,12,13
33:15 34:3,15
35:25 36:2,11
36:16,22 37:8
38:3,7,16 39:8
39:13 46:3,5
52:6,7 58:15
61:8,11 65:7,15
65:23 66:1,5,10
66:15 67:12,14
67:24 68:13
134:15 151:21
151:22
**medications** 21:7
21:14 25:4,12
25:20,23 28:25
**medicine** 26:4
37:16,22 39:6
58:1
**meds** 57:19
**members** 9:16
**memo** 142:17
151:2
**memory** 158:18
171:7
**Mena** 4:6
**mental** 18:14,25
19:13 21:5 23:9
25:20 28:22,24
29:4,9 34:4,6,9
39:16 50:6
151:22 166:18
**mentally** 18:14

**mentioned**
131:19
**mentor** 91:2
**merely** 148:20
**merits** 44:4
**Merrick** 23:23
23:25 24:1,13
25:1
**messaging**
154:13
**met** 61:3,4
**method** 91:15,16
168:10
**methods** 13:14
91:18
**mic** 78:13,13,14
78:14,17 88:12
88:13
**Michael** 1:11,15
2:8 3:6 4:2 5:3
5:12 137:21
158:3 170:25
171:2
**micro** 84:2
**middle** 69:23
74:18
**midnight** 17:5,6
17:7
**midway** 96:19
**Midwest** 48:3,5,6
**mile** 89:21 90:10
**miles** 68:20 72:4
75:15,15 76:12
77:2,2
**military** 8:24
72:8
**milligram** 56:13
**milligrams** 41:16
41:16 54:3,5
55:7,9 56:10,10
56:11,14 57:8
**MILO** 159:21
**mind** 7:11,15
164:23
**mind-altering**

30:12
**mindset** 164:6,9 164:18
**mingling** 82:25
**minor** 21:24 35:13 58:9
**minors** 27:7
**minute** 23:2 100:15 154:6
**Miranda** 128:1
**mirrors** 73:22
**misscript** 63:9
**mission** 129:19
**mistake** 63:4
**mistaken** 58:23 77:3
**misunderstood** 49:13 65:21
**moaning** 108:12 115:15,17
**mode** 82:12,13 82:14 85:11,18 87:21
**model** 80:8,8,9 87:22
**modified** 136:15
**mom** 23:14
**moment** 82:18 97:23 106:25 109:1 141:22
**moments** 108:14
**Monday** 64:24
**money** 44:13
**monitor** 37:11 134:14 151:22
**month** 38:17 58:20,22 63:6 63:12 151:5
**months** 11:8
**morning** 53:24 55:15 56:13,14 64:24 69:20 71:11,22 72:21 77:3 103:19
**mother** 18:21

**motion** 97:14
**motions** 84:18 93:8
**Mount** 73:20
**mounted** 154:8
**mouth** 109:4 117:10
**move** 10:11 11:3 45:8 153:5
**moved** 11:8,14 11:15 20:23 22:1
**movement** 74:2 83:7
**moving** 99:10 108:19 115:7

———— **N** ————

**N** 2:1 3:1 4:1 5:1
**name** 5:11 23:24 26:18 59:15 60:10 69:2 73:19 75:13 77:18 110:21 158:2 171:8
**NAMED** 5:4
**names** 27:2
**narcotic** 30:11 66:5
**Natalie** 1:21
**Nathan** 2:19 68:20 80:5 83:14 90:19,22 91:12,15 107:8 107:8 109:5,7 110:14,19 111:1,14 112:4 112:6,24 113:17,25 117:4,17,20 119:5,16 120:3 120:4,23 122:3 123:4
**nature** 50:24 126:11,11

**necessarily** 35:21 75:19 105:11 124:13,21
**necessary** 146:3 171:4
**necessity** 28:3
**neck** 118:12,14
**need** 6:24,25 7:6 26:9 37:11,15 37:16 38:15,16 38:17 39:5,11 39:15 43:12 45:2 46:24 60:16 62:12 66:12 67:14 85:22 114:19 123:20 126:2
**needed** 14:11 26:2,4 27:18,19 27:24 31:5 52:6 52:7 55:2 61:19 61:20 86:16 113:20 128:7 165:13
**needing** 39:8
**needs** 22:20 28:7 34:14 44:19 126:4 151:4
**neglect** 153:1
**negligent** 159:13
**neither** 101:10
**nervous** 51:21 90:2
**neutralized** 93:24
**never** 6:1 39:11 44:9 46:25 51:9 57:15 62:5 80:1 82:5 90:15 93:12 107:23 109:13 162:1,2 162:6 166:11
**new** 9:19 21:14 31:8 151:1 159:21

**NEWCOMB** 2:14 22:24 23:1 41:25 42:6,10 42:15 43:17,20 44:5,8,12,23 45:5 59:21,23 59:25 60:2 128:14,18 137:21 142:23 146:8,13 157:18,23 158:20 167:1
**newer** 80:8
**night** 7:24 14:4 16:24 17:11,11 17:13 48:22,23 64:24 68:15,24 75:22 164:13
**nights** 48:20,21
**nine** 65:4 90:6
**Noah** 1:7
**nods** 6:20
**noises** 116:6
**non-deadly** 138:22,24,25
**nondisclosure** 41:19,21 42:11 43:11 44:15
**nonlethal** 145:3
**nonprescription** 133:4
**noon** 17:4,6
**normal** 10:10 78:9
**normally** 21:21 138:15
**north** 73:6 75:16
**northbound** 69:16 70:1,19 73:23 78:4,8
**Notary** 168:7 171:18,23
**notice** 3:14 28:18 50:11 57:10 71:1 75:6 116:4

148:1 150:11 150:21 152:13 153:22
**noticed** 37:18 38:2 69:11,25 71:3,18 73:2,9 73:24 74:10 75:8 77:6 82:2 82:8,11,13 84:20 85:14 92:25 93:3,4,22 109:2 111:11 119:12 122:4,6 150:10 152:2
**notified** 82:15
**notify** 73:9 134:2 134:10
**number** 3:3 24:4 94:12 129:7,18 130:5,22 132:1 133:2 134:17 135:17 136:18 138:20 139:6 140:5,15,24 141:7,12,17 142:15 143:4 146:18,24 152:12 153:18
**numbered** 4:4
**numbering** 152:10
**numeral** 133:20 134:5

———— **O** ————

**O** 4:1 5:1
**O-R** 59:23,24
**oath** 5:8 149:6 171:4
**object** 41:25 42:2 43:14 106:20 107:14 116:25 128:14 146:7 146:12 151:25
**objection** 43:22

158:20
objectively
145:25
oblige 127:24
obliging 112:2
observations
27:17 52:13
observe 12:16
83:6 87:15
observed 41:1,3
81:14
observing 116:18
obstructing
74:17
obtain 75:11
135:2
obviously 5:13
6:19 14:17,24
116:13 147:14
occasion 148:6
occasionally
18:20 165:25
occupants 74:2
75:6 76:22
114:14
occur 143:18
occurred 101:7
129:15 148:11
occurrence 16:3
occurring 53:18
119:18
ODD 19:9
Offense 141:19
offenses 146:20
office 3:15 4:5
7:17 8:14,21
10:20 11:4 12:8
12:22 15:10
16:10 21:2,13
22:14,21 23:21
24:20 29:25
30:3,6,8 36:2
37:11,14 50:19
50:21 59:1,4
64:2 68:6 69:1

91:14 124:10
127:2 145:19
147:9 148:2,15
157:20 159:21
officer 7:22 8:12
8:17 10:6,8
11:7 36:24 47:6
50:24 64:11
116:3 131:12
142:20,21
145:1,25 160:4
officer's 132:2
officer-involved
149:22
officers 10:10
16:4,14 50:25
79:20 80:10
84:10 109:6
119:8,9 149:22
161:18 165:18
official 127:7
oh 9:24 23:3 26:1
39:5 55:16 65:3
65:21 66:9 70:7
88:14 92:8
116:24 121:19
122:18 150:9
157:24 161:19
oil 107:3
okay 5:11 6:6,16
6:22 7:2,7,13
8:11 9:5,16
10:19 11:3,6,10
11:16,24 12:4
12:11,20 13:14
13:21 15:14,20
16:24 17:16
18:25 19:11,18
20:10 22:22
23:18 25:17,25
27:23 28:9,12
28:21,24 29:5
30:15 31:1,4,14
32:4,24 33:4,23
34:12 35:24,24

37:7,10,18
38:13,24 39:7
39:21 40:2,5,17
40:24 41:7,14
41:21 44:22
45:14,25 46:2
47:5 48:8 49:8
49:17 50:8,17
50:20 51:9
52:10,16,22
54:5,7,15,20,25
55:21,24,25
56:11,16,18
57:7 58:22
59:10,13,22
60:1,11 62:7,18
63:18,24 64:1
64:17 65:5,21
66:9,12,20,24
67:3,5,11 69:2
69:7,14,18 70:7
70:13,23 71:5,8
72:11,23 73:17
74:15,20 77:10
78:6,23 79:3,10
79:13 80:5
81:11,16 82:18
83:14 84:6,12
84:20 85:2,21
86:7 87:9 89:5
89:23 91:17
92:1,5 94:1,21
95:7,20 96:3
97:12,17 98:19
99:14 101:5,10
101:16 103:20
104:12,24
105:19 106:6
106:19 108:3
108:14 109:1
109:21 110:13
111:14 113:6
114:2,5 115:3
115:13,22
117:1,14,17

118:22 119:14
120:8,13 121:1
122:23,25
123:15 126:2
126:17 127:9
127:16 128:9
128:23 129:1
129:17,24
130:3,5,8,22
131:7,15,23
132:6,10,14,21
133:8,14,19
134:4,8,10,22
135:1,4,12,17
136:17 137:2
137:14 138:5
138:12,16,24
139:6,14,24
140:2,5,8,13
141:7 142:5,11
142:15 143:16
144:8,14,24
145:12,21,24
146:16,18
147:6,13,18
149:14 150:3
152:16 153:11
153:15 154:20
155:23 156:3
157:9,15,24
162:21 163:12
163:17,25
164:5,10,17,21
165:6,14,16
166:23
Oklahoma 39:17
40:20 45:18
48:5,7 50:2
52:2,10,17,19
57:15 58:16,16
61:6 63:20
131:20 132:6,7
132:12 158:7
158:13
old 20:6 86:13

omeprazole 25:9
on-the-street
14:3
once 52:19 53:8
57:3,5 61:7
82:2 93:14
119:12 122:6
125:10,10,16
125:20,25
131:12 132:16
135:24 148:8
150:7 155:25
one's 29:11
one-and-a-half
53:23 55:14
One-page 3:14
3:15
ones 79:24
onset 53:2
open 16:20 43:18
44:16 45:4 93:6
96:8,9,10,17
99:3 100:13,18
102:1 108:3
opened 100:17
operating 90:18
operation 79:21
opinion 29:8
50:12
opportunity
45:14 77:19
79:7 109:21
132:24 144:14
147:13
opposite 77:8
78:3 88:10
90:11,12,16
oral 1:13 4:2
169:5
order 7:7 42:1
66:13 124:14
ordered 112:11
112:12
original 59:14
168:20 171:9

originally 56:1 60:24
outcome 42:21 168:16
outside 41:20 42:20 69:22 153:1
overdose 58:24
overseeing 24:17 24:22,24
overtime 17:14 17:17
OWENS 2:21,22 116:25 146:7 146:12 151:25
owens@jowens... 2:25
owned 136:1,1,2

**P**

P 2:1,1 4:1 5:1
P.A 2:10,22
p.m 1:16 4:5 167:4
P.O 2:5,16,23
pace 98:11 99:14 99:15
pack 14:23
page 3:5,10 6:8 130:11 138:14 139:14,15,16 139:16 152:7 170:2,5,8,11,14 170:17,20,23 171:1,9
pages 130:2 136:24 147:4 147:10 152:4 171:3
paid 44:13 58:20
pain 108:17 115:19 116:10 116:15,20,23 117:2,7
pairs 145:14

panel 87:15
paperwork 15:5 15:7,16 37:6 46:8,8,9,10 57:11 142:9
parallel 74:9
paranoia 46:13 57:13,14 62:25
paranoid 41:7,10
parents 34:13
park 87:3,5 92:15 93:6 94:10,13 95:11 95:24 96:1 103:4,5
parking 73:23 78:18,20,21 92:18,19
part 16:8 24:25 63:23 68:6 92:14 100:23 112:8 133:21 137:11,15,20 151:21 159:23 166:14,18
partially 78:5 88:10 89:24 90:12
participate 112:19 119:14 162:7
participated 119:16
particular 71:1 135:7 164:8
parties 168:15,17 168:23
partly 88:18
pass 15:7 71:5,8 75:6
passed 71:3
passenger 94:25 111:19,24 112:11,11,12 112:20,22

113:3,12,22 114:10 116:2 121:9 122:4,17 122:20 123:5
passenger's 100:9
passing 38:10
pastor 16:10
path 10:10 76:8 76:15
patient 51:16
patients 22:4
patrol 11:13,15 11:21,24 12:21 14:8 20:23 37:7 68:15 112:15 112:16 121:7,8 122:2,3,3,8 131:16 140:17
pause 100:15
paying 87:5
PAYNE 1:5
PBA 127:5,6 128:12
pending 7:1
PENNSYLVA... 2:6
people 12:4 16:14 18:24 35:14 36:12 51:14 55:4 66:14 70:24 72:8 75:7 90:2 90:5,11,13 91:5 103:9 108:23 109:15,16 119:24 137:25 160:16 161:22 161:23,24
people's 37:5
pepper 10:16 145:3
perceive 52:8
perceived 111:7 159:18 160:12

perceives 52:8
percent 24:10 26:1 27:25 28:19 30:7,25 31:12,21 33:1 47:10 48:14 52:18 55:21 61:5 64:22 77:17 78:12 81:9 85:24 88:12,19 99:8 102:23 106:12 107:7,9 111:5 112:22 113:8 114:4 123:25 124:16 127:19 129:11,21 130:4 131:17 132:11 133:12 133:25 138:3 139:12 140:1 140:11 141:5 152:23 155:12 166:3
perceptions 69:18
perform 60:11
performance 36:20 64:11
performed 119:11
period 29:3,5,6 31:25 47:9,25 52:16 64:18 85:22 87:23 115:3 116:16 116:20
periods 35:3 57:7
permanent 22:16
permission 126:15
permitted 162:21
perpendicularly 71:5
person 22:3

23:16 41:10 59:13 61:2 77:13 98:19 103:5 114:16
personal 1:6 16:14,19 145:18 154:17 155:5,8 156:15
personally 1:5 147:24
personnel 120:8 142:17
persons 125:5 168:17
pertaining 50:18
pharmacy 66:20
PHONE 1:25
photographed 88:22
photos 89:4
physical 131:7 142:14
physically 18:19 18:20 41:8 46:19 100:13 110:8 120:17 133:11 158:23 161:3
physician 22:2 57:6 58:8 133:22
pick 27:15 78:11
picked 54:8 60:25 98:8
picking 11:12
pickup 69:12,16 71:3 74:5 112:13
pill 55:19
pills 53:23 54:15 55:4,4,14 56:13 67:17
place 77:6 90:3 101:24 109:2 129:14 134:13

168:12
**placed** 108:21
112:13 125:1
125:16
**Plaintiffs** 1:7 2:2
4:3 169:8,9
**plan** 81:5 83:8
**plate** 75:1,9,11
**play** 49:23
164:13
**Pleasant** 73:20
**please** 11:6
109:16
**plenty** 148:10
**point** 7:4 11:3
12:17 14:19
20:21 23:17
31:24 38:13
47:1,12 49:14
50:5,9 52:5
61:17 69:7,19
72:18 74:21
76:18,23 77:7
81:4,25 82:4,6
82:20 84:1
86:22 92:18
93:11,13,23
95:23 97:25
98:20,25 99:16
100:1,6,20
101:9 103:3
105:19 107:5
107:24 109:2,7
110:13 111:5,9
111:11,12,23
113:19 119:12
120:9,11,14
121:1,11,20
125:14 126:3
126:17 128:10
155:3 159:19
161:15 163:19
165:9 166:4
**pointing** 137:22
137:23

**police** 46:21
50:23 51:9
65:23 66:1,7,13
72:10 89:2
119:8,9 127:1,7
127:20,23
132:7,8,12,12
149:7 165:4
**policeman**
161:17
**policies** 8:8,13
12:21 13:14
33:20 137:1
144:1,5 149:1,9
149:24 150:7
155:13,25
156:6,22,23
159:1
**policy** 21:13
30:10,17 82:1,1
82:17,20 124:2
124:9,16,25
125:13,19,23
126:2 129:8
130:19,25
131:2 132:3
133:5,11,16,17
134:1,18,20
135:20 136:20
136:25 139:1,9
139:12,19,20
139:23 140:4,8
140:10,14,18
140:20,23
141:4,10,15,20
141:22,24
142:5,8,18,22
143:7 146:20
146:21 148:2,2
148:9,25 149:5
149:19 151:1
155:22 156:19
158:25 159:4
**Polk** 4:5
**pool** 108:2

**poor** 24:25 68:5
**POPE** 168:4
**popular** 161:20
**Portale** 81:1
127:14
**portion** 103:25
157:12
**position** 8:22
92:23 94:9
104:20,20
108:21 109:3
117:25 118:5
119:4 130:17
134:24
**positioned** 74:7
92:20,21
104:22
**positioning** 71:2
92:24
**possession**
156:15,16
157:5
**possibility**
111:23
**possible** 28:24
124:5
**possibly** 113:24
144:7
**potential** 114:5
160:12
**pouch** 145:13,14
**pound** 103:15
**pounds** 18:2,6
**power** 85:10
**powered** 85:2
148:12
**practice** 22:4
33:20 44:9
82:24 83:4,18
83:19 84:7,9
87:13 90:19
91:4,7,8,11
101:22 124:17
164:12,13
**practicing** 24:6

**practitioner** 22:8
23:20
**preferred** 14:14
94:2 169:5
**prepare** 142:8
143:2
**prepared** 5:18
45:15 79:8
109:22 169:7
**preparing** 142:21
**prescribe** 23:12
24:15 28:4 36:6
**prescribed** 25:10
25:12 26:5 28:1
28:2,14 29:16
31:24 32:15,19
32:24 33:2,5
36:5,10,12 39:1
41:16 54:12
55:13 56:9,12
57:23 133:15
**prescribing** 25:2
**prescription**
28:13 29:19
33:2,4,8,15,21
33:22 58:23
61:7 63:4 65:20
66:11 68:7
**prescriptions**
24:17
**presence** 145:1
**present** 27:9
**presently** 53:25
56:6
**presumably** 13:1
15:7 18:3 28:2
33:4 91:1,4
107:24 115:4
**presume** 8:4,7
**pretty** 20:13
36:23 48:19
63:11,16 64:11
121:15,23
128:18 160:1,5
163:15 166:12

**prevent** 5:24
17:16
**previous** 30:7
88:25 109:25
**previously** 66:16
92:8 129:3
**primary** 22:2
32:9
**print** 13:19 88:23
**printed** 13:16
138:13
**prior** 9:1 22:14
22:15 54:11
63:20 65:1,2
71:13 83:5,12
96:6 107:7
117:20 131:11
**probable** 124:13
**probably** 7:5
51:18 57:3 58:4
62:21 130:1
**problem** 21:22
26:14
**problems** 27:12
27:12 34:22,24
**procedure** 4:7
113:9 129:8
134:13
**procedures** 8:8
12:21 13:15
141:9,14,19
**proceed** 5:18
**proceedings** 23:5
45:12 79:5
109:19 144:12
167:3 168:8,9
**process** 12:15
34:20 39:12
59:3 69:19
71:20 84:15
86:13,14 87:4,8
88:8
**processing** 111:3
**produce** 137:4
**produced** 4:3

157:17
**professional** 58:1
**program** 12:11
  12:20 164:19
**project** 77:12
**projected** 18:21
  90:8
**projecting**
  104:18
**promoted** 11:15
  11:23 131:12
**promotion** 11:25
  12:2
**prompted** 34:13
**proper** 142:8
**properly** 34:20
  81:17 92:21
  153:5
**property** 100:23
**protect** 58:13
**protection** 152:6
**provide** 128:9
  135:13 168:22
**provided** 8:7,19
  10:14 62:5
  147:7,9,17
  156:22 157:9
  159:17 160:8
**provider** 169:5
**psych** 61:21,22
**psychiatric** 40:3
  40:6 47:24 49:1
  49:2 50:9
**psychiatrist** 22:5
  22:8,13,16,18
  23:11,13 59:2,4
  59:11
**psychol** 22:13
**psychological**
  130:24 131:7
  131:23
**psychologically**
  18:22,23
**psychologist**
  22:11,18 23:8

23:13 39:18
  40:6 59:10
**PTSD** 32:23
**public** 43:24 80:3
  157:19 168:7
  171:18,23
**pubs** 65:11
**puddle** 116:13
  118:18,20
**pull** 64:13 74:1
  77:13,14,15,20
  90:14 120:18
**pulled** 41:14
  73:21,25,25
  75:5,5,7 78:22
  90:15 92:19
  100:20 109:6
  119:22
**pulse** 120:11
**purpose** 93:2
  95:13,21,21
**purposes** 15:15
  112:9 124:2
**pursuant** 4:6
  8:13 124:25
  125:12 131:8
  142:22 148:20
**put** 10:20 13:16
  21:6 31:14 58:8
  73:2,8 85:18
  87:3,21 92:14
  95:10,15,24
  103:4,5 117:24
  118:6 134:13
  137:8 152:5
  159:21
**putter** 45:2
**putting** 73:9 96:1

———————

**Q**

**qualifications**
  135:19
**qualified** 135:24
  145:18
**qualify** 135:23

**quarter** 87:15
**quarter-** 90:9
**question** 6:14 7:1
  7:2,4,7 8:16
  14:5 24:25 30:7
  35:9 43:22 45:4
  49:10,13 54:8
  68:5,15 78:25
  81:6 85:12
  88:25 109:25
  116:1,7 117:25
  125:10,22
  142:24 146:14
  158:21 159:2,7
  163:1
**questioned** 124:6
**questions** 5:21
  6:13 7:12
  166:24
**quick** 128:18
  158:1
**quickly** 58:24
  63:11
**quit** 25:16,17,18
**quite** 8:2 161:1

———————

**R**

**R** 2:1 5:1 168:1,6
  169:1,15
**radio** 78:11 82:7
  82:8
**rain** 153:6
**raining** 153:2
**raising** 43:14
**Ramm** 68:23
  69:9 91:13,22
  110:23 114:3
  121:2,8
**Ramm's** 121:8
  125:17
**ran** 73:5
**range** 57:1
**rank** 7:20
**rapid-evolving**
  84:19 86:3 87:2

**rapidly** 89:12,13
**rapidly-evolving**
  92:16
**Ray** 67:4
**reaches** 99:6
**reaching** 98:19
  99:1
**reacting** 100:5
**reaction** 57:9
**read** 48:18 55:12
  74:25 142:1
  147:13,15
  158:15,23
  171:2
**reading** 137:22
**ready** 73:25
  144:16
**real** 22:21 41:4
  75:10
**realize** 53:8
  111:9
**realized** 9:14
  90:24 93:13
**realizing** 54:13
**really** 6:25 16:13
  28:19 35:4 38:9
  71:17 78:2,2
  80:1 105:12
  132:19 152:4
  159:3 165:17
**rearview** 73:22
**reask** 85:12
  163:1
**reason** 5:20
  62:24 72:18,24
  81:20 132:14
  136:23 142:13
  143:1 149:12
  151:10,18
  153:12,16
  170:4,7,10,13
  170:16,19,22
**reasonable** 77:13
  103:5 145:25
**reasonably** 146:3

**reasoning** 74:23
  151:16
**REBECCA** 1:5
**recall** 10:15,18
  13:17 19:2,13
  19:20 20:25
  21:1,4,7 23:13
  23:14 24:8,21
  24:22 25:22
  27:25 28:11,16
  29:7,14 31:3
  33:13 34:11
  41:14 45:22
  48:20 50:10,11
  51:17 53:1,14
  56:8,18 58:12
  60:18 62:2,16
  63:3 64:5 66:19
  68:8,25 70:22
  72:5,17 73:19
  74:4 82:11
  83:25 84:8,25
  85:19 88:6,12
  88:19,20 89:17
  89:20 90:23
  91:8,8 97:2,8
  98:17,21
  100:17 101:8
  101:18 104:16
  108:4,13
  111:12,13
  112:10,18,19
  112:24 113:6
  113:12,18,20
  114:3 116:5
  117:6 118:12
  119:7,15,15,17
  119:18 120:12
  120:25 121:6
  121:14,17,19
  123:10,13,18
  123:20,25
  126:12 127:10
  127:23 128:2
  128:11 129:10

130:8,16 131:7
131:11,17,24
132:19 133:9
133:16,16,17
134:9 135:8,14
135:15 136:9
136:12 137:10
137:14 138:9
138:16,18
139:21 141:25
155:7,9 158:22
160:1 161:25
162:23 163:15
165:4,7 166:21
**recalling** 29:1
72:6
**receive** 10:22
13:12 135:6
**received** 12:21
13:10 147:7
148:8 156:24
157:2 160:25
**receiving** 160:1
**recognize** 136:22
137:7 138:1,2,6
**recognized** 10:25
**recollection**
21:11 39:3
152:24
**recommendation**
148:7,14
**recommended**
161:21
**record** 5:11 6:15
7:9,10 21:9
27:3 80:19,23
82:12 84:18
85:23 127:6
137:8,14
150:17 152:5
157:18,19
**recorded** 82:4,11
82:16 90:20
143:17 147:20
**recording** 83:13

84:21 85:20
87:18,20,25
88:2 140:7
150:8
**records** 31:22
**recover** 42:7
69:21
**recovered** 71:11
**recovering** 119:4
**recovery** 108:21
109:3 117:24
118:5
**recreationally**
54:21,22 55:5
**refer** 60:16
**reference** 34:1
153:23
**referenced** 15:14
24:11
**referral** 144:6
**referred** 22:12
59:7,14 91:2
160:19 161:14
162:19
**referring** 10:1
**refers** 60:7
**refill** 32:17 54:10
65:17,18,19
66:6,11,13,17
**refilled** 65:25
67:15
**refills** 32:1
**reflective** 74:7
**refusal** 147:25
**refused** 148:9
**regarding** 62:6
147:24 148:3,6
**regardless** 30:19
124:18
**regards** 151:3
**registered** 76:11
**regular** 16:3
25:14 166:12
**regularly** 55:1
66:20 161:18

**Regulations**
169:11
**rejected** 66:17
**related** 51:15
63:15,18
154:21 155:23
156:3,12,14
**relates** 150:6
**relating** 114:1
155:10
**relation** 54:7
152:22
**relative** 168:14
**relatively** 58:9,24
**relay** 88:16
**release** 53:21,21
57:2,4,4,4
58:25
**released** 48:8,9
48:13
**relied** 150:10
**relinquish**
168:20
**remain** 123:21
126:24
**remained** 68:7
**remedy** 81:5
**remember** 12:7
12:13 14:25
17:1 19:21,22
19:23 20:9
29:14,16 33:11
36:25 37:24
41:17 47:17
48:12 58:19
59:8,13 60:8,9
60:13,21 61:3
63:20 69:3
71:23 72:2 73:4
73:18 76:4 77:5
79:22 83:14
84:3 85:15
87:22 91:21
96:25 97:9 98:1
98:5,10,11

100:9 103:25
111:16 112:21
113:13 114:18
115:10,14
117:6 118:15
118:16,20
119:11 120:1,3
120:4 121:4,22
122:1 123:13
126:16,20,21
127:22 129:8
129:12,20,21
129:22 130:10
130:20 132:8
132:23 133:11
134:1 137:11
137:25 139:22
140:4 145:15
147:1,16
150:14,24
152:22 153:8
155:15 159:19
159:23 162:12
162:18,20
163:19,25
165:2 166:3
**remembered**
62:22 75:14
137:12
**remembering**
65:5
**reminded** 151:4
**reminding**
150:22,25
**remove** 120:16
**removed** 120:19
125:20,24
**render** 113:20
**repeat** 146:8
**repetition** 150:19
**rephrase** 7:5
**report** 14:15,23
14:25 15:12
65:23 66:1,7,13
68:2,6,10,12

137:25 138:17
138:17 142:3,4
142:13,14,21
143:2 147:2
148:19 156:24
**report-wise**
21:20
**report-writing**
141:19,23
**reported** 76:19
79:11,11 80:13
80:20 132:7,8
132:14,24
168:9
**reporter** 6:10
168:6 169:10
169:16
**REPORTER'S**
3:9
**Reporting** 1:20
3:24 169:24
**reports** 14:10,11
14:13 15:1,9,11
21:18,22 36:3,3
37:3,5 39:5
66:14 154:9,18
154:18
**reposition** 111:17
**represent** 122:19
**Representative**
1:6
**represented**
153:15
**reprimand** 148:1
150:12,21
**request** 4:3 32:14
60:5 135:5
169:8
**requested** 32:12
117:22 135:9
162:1,2,4
**require** 29:10
125:20,24
**required** 8:5 12:9
15:5 68:9,12

131:13,14 134:23 138:16 142:8
**requirements** 134:21 141:24
**requires** 168:19 168:22
**reserve** 42:10
**resided** 158:8
**resistance** 139:8
**respect** 8:16 25:20 36:21 133:14 159:7
**respond** 110:19
**responded** 152:25
**responders** 60:22
**responding** 73:15
**Response** 139:8
**responsibilities** 36:21 38:15
**responsible** 15:4
**rest** 17:9
**restarted** 32:6
**restate** 7:6
**result** 41:24 42:18 144:6
**resulted** 5:15 62:3,7
**resumed** 23:5 45:12 79:5 109:19 144:12
**retired** 22:3 24:11
**retreated** 111:21 111:24
**retrieved** 47:2
**return** 75:12 93:12 102:5,6 102:22
**returned** 47:13 47:15 75:13
**reverse** 71:4,18 73:2,10
**review** 15:11

92:6,11
**reviewed** 92:3 161:5
**revisit** 44:15
**Rice** 2:19 68:20 69:10 72:1,12 73:4 80:5 83:14 90:19,22 110:14,24 111:1,14 112:4 119:21 123:4
**Rice's** 122:3
**ride** 51:11
**riding** 51:2
**rifle** 93:18,20 104:1,11,23,24 105:2 145:18
**right** 7:11,15 15:18 21:12 22:17 27:2 29:8 35:16 39:11,23 40:11,15 41:6,6 43:13 44:11 45:7,17 46:24 48:15 49:6 50:20 52:21 53:8 54:1,12 55:24 57:16 58:9 59:24 60:3 66:3 72:24 76:11,18,22 86:1,15 87:10 88:14,16 89:17 89:20 91:24 96:17 99:6,10 101:1,8 105:4 106:8,24 107:8 108:19 110:6 114:4,6,23 115:7 116:21 117:6 118:14 120:23 121:12 125:7 133:2,25 134:4 136:17 136:22 138:18

144:22 150:21 152:3,5,19 156:15 164:21
**ringing** 24:9
**road** 2:11 64:13 67:3 69:13,15 69:23 72:6,7,7 72:8,9 75:17,24 75:25 76:15 77:13,14,15,18 94:8,14
**roads** 75:23,24 75:25 76:8
**roadway** 71:6 88:4
**ROBERT** 2:14
**robertnwcmb...** 2:18
**Rock** 1:22 2:12 2:17
**role** 164:13
**roll** 98:6
**rolled** 71:19 94:18,21,25 95:3 96:2
**rolling** 73:23 93:4,6 94:20,23 98:8 100:7 103:3,18
**Roman** 133:20 134:5
**room** 44:8 47:3 48:17,18 49:16 51:22
**rose** 74:16
**roughly** 10:17 19:23 20:6 30:5 40:9 53:3 65:3 89:15
**rounds** 136:5,12
**route** 69:9
**routines** 64:6
**rule** 42:3 145:5
**rules** 4:6 6:7 105:16

**run** 93:3 153:1,5 153:5
**rundown** 127:21
**running** 18:10 98:3,3,4,9

—————— **S** ——————

**S** 2:1 3:12 5:1
**safe** 77:12 92:22 114:20 164:21
**safer** 90:3,14
**safest** 101:24
**safety** 114:5 116:3,3 125:4
**sat** 121:7,9 125:16,18 158:22
**save** 113:24
**saw** 46:25 70:4 74:9 81:16 82:19 92:5 114:24 118:25 119:1 120:17 120:18 158:18
**saying** 9:7 27:2 27:12 30:19,22 35:10 37:15 50:11 55:18 56:23 84:23 86:15 92:8,9 95:7 96:18 98:22 106:3,16 122:19 138:6
**says** 42:12 147:23,24 151:2
**scenarios** 161:3 164:13
**scene** 82:14 88:17 109:6 112:8 114:19 116:2 117:23 119:8,9 120:8 120:16,19,22 121:10,18

122:18 124:11 127:11,20,25 128:5
**schedule** 12:5 30:11 48:8,9 66:4
**scheduled** 127:17
**scheduling@ar...** 1:24 3:25 169:25
**school** 34:17
**scope** 143:24
**Scorpion** 84:1
**script** 42:23 54:8 54:23 55:3 57:20 62:1 68:3 68:5
**SEAL** 169:12
**sealed** 42:9
**search** 155:10,20 155:21
**searched** 155:14 155:15
**searching** 155:16 155:22,24
**seat** 121:9 122:4
**second** 14:10 73:23,25 133:14 139:16 154:12,23 165:16
**seconds** 83:7,10 85:24 86:2,9,16
**Section** 169:11
**secured** 114:11 121:25
**security** 132:18
**sedated** 132:20
**see** 13:10 14:14 15:3 18:22,25 21:23 22:5 23:3 29:10 32:13 37:8 38:10 47:5 49:4,4 50:3,17 55:16,18,21

60:24 65:17 66:12 70:7,14 70:23 71:8,17 72:21 73:10 74:2 76:22 82:5 84:25 85:8,21 88:3,23 90:3,14 92:1,1,3,8,13 93:16 95:15 96:10,11,17 97:3,23 99:19 102:12,21 103:24 104:19 105:6 106:5 107:19 108:1 110:3,8 112:1 115:7,22 118:8 118:10,11,25 119:2 120:16 122:9,18 129:1 130:3 133:8 147:8,18 157:13 162:3 165:20

**seeing** 22:1 23:20 50:2 96:4 116:14 121:17 129:10,12,21 129:22 130:8 130:16 137:10 139:4 147:1 165:18

**seen** 74:3 92:8 129:6 142:16 146:25 147:11

**sees** 60:4

**selected** 60:24

**selection** 32:13

**self** 97:13 98:2

**self-reported** 132:6

**selling** 67:17

**seminars** 161:4

**send** 13:7,18 161:24

**sending** 61:15,24 63:10

**senior** 158:4

**sense** 43:19

**sensitive** 58:8,10

**sent** 63:4 64:2 89:3 127:17 148:3 150:15 155:17 162:1

**separate** 2:8,19 20:24

**separately** 152:9

**sergeant** 7:20 80:25 127:14 147:24 148:1,5 148:8,9,14 150:11

**serious** 16:4 38:14

**served** 153:8

**service** 168:23

**set** 39:15 79:13 88:12,13 127:13 168:12

**settled** 41:20 42:19 43:2,21 43:23

**settlement** 43:25 44:6,10,20

**seven** 20:11

**shadow** 104:18

**shape** 18:11

**shared** 52:2 161:18

**SHEET** 170:1

**sheet(s)** 171:7

**SHEET/SIGN...** 3:10

**shelter** 153:6

**sheriff** 2:20 38:13,20 39:7 60:5 61:13 62:12,14 63:3 63:10 64:1 68:2 121:10,17

126:8 127:12 129:4 134:14 149:6 150:3 151:12 161:24 162:6,10 163:3 163:19

**sheriff's** 3:15 4:5 7:16 8:14,21 10:20 11:4 12:8 12:22 16:10 21:2,13 22:14 23:21 24:19 29:25 30:3,6,8 36:2 37:11,14 50:19,21 59:1,4 64:1 68:6 69:1 74:5,6 91:14 124:10 127:2 145:19 147:9 148:2,15 151:21 159:20

**shift** 7:24 8:1 13:21,24 14:4 15:2,11 68:23 80:2,7 83:19 91:5 151:4 164:13

**shifts** 13:25 17:2 80:1

**shoot** 99:22 100:2 103:2,22 105:6,9

**shooting** 82:19 88:17 93:19 100:16 101:6 104:11 123:3 126:23 135:25 143:21 147:19 148:19,24 149:2,18,23 151:12 152:22 154:4 165:1

**shop** 101:4

**short** 17:11,13 29:6 65:1

**shortage** 166:5

**shortly** 150:14

**shot** 32:20 94:21 106:6,10 107:16 110:14 111:1 153:10

**shotgun** 145:19 145:20

**shots** 82:7 84:20 101:13 110:13 110:17 111:17 114:6

**show** 93:16 102:20,25 103:1 129:2,3 129:17 130:5 130:22 131:25 133:2 134:17 136:17 138:20 139:6 140:5,15 140:24 141:7 141:12,17 142:15 143:4 146:18,24 153:18

**show-me-your-...** 102:9

**showed** 121:19 121:21 161:14

**Showing** 135:17 152:11

**shows** 110:24 112:4

**shut** 87:21 100:12,14,19

**sic** 151:15

**side** 11:4 12:21 40:23 64:13 69:15 74:6 96:23,24 112:22 113:3 113:22 117:12 117:19 118:14 161:22,22

**side-view** 73:22

**sign** 12:24

**signature** 171:1,8

**signed** 13:4,5 14:18 41:19 171:8

**significant** 58:2,4 124:11

**signing** 49:9

**similar** 46:12

**simply** 58:23 62:7

**simulator** 159:21

**simultaneous** 128:19

**sir** 5:14,17,19,22 5:25 6:9,17,23 7:3,8,14,18,21 7:23,25 8:3,6 8:10,15,20,23 8:25 9:18,20,25 10:2,4,12,20,24 11:5,14,18 12:1 12:7,23 13:3,12 14:5 15:6 17:18 17:21 18:5,12 19:2,4,6,12,15 19:21,24 20:1 20:14,19,22 21:3,8 22:10 23:10,19 24:7 24:12,14,16,18 24:21 25:3,7,22 26:17,24 27:4,8 27:10 28:23 29:7,12,16,20 29:23 30:1,4,18 30:21,24 31:12 32:7 34:5,8 35:8,17,19 36:17,19,23 37:1,9,13,20,23 38:4,8,12,19 39:10,14,17 40:4,8,12,19,21 40:25 41:2,9,17

41:22 43:3
45:14,16 46:1
46:14,16,18,20
46:22 47:7,14
47:16,19,21
48:1,3,12,25
49:2,5,10,18,21
49:24 50:1,4,7
50:10,18,22
51:12,17 52:4
52:12 53:7,12
53:16,19 54:4,6
54:16,24 55:6,8
55:14 56:3,12
56:17,19,22
57:6,10,18,24
58:6,12,14 60:6
60:8,10,13,15
60:25 61:9,12
62:10 63:25
64:19 65:8,19
66:2,19 67:8,10
67:16,19,22,25
68:4,11,17,19
68:22 70:25
71:7 72:14,20
72:25 73:16
74:14,22 75:3
76:3,24 79:7,12
79:15,17,22
84:15,24 85:1,4
85:9 86:3,18,21
87:22 88:5,8
89:8,11,13
90:21 91:3,6,10
92:17 94:4,17
95:9 96:5,9,19
96:22 97:4,6,13
98:6,24 99:2,5
99:11,13,18,20
99:23 101:17
104:5,7,14
105:3,18,21
106:2,7 107:5
107:18,25

108:6,9,11,16
108:18,20
109:21,23
110:5,18,20
111:8,19 112:5
112:16,18
113:11 114:9
114:12,18,22
115:1,6,8,14,21
115:23 116:24
117:13 118:9
118:17,20
119:3,21 120:1
120:15 121:5
122:13,15,17
122:22 123:8
125:9 126:6,10
126:13,16,19
126:21,25
128:11 129:11
129:16,19,20
130:9,10,15,24
131:1,3,6,9,22
132:5 133:1,7
133:18 134:7
134:12,16,19
134:25 135:4
135:22,24
136:4,7,9,11
137:6,17
138:11,25
139:3,8,18
140:19 141:1,5
141:11,16,21
142:10,19,25
143:3,8,11,15
143:19 144:3,7
144:14,15,17
145:11,18,23
146:1,4,15,23
147:12,21
148:18,22
150:24 151:7,9
152:17 153:14
153:20,25

154:5,11,14,22
154:24 155:7,9
155:18 156:10
157:4,6,8,14
158:5,12 159:3
159:6,10 160:7
160:9,13,17,20
160:24 161:1,7
161:10,19,21
162:9,23
164:14,16,22
164:25 165:7
165:12,23
166:13,15,17
166:20,22
**siren** 77:22
**sit** 23:18 29:13
  35:2 103:15
  109:13 119:22
  122:2 126:12
**sitting** 30:17
  35:11 37:15
  39:4 69:12
  78:15 127:4
**situation** 14:16
  18:24 38:22
  64:13 84:19
  86:3 87:2,17
  92:16 105:24
  111:3 112:9
  119:23 125:3
  145:9,10 166:1
**situational** 84:16
**situations** 16:9
  64:9 101:19
  112:7
**six** 11:8 20:11
  79:25
**slam** 87:5 93:5
  94:12
**sleep** 25:10,11
**slid** 88:15
**slip** 95:17
**slipped** 93:2
  95:14

**slips** 97:12
**slow** 77:14
**slow-** 71:18 73:22
**slow-rolled** 71:15
**slowed** 78:2
**slower** 16:23,23
**small** 17:20
  51:22 118:3,20
  129:20,24
**smaller** 139:4
**smoke** 69:25 70:1
  70:5,8,10,13,13
  70:15 71:2,16
  71:16 74:11,12
**smoking** 70:4,6
**smoky** 75:10
**snort** 54:15
**snowing** 153:2
**software** 154:20
**somebody** 15:21
  58:7 60:20 64:8
  100:6 102:20
  108:7 122:7
  124:3 126:4,17
  127:12
**somebody's**
  16:18
**someone's** 122:2
  122:3
**something's**
  34:14 53:8
**somewhat** 12:3
  35:4 75:24
  104:20 163:22
**soon** 65:18 66:11
  83:15 90:23
  100:18
**soothe** 117:5
**sorry** 6:4 22:20
  23:24 24:25
  26:20 27:1 35:8
  36:18 48:4 49:5
  49:7 51:21
  59:16 68:5
  96:15 102:16

116:9 117:21
122:20 124:20
124:21 125:22
127:2,6 131:10
138:23 146:8
152:18 156:9
**sort** 10:10 29:9
  138:2 154:12
**sound** 108:5
**sounded** 89:13
**sounds** 10:9 52:7
  55:25 116:12
  166:11
**source** 26:14
  27:11,13
**south** 69:11 73:6
**southbound**
  71:19 73:24
  77:25
**span** 79:23
**speak** 34:9 38:20
  39:19 48:8 59:8
  61:21 121:6
  124:23
**speaking** 57:25
**special** 127:11
**specialized** 135:6
**specific** 41:10
  45:22 133:16
**specifically** 42:20
  84:25
**specifics** 39:4
**speculate** 151:17
  152:1
**speed** 77:14
  89:15 98:5,8
**spend** 50:8
**spikes** 73:8
**Spirit** 164:7
**spoke** 36:8 51:25
  53:9 59:2,6
  61:13 80:5
  126:8 127:10
  147:24 149:6
**spoken** 34:4,6

148:5 151:3
**spot** 21:6 77:12
**spray** 10:16 145:3
**Springs** 65:10
**spun** 97:19
**squealing** 70:3
**squirrel** 35:23,23
**ss** 168:3
**stable** 120:6,9
**STALEY** 2:19,20
**standard** 136:8 136:10 144:19
**standards** 10:15
**standby** 82:13,14 85:11,18 87:21
**standing** 116:1
**standpoint** 58:3
**start** 11:21 12:5 27:15 35:1,1 36:6 73:4 83:13 85:19,23 93:19 104:11 145:6,8 160:2
**started** 9:12 10:10 14:20 40:17 52:19,20 56:1 73:24 84:17 89:6,6,9 92:25 93:14 94:20 100:18 102:9 119:13
**starting** 68:12
**startle** 35:18
**state** 5:11 11:1 89:2 127:10,20 127:23 149:7 165:4 168:2 171:16,19
**stated** 110:1,2 148:11 168:7
**statement** 128:24 139:21
**statements** 128:4 128:4,9 129:19

**states** 1:1 158:8
**station** 72:8 82:23,25
**stats** 18:3
**statutes** 144:1
**stay** 28:7 93:9 102:1,3,5,24 112:24 114:8 166:6
**stayed** 22:4 103:5 103:10 111:21 114:10 127:3
**staying** 15:16 65:11
**step** 100:11 144:25
**stepping** 93:7
**STEVENS** 2:9 22:20,25 42:16 42:19,24 43:2,4 43:8 44:6,11,18 78:24 79:3 106:20,22 107:14 133:21 167:2
**stick** 13:19 75:23
**STIPULATION** 3:5
**stock** 67:13
**stolen** 14:23 66:10,15 69:21 69:22 71:11,13 71:21,23 73:3 73:12,12 76:19 76:19 79:11
**stomach** 115:11
**stomped** 78:1,7
**stop** 25:17,18,19 26:12 28:9 36:6 67:25,25 72:24 74:13,16 77:9 77:17,20,21 78:4 79:10 83:15 87:16,25 88:3,9,10 89:16

89:18 90:2,2,6 90:7,7,12,14,24 93:15 101:24 102:20 108:19
**stopped** 28:20 51:1 69:12,23 74:17 88:17 89:5 90:10,16 93:24 95:4 117:9,14,15 119:11 147:19 147:21
**stopping** 68:13
**stops** 90:5
**street** 13:22 15:3 31:17,18 68:18 70:12 160:6 162:7 164:1,17
**stressful** 15:22 16:8 119:23 166:1
**strong** 145:2
**struggling** 64:3,4 108:5 117:14 117:15
**students** 36:11 36:12
**study** 25:10,11
**studying** 36:13
**stuff** 9:13,15 11:12 14:7 15:1 15:22,25 16:1,2 16:11,16 17:2 18:8,10,16 21:19 22:13,15 25:13 26:14 27:14,15 28:8 28:11 31:22 32:11,23 34:18 34:23,25 35:15 36:4,24 37:3,3 37:4 46:8,10 47:21 51:3,14 51:24 57:11 59:2 60:19,19

60:23 61:16,18 62:23 63:16 64:7,12 66:15 70:19,21 71:16 80:16 82:23 84:8 85:7 86:5 86:6 92:17 94:14 96:5 100:3 108:21 108:24 113:19 115:2,18 116:4 116:6,13 118:9 121:20 131:13 132:18 135:11 136:25 137:13 138:1 139:11 140:22 142:4 145:4 150:1 154:9 155:5,8 155:13 156:19 156:20,21 161:2 162:15 162:19
**STYLE** 3:3
**styled** 4:4
**subchapter** 140:3
**subject** 43:11 87:3 137:9,15 138:10
**submit** 15:12
**subordinate** 68:21 91:1 165:17
**subordinates** 37:24 165:22 166:12,16
**SUBSCRIBED** 171:18
**subsection** 133:19
**substantial** 168:19
**sued** 41:15
**suffer** 18:25
**suffering** 114:24

115:1,4,5
**sufficient** 74:13
**suggested** 163:12 163:14
**Suite** 2:11 4:6
**summary** 152:6
**summertime** 63:21
**supercenter** 67:2
**supervise** 22:8
**supervising** 166:16
**supervision** 15:5 38:5,6,10 39:15 166:19 168:11
**supervisor** 11:15 14:3,8 15:3 21:15 31:8 68:18 80:20,21 80:24 123:4,6,7 123:11,16 134:2,11 163:12
**supervisors** 16:13 37:25 162:13,15 165:24
**supervisory** 162:24 163:2,5
**supervisory-type** 39:12
**supplement** 137:9,15,24 138:10,17
**support** 148:20 151:8
**supposed** 35:8 55:22 60:11 82:17 85:21 165:10
**supreme** 157:20
**sure** 6:7 10:6 11:2,22 12:19 13:5 14:6,13 15:4,15,17,25

| | | | | |
|---|---|---|---|---|
| 16:1 19:8 21:16 22:12 23:17,18 24:10 25:12 26:1 28:15,19 30:8,25 31:10 31:11,21,23 32:2 33:1,13,14 33:17 34:22 36:23 37:12 38:1,22,22,24 38:24 39:1,25 45:10 47:10 48:14 49:12 51:1,23,23 52:18,25 53:2 53:22 58:20 59:15 60:25 61:5,16,17 62:2 62:21 63:17 64:17,22 67:14 72:5 75:12 77:17 78:12 80:11,11,15 81:7,9,10,10,11 82:10 85:24 86:11,12 87:19 87:24 88:2,19 89:3 90:25 92:5 94:12 98:11 99:8 100:12 106:12 107:7,9 108:13 109:1 109:17,17 110:7 111:11 112:23 113:8 113:14,15,18 113:25 114:19 115:17 117:21 118:24 119:24 119:24 120:5,6 120:17,19,21 121:14,15,21 121:23 122:5 123:25 124:16 125:5,14,14 | 127:19 129:11 129:21 130:4,9 131:18 132:11 133:13,25 136:13,22 137:10,18 138:4,13 139:12 140:1 140:11,20,21 144:10 146:10 149:23,24,25 152:19,21,23 155:2,12 156:1 161:14 163:3,7 163:8,24 164:3 166:3 **surprise** 142:12 149:16,21 150:9 **surprised** 81:20 81:22 147:18 148:24 **surrendered** 132:18 **survival** 160:6 164:1,17 **survivor** 162:7 **suspicions** 73:16 **suspicious** 72:2,3 72:11,20 77:6 **sweeping** 101:4 **switch** 9:8 21:24 67:11 85:16,18 87:7,10 126:17 129:1 **switched** 20:6 21:25 131:15 **Switching** 17:19 144:18 **sworn** 5:5 7:22 132:2 171:18 **syndrome** 35:23 **system** 28:7 58:24 61:8,11 165:6 | **T** **T** 3:12 4:1 168:1 168:1 169:1,1 **tactics** 164:18 **tailgate** 93:19 113:23 **taillight** 98:16 **take** 5:13 7:2 12:18 17:12,13 19:25 20:2 21:19 26:4,4,6 26:7 32:10,12 33:19 34:3 36:2 36:11,14 37:2 37:16,21 38:17 39:6,9 45:9 53:5,9,13,23,25 55:1,2,14,17 56:13 57:8 63:17 73:7 75:24 76:2,3,6 76:16 78:16,25 107:16 109:1 109:13,16 116:2 123:4 126:22,22 127:12 133:8 141:22 143:20 144:9 154:15 165:12,13 **taken** 1:16 4:3 14:13 23:4 25:15 36:9 38:16 45:11 48:24 49:1,2 51:11 65:3 79:4 88:11 109:18 111:6 125:15 126:3 144:11 160:25 161:6 165:1,2 168:11 **talk** 23:8 31:1 32:22 39:22,24 40:5 43:10 44:20 60:20,20 | 63:14 64:8 94:1 115:25 154:3 162:10,13 **talked** 10:9 22:13 26:1,5 32:21 39:2,22 61:17 61:17 75:17 81:15 88:25 89:2 94:1 114:3 119:4,5 121:2,2 121:11 126:7 162:16,18 163:25 166:2 **talking** 33:12 40:19 45:17 53:4 57:14,16 91:16,20,20 92:7 134:5 162:16 163:20 166:7 **talks** 120:22 135:1 139:16 **tall** 17:22 **tased** 138:1 **taser** 10:15 137:13,24 138:17 145:13 145:15 **TASERs** 145:3 **task** 21:22 35:1,2 35:6 **tasks** 34:17 36:1 36:15,18 64:14 **taught** 83:6 102:11 160:10 **teach** 105:4,5 **teaching** 91:8 **team** 128:22 **tech** 152:7 **technically** 82:1 **tell** 12:11 34:12 37:11,21 46:23 59:3 65:9 69:7 69:18 70:9 75:4 79:18 92:13 | 96:7 103:15 115:9 144:24 152:20 **telling** 33:14 50:14 86:16,19 91:7 113:20 114:1 120:3,4 121:1 150:3 **ten** 14:22 50:20 90:6 92:22 94:2 94:6,9,13 95:10 **tend** 75:20 **tendency** 168:19 **tending** 119:24 **term** 6:6 **terminate** 151:12 **terminated** 81:16 81:23 148:14 148:16 149:5 149:11 151:14 155:4,25 **termination** 3:14 81:21 140:9 148:20 151:8 151:10,15 152:13 153:12 153:22 156:24 160:18 **terms** 42:17,21 43:4,9 44:20 133:9 **test** 38:17 165:3 **testified** 5:7 134:10 **testify** 5:6 **testimony** 86:7 124:9 157:9,13 171:4 **testing** 132:2 **tests** 36:13,13 **Texas** 20:11 22:1 158:9,11 **text** 154:13 **thank** 60:3 **theft** 71:14,14,24 |

| | | | | |
|---|---|---|---|---|
| **therapeutic** 57:1 58:2 | 156:25 158:1 158:12 159:13 | 14:14,18,19,21 16:7 17:1,3,3 | 130:18 133:6 135:12,19 | 105:24 125:2 **totally** 77:1 |
| **therapist** 39:19 59:7 63:15 | 159:23 160:2,5 161:10,16 | 17:10 20:18 21:25 23:20 | 137:1 140:12 147:5 148:10 | **touched** 106:15 106:17 |
| **thing** 13:11 45:22 57:10 59:5 | 164:2,8 165:4 **thinking** 87:7,9 | 25:5,11,13 26:6 28:1,14,23 29:3 | 150:13 151:15 153:3 155:3 | **tourniquet** 118:6 **Tower** 77:18 |
| 104:19 106:14 109:11,14 | 113:23 118:2 136:23 142:13 | 29:5,6,21,24 30:9 31:10,24 | 156:23 159:19 161:17 163:19 | 90:8 **town** 24:2 159:24 |
| 133:19 154:19 158:23 | **third-party** 169:6 | 31:25 33:10,12 33:13 35:3 | 163:22 164:24 165:6,10 166:4 | **traction** 93:3 95:19,19 |
| **things** 6:21 16:18 35:7,11,13,18 | **thoroughfare** 75:18 | 38:13 46:15 47:1,9,25 50:3 | 168:12 **times** 16:17 17:3 | **traffic** 77:8,9,17 77:21 78:3,9 |
| 46:2 51:7 63:1 64:8 94:14 | **thought** 27:19 49:13 56:16 | 50:9,19 52:16 53:3,20 54:3 | 28:16 39:25 51:1,1 52:7 | 79:10 83:15 87:16 88:3,9 |
| 100:5 165:13 | 65:6 68:25 | 57:7 58:16,21 | 61:1,4 74:11 | 90:5,12,12,16 |
| **think** 11:7 17:16 | 69:19 71:20 | 61:18,25 62:22 | 75:9 90:6 135:8 | 90:24 101:23 |
| 20:11 21:12 | 82:3 93:18 | 63:14 64:18 | 154:17 163:17 | 102:20 141:3 |
| 24:9 25:11,25 | 102:16 106:9 | 65:24 66:14,23 | 163:18 | **traffic-stop-rel...** |
| 28:15,22 30:5 | 109:12 110:1 | 67:14,15 69:7 | **tire** 88:23 | 83:3 |
| 31:25 32:16 | 151:18,19 | 72:23 73:3 | **tires** 70:2,3 | **trafficking** 71:12 |
| 35:20 39:25 | **threat** 83:8 93:24 | 75:13 77:14 | **to-wit** 5:8 23:5 | **trailer** 153:5 |
| 42:10 43:12,17 | 93:24,25 | 79:10,22 80:8 | 45:12 79:5 | **trained** 83:20,23 |
| 44:5 48:21 | 102:13,13 | 81:4 82:4,6,10 | 109:19 144:12 | 83:23 84:6 |
| 49:22 51:25 | 105:9,16,22,25 | 83:4,11,25 | **today** 5:21 62:20 | 101:22 110:2 |
| 52:1 53:3 54:7 | 106:1,4 110:4 | 84:10 85:6,22 | 92:11 | 161:23 |
| 54:25 55:25 | 110:10,11 | 85:25 86:4 87:3 | **toddler** 63:22 | **training** 8:16,19 |
| 57:4 60:18 61:1 | 111:6,7,23 | 87:8,23,24 | **told** 28:18 41:5 | 10:14,17,22 |
| 61:4 62:24 | 125:6 | 88:21 90:13 | 43:21 62:15,18 | 12:15,17 84:8 |
| 63:21 64:4,20 | **threatened** | 93:4,21,24 | 62:19,19,25 | 87:13 100:4 |
| 66:22 75:22 | 105:14,15 | 94:10 95:22 | 63:5 64:1 81:13 | 108:22 110:11 |
| 78:13,15 84:12 | **threatening** | 97:3,25 102:8 | 88:8 93:12 | 134:21,21,23 |
| 88:12 92:15 | 105:20 | 103:7 107:5 | 102:5,6,24 | 135:2,5,6,9,13 |
| 95:3 98:25 99:6 | **threats** 159:18 | 111:5,6,9,11,12 | 112:10 119:22 | 135:15,19 |
| 99:16 106:8 | **three** 12:13 17:1 | 112:10,14 | 126:4 127:12 | 144:5 149:1,9 |
| 107:6 108:7 | 17:9 32:1 63:22 | 113:16 115:3 | 127:12,24 | 149:19 150:7 |
| 110:21 112:13 | 69:24 74:18 | 115:20 116:7 | 128:8,21 | 159:7,8,17,21 |
| 117:2,18 118:1 | 152:4 | 116:11,16,20 | 132:17 142:11 | 160:1,11,15,19 |
| 118:18,23 | **throw** 94:10 | 117:3 118:9 | **top** 15:16 24:4 | 160:25,25 |
| 119:21 122:1 | **thrown** 65:15 | 119:12 121:2 | 60:10 103:25 | 161:5,20,24 |
| 126:7 127:14 | **thumb** 137:1 | 121:11,17,20 | 137:15 | 162:3,8,11,14 |
| 129:21 130:11 | **tied** 153:1,4 | 121:21 122:5 | **topped** 69:11 | 162:25 163:6 |
| 130:18 131:19 | **time** 6:24 7:1,4 | 124:3 125:1,14 | **tossing** 18:8 | 163:22 |
| 135:2 136:24 | 7:19 8:2,10 | 125:22 127:14 | **total** 55:17 56:15 | **training-wise** |
| 139:15 143:1 | 10:7 12:13 13:1 | 128:10,11,17 | 56:24 125:2 | 162:1 |
| 151:20 155:13 | 13:2,6 14:2,12 | 129:9 130:14 | **totality** 105:13 | **transcribed** |

168:10
**transcript** 6:22
  157:2,11,19
  168:20,21
  169:7 171:3,5
  171:10
**translation** 171:4
**transmission**
  103:8
**transport** 11:9
  11:14,14,24
  12:2 120:2
  131:12
**transported**
  120:7 127:1,14
**transporting**
  11:11
**travel** 69:24
  77:25 78:5,9
  88:11 89:25
**traveled** 73:18
**traveling** 69:10
**treat** 16:15 22:5
  22:6
**tree** 153:3
**trench** 25:13
**trial** 18:13 65:6
  108:8 157:2,3
  157:10
**trials** 157:19
**tried** 65:17 67:13
  73:7 77:11
  84:13 85:10,13
  109:11 127:24
  153:3
**triggering** 17:17
**trip** 54:8
**tripped** 95:14
**trips** 113:21
  158:13
**trooper** 127:10
**trouble** 21:18
  72:6 103:9
**troubles** 35:2
**truck** 69:12,16

70:16,21 71:3
74:5 78:2 93:14
93:15,23 97:11
97:20 98:16,17
99:1,3,4,9,10
99:12,14,15,22
99:25 100:2
102:9 104:18
104:19 112:13
**true** 168:8 171:7
**truth** 5:6,6,7
**truthfully** 5:21
**try** 6:21 16:15,19
  43:8 48:10
  58:13 65:19
  66:17 73:5,6
  74:25 75:24
  84:23 92:21
  101:23,24
  117:5 118:1
**trying** 7:11 22:21
  44:2,4 49:23
  55:24 73:10
  75:9 86:4,5
  93:2 95:17,18
  95:22,24 101:1
  101:5 111:3
  118:1 150:18
  153:6 160:2
  161:16 163:20
  163:21 165:17
**tubs** 65:14
**Tuesday** 64:24
**turn** 15:9 74:20
  80:2,3 82:6,8
  82:24 83:10,16
  84:13,14,17,23
  85:13,17 86:4
  90:23 121:12
  126:15 150:18
**turned** 14:15
  78:20,21 82:20
  90:8 91:23
  146:5
**turning** 77:21

89:19 93:8
117:18 150:19
**turns** 85:18
**twice** 55:7
**two** 6:10 12:13
  17:10 27:6 32:1
  39:23 48:21
  61:4 63:12 67:2
  74:12,18,18
  75:25 130:1
  133:19,20
  134:5 139:16
  145:13,14
  147:10 152:9
**type** 9:1 10:13
  19:20 21:14
  25:20,23 28:21
  38:6 46:12
  53:20 64:6
  131:21 136:5
  136:12 156:18
  159:21 160:15
  161:18,24
  162:3,7,10,13
  162:25 163:6,8
**typeface** 129:25
  130:1
**types** 19:19 20:3
  25:8 36:21 63:1
  161:12
**typewritten**
  171:3
**typical** 12:14
  90:5
**typically** 13:23
  14:7,16,23
  15:10,22 16:9
  17:3,9,12 21:13
  21:19 36:1,10
  44:6 65:22 66:4
  66:6 67:12
  69:21 72:6,20
  73:5 75:22
  77:11 79:25
  82:21 83:1,9,18

84:9 87:14,16
90:6,11,13
91:25 92:21
94:4,7,8,13
100:5 101:19
102:3 103:9
112:7 113:1
118:3 123:18
124:2,17 142:3
163:9

---

**U**

**uh-huh** 6:20
  163:4
**ultimate** 44:25
**ultimately** 15:24
  41:20 43:1 47:3
  78:4,22 81:16
  84:17 94:23
  100:14 103:19
  107:3 111:4
  112:12 119:10
  125:6 128:6
  140:8,10 142:6
  148:16 149:4
  153:10 159:11
  166:8
**unable** 80:2
**unattached** 153:9
**uncle's** 101:2
**uncomfortable**
  35:5
**undated** 151:2
**underlying**
  151:11 159:8
**understand** 7:4,7
  12:4 21:9,10
  22:17 28:6
  50:13 92:5,14
  106:1
**understandably**
  63:24
**understanding**
  14:2 19:18,19
  20:5 22:12 23:7

23:12 30:10,15
30:22 34:16,21
36:8 38:15
41:15 43:20
47:8 57:2,5,24
57:25 63:13,16
66:7 85:15
100:25 101:4
105:18 124:8
125:19,23
134:1 137:19
144:19,21,22
149:3 161:21
165:12
**understood**
  43:22 51:25,25
  158:15,15
  161:5 166:18
**undo** 153:3
**uneasy** 71:10
**unexpired** 33:15
**unfold** 100:24
**UNITED** 1:1
**unlawful** 76:12
  76:16
**unusual** 69:22
  70:3 90:17
**update** 13:6,9
**updates** 8:5 13:1
**upheld** 159:11
**use** 36:16 55:4
  66:20,22 75:20
  76:8 81:17,24
  98:1 136:19,20
  137:11,16,24
  137:24 138:8,9
  138:17,22,22
  142:21 145:2
  145:25 146:2
  147:25 148:3
  150:23,25
  151:4 154:20
  155:5,8 168:9
**use-of-force**
  138:17 144:23

**V**

**V** 1:9
**vacation** 40:18 40:20 67:21 159:24
**vague** 160:2
**varies** 94:7
**various** 155:16
**vehicle** 69:8,12 69:23 70:4,6,7 70:8,8,14,15,18 70:21,23,24 71:2,13,24 72:2 72:3,11,12,15 72:20,21,24 73:3,5,12,13,21 73:24 74:1,2,10 74:16,20,24,25 74:25 75:5,6,7 76:11,19,23 77:1,6,17,19,22 77:22,25 78:7 78:15 79:13 82:19 83:5,5,6 83:8,9,11 84:11 84:11,15,16,19 85:16 87:3,4,5 87:15,15,16 88:6,23 89:6,10 91:24 92:14,20 92:20,21,22,25 92:25 93:1,2,4 93:5,5,6,7,9,12 94:2,5,9,11,16 94:16,18,19,20 94:21,24 95:1,4 95:23,24 96:1,7 96:14,16 97:15 97:16,18,19 98:4,4,12,13,14 100:7,12,13,21 101:22,23,25 102:2,4,5,6,6 102:22,23,24 103:3,6,11,18

111:20,21,22 111:24 112:15 112:16,21,24 112:25 113:1,2 113:2,2,4,14,16 113:19,22,22 114:13 116:1,3 117:24 118:2 119:19 121:7,9 122:12 125:4,5 125:16,16,17 125:18 127:3 145:16
**vehicles** 69:21 71:12,23,24 74:4
**verbal** 80:16 86:6 93:9,10 100:8 100:11,19 103:14 111:20 112:2 113:4 145:1
**verbally** 18:19,20 30:23
**verbatim** 168:9
**verified** 105:22 106:3 129:5
**verify** 105:9,16 107:13 110:4 110:11 159:18
**versa** 115:12
**vice** 115:11
**vicious** 153:7
**video** 82:5 92:2,3 143:21 161:10 162:19 164:2
**videos** 161:1,12 163:23
**violate** 45:6
**violated** 144:1,2 144:5 158:25 159:1,3,8
**violating** 149:5
**violation** 148:2 148:17,21

**violations** 148:25
**visibly** 120:17
**visit** 158:13
**visiting** 40:20,22
**visually** 114:13
**voice-writing** 168:10
**volunteer** 9:12

**W**

**W** 2:19,20
**wait** 86:1 87:14 110:2 114:8
**waiting** 111:4 116:1
**Walgreens** 41:15 42:6
**walk** 10:22 35:14 113:4
**walked** 123:1
**walking** 98:3,4,9
**walls** 100:4
**Walmart** 41:11 45:19 52:20 66:22,24 67:12
**want** 6:21 7:10 7:10,12 18:24 25:9 27:3 35:5 42:18 44:24 45:5 54:11 78:17 84:1 101:3 121:8 130:1 133:8 138:2 152:25 157:25 165:8
**wanted** 9:11 25:17,18,19 45:18 59:1 60:20 64:8 73:3 109:13,15
**wanting** 63:14
**wants** 44:19
**warnings** 128:1,1
**warrants** 153:8
**Warrior** 164:5,7

164:7
**wasn't** 16:6 18:23 26:10 30:13,14 31:4 36:19 38:9 40:5 43:23 56:20 62:8 64:4,10 70:4,15 72:3 73:12 84:21 86:9,12 87:6,7 87:18 95:19 100:7 103:21 119:13 125:11 127:22 135:12 147:4,20 149:11,14 150:16,16 155:4 162:21 166:1,8
**watch** 12:18 163:11,13
**watched** 75:6 161:1 163:15 163:18,24 164:9
**watching** 83:11 84:15 100:23 100:23 113:12 113:14
**water** 65:12
**way** 6:15 14:12 18:9 19:16 20:8 36:6 45:19,20 65:22 69:1 72:1 73:4,5,7,11 74:7 82:19 83:20,21 84:4,4 84:7,7 87:13 95:18 102:19 103:23 104:17 122:25 124:5 124:24 125:4 136:15 150:17 151:11 166:16
**ways** 76:5 117:8

**we'll** 38:5 42:3 44:15 158:1
**we're** 5:13 6:7 7:9 11:11 21:9 39:24 41:25 45:7 53:3 80:18 80:23 82:24 83:5,11 94:8,14 102:11 113:15 137:7,22 162:6
**we've** 71:11,22 120:22
**weapon** 103:2 106:5 107:11 107:13 110:3,8 111:10 126:18 126:22 145:15
**weapons** 145:3,3 145:17
**week** 17:11 54:11 65:2 151:2
**weekend** 65:1,2
**weekends** 17:12
**weigh** 18:1
**well-being** 166:18
**went** 10:15 11:13 11:16 12:15 21:23 40:2 41:5 41:11 45:20 46:23,24 47:17 47:24 49:16 50:21 52:19 59:4 65:2,11 71:20 74:10 75:8 76:6 78:2 78:7,8,14,16 82:6 84:17,18 88:20,20,22 90:15 93:7,15 93:17,21,23 99:9 100:11 102:8 106:11 106:14 118:24 119:19 122:7

122:11 132:16 150:1 154:16
**weren't** 15:18 21:16 31:17,18 33:14 38:3 40:3 55:1 61:7,10 87:9 125:11 150:11 163:3
**west** 69:15 78:21
**whip** 92:18
**whipped** 78:18 78:20 92:18
**white** 71:3
**whoever's** 142:7
**Wide** 96:9
**wife** 26:2,7,16 27:9,11 33:3,15 47:1,12 52:1,5 53:13,15,17
**William** 30:10
**Willie** 67:4
**willing** 32:20 43:10
**window** 100:10 101:2,6
**withe** 33:25
**witness** 3:6 4:2 5:4 42:25 43:3 43:6 45:9 124:5 167:5 169:12 170:24 171:13
**witnessed** 96:13 96:16 120:20
**witnesses** 124:10
**word** 130:20,20 140:11,11 141:6,6
**worded** 116:21
**work** 15:19,20,21 20:15 30:13 39:5 50:21 58:17,18 154:23,25 155:5,8,10 166:6

**worked** 8:1 9:3 13:25 17:5 20:4 22:7 50:19 69:4 91:14
**working** 7:24 22:14 112:7 159:24 161:22
**works** 24:3
**wouldn't** 5:20 26:3,7 29:2 33:18 35:21 36:18 50:13 51:18 58:4 67:12 82:24 87:21 88:1 89:1 102:20 159:3
**wounds** 119:2
**wrecks** 15:24 16:5
**writ-up** 151:15
**writing** 30:13 80:13,15 129:25
**written** 21:2 30:24,25 130:19 142:21 143:2 150:13 169:5
**wrong** 42:23 55:25 65:5
**wrongdoing** 44:12
**wrote** 33:21 148:3,5

_____
**X**
**X** 3:1,12
_____
**Y**
**y'all** 149:15
**yards** 89:22,22 101:4
**Yates** 77:18 90:9
**yeah** 16:16 22:24 22:25 28:10

29:14 43:1 44:6 44:18,19,23 45:5 51:6,19,21 52:21 54:2 55:20,23 65:1,3 69:6 71:21 76:3 79:2 85:13 91:21 94:13 106:1 122:19 123:2 128:15 128:16,20 129:1 133:23 142:2 150:9 160:23 163:2 167:2
**year** 12:8,9 31:11 33:5 39:23 135:24
**year-wise** 30:5
**years** 20:20 44:9 50:20 56:21
**yell** 101:13
**yelling** 98:22 102:24
**young** 20:8,13 34:13 158:10
**younger** 19:17,22 50:16
**YouTube** 161:10

_____
**Z**
_____
**0**
_____
**1**
**1** 3:3 4:6
**10** 135:17
**10-2-17** 147:25
**100** 24:10 26:1 27:25 28:19 30:7,25 31:12 31:21 33:1 47:10 48:14 52:18 61:5 64:22 77:17

78:12 81:9 85:24 88:12,19 99:8 102:23 106:12 107:7,8 111:5 112:22 113:8 114:3 123:25 124:16 127:19 129:11 129:21 130:4 131:17 132:11 133:12,25 138:3 139:12 140:1,11 141:5 152:23 155:12 166:3
**11** 136:18
**12** 64:20 80:1 138:20
**12-hour** 13:25
**12:13** 1:16 4:5
**13** 139:6
**14** 20:20 25:15 140:5
**14-8** 148:2
**149** 2:16
**14th** 169:12
**15** 20:20 95:6 140:15
**150** 55:21
**152** 3:14
**154** 3:15
**16** 27:1 39:25 140:24
**167** 3:8 171:3
**168** 3:9
**17** 27:1 40:1 141:7
**17055** 2:6
**18** 141:12
**19** 141:17 169:11

_____
**2**
**2** 3:4
**2:00** 17:5,5,7,8
**20** 20:16 41:16

54:5 55:13 94:11,18 95:6 142:15
**20-** 56:12
**20-milligram** 55:14
**2011** 10:7 160:4
**2012** 11:23
**2013** 11:20,23
**2017** 27:1 150:11 150:21,22
**2018** 150:25
**2020** 151:1
**2021** 7:16 139:2,9 139:20 141:4 141:10,15
**2024** 1:16 4:4 167:4 169:12 171:5,20
**205** 2:11
**21** 18:3 20:16 129:14 132:3 139:25 140:18 141:20 142:6 142:18 143:4,7 146:21 151:3
**21043** 1:21
**23** 146:18
**25** 146:24
**26** 152:11
**27** 3:14 152:11,12 152:14
**28** 1:16 3:15 152:11 153:18 154:1 167:4
**28th** 4:4 171:5

_____
**3**
**3** 129:7
**3:00** 69:20 71:11 71:22 72:21 77:3
**30** 14:20,24 41:16 54:3 55:7,9,13 55:17 56:10,11

56:14,14 75:15 76:12
**30-milligram** 53:23
**30-some** 77:2
**300** 18:2,6 89:22
**300-** 101:3
**3700** 2:11

**4**

**4** 3:5 129:18
**4:22-CV-00588** 1:9
**4:49** 167:4
**40** 73:6 75:15 77:2
**400-** 101:3
**45** 136:13

**5**

**5** 3:7 76:4 130:5
**5:00** 17:6,8
**50** 44:9
**501.319.4807** 1:25 3:24 169:24
**507** 4:5

**6**

**6** 130:22
**6'** 17:23,24,25
**6-21-29** 169:17
**60** 56:10,15,25 57:1,1,8

**7**

**7** 17:23,24,25 132:1
**7:00** 166:7
**72** 14:18 48:1
**72-hour** 40:10 48:10
**72033** 2:24
**72202** 2:12
**72203** 2:17
**72206** 1:22

**741** 168:6 169:16

**8**

**8** 133:2
**8:00** 17:14
**837** 2:5
**850** 2:23
**89** 69:11,17 70:1 70:19 71:19 73:18 76:1,2,3

**9**

**9** 134:17