# IN THE CIRCUIT COURT OF LONOKE COUNTY, ARKANSAS
## FIRST DIVISION

STATE OF ARKANSAS                                    PLAINTIFF

VS.                          NO. 43CR-21-489

MICHAEL DAVIS                                        DEFENDANT


## TRANSCRIPT OF PROCEEDINGS

PLEA AND ARRAIGNMENT - NOVEMBER 15, 2021
PRETRIAL - MARCH 14, 2022
JURY TRIAL - DAY 1 - MARCH 15, 2022
JURY TRIAL - DAY 2 - MARCH 16, 2022
JURY TRIAL - DAY 3 - MARCH 17, 2022
JURY TRIAL - DAY 4 - MARCH 18, 2022

EXHIBIT

2
_____

exhibitsticker.com

**RT 001**

this court?

THE WITNESS: Yes, ma'am, I do.

THE COURT: Okay.  Mr. Davis, as with everybody else, you can take your mask down when you testify.

Whereupon,

**MICHAEL DAVIS,**

having been called on his own behalf as the Defendant, and having been previously duly sworn, was examined and testified as follows, to-wit:

**DIRECT EXAMINATION**

**BY MR. NEWCOMB:**

Q   Mr. Davis, would you state your name for the record, please.

A   Michael Christian Davis.

Q   Mr. Davis, how old are you?

A   Thirty-one.

Q   Are you married or single?

A   Married.

Q   Do y'all have any children?

A   Yes, sir.  One and then one on the way.

Q   And where did you grow up?

A   In Cabot.

Q   When did you go to work at the sheriff's office and what was your first position and how old were you

then?

A   In 2011, I was 20 years old.  I worked at the Lonoke County Sheriff's Office as a jailer, detention officer.

Q   So you've been at the sheriff's office for -- prior to the sheriff separating you because of the camera, as he testified yesterday, you would've been there, approximately, ten years; is that correct?

A   Yes, sir.

Q   Now, while there, just briefly -- I'm not going to go into all of it, but when you -- when you were a jailer, just briefly what was your duties at -- it's sort of self-descriptive but --

A   Yes, sir.  To keep the inmates in their cells, you know, pods; make sure nobody escapes; booking in inmates and also cleaning duties; providing them cleaning materials to clean the pods and clean clothing, blankets and stuff like that.

Q   Okay.  Then what was your next job assignment at the sheriff's office?

A   I was promoted to transport.

Q   And what does "transport" mean?

A   We'd go to other facilities, pick up inmates that have to come back for court, pick them up and take them to court, and then also return them back to the

facilities we pick them up at.  And, also, transporting inmates from our facility to courthouse and bringing them back.

Q   Okay.  And did that involve you having to carry a gun to transport them?

A   Yes, sir, it did.

Q   And so you did that job for how long?

A   Approximately a year, maybe a year and a half.

Q   And then what did you do next?

A   I was promoted to patrol in 2013.

Q   Was the move from jailer to transport officer a promotion or just the same thing?

A   There was a -- sort of a promotion.

Q   Okay.  Now you said you got promoted to deputy. When was that?

A   In 2013.

Q   Okay.  Did you immediately go to the -- well, strike that.  Before you started working as a deputy, what training did you receive to be a deputy?

A   None, sir.

Q   So what -- I mean, kind -- were you sworn in before or after you went to the law enforcement academy?

A   After.

Q   What about be- -- did you ride with other officers

before you went to the academy?

A   Yes, sir.  I conducted ride alongs.

Q   And then you went to the academy.  And how long was it?

A   It was 12 weeks.

Q   And let's talk about if for a minute.  And we'll come back to it.  But is that a -- how many weeks when you went?

A   Twelve weeks.

Q   And did you go -- we've talked about Pocahontas.  We've talked about Camden.  Which facility did you go for your training at?

A   Camden.

Q   And so what did -- did you live there during the week or exactly what?

A   Yes, sir.  We'd go down there on Sunday night.  There was a group of us, I believe four, had totally went.  We'd all take one vehicle from the sheriff's office, meet up there and transport ourselves down to Camden and we'd stay all week.  There was only -- if I recall, there was one or two weeks where we were allowed to leave early like during range week.  Since we all qualified by Wednesday, we were allowed to go home that Wednesday night and not have to return till that following Sunday.

Q   And "range" means your firearms handling and decision making and --

A   Yes, sir.

Q   -- marksmanship?

A   Yeah.  Yes, sir.

Q   And you -- did it -- did it -- completed that early and --

A   Yes, sir.

Q   -- and got to stay.

A   Yes, sir.  It was mandatory for us to stay that Monday.  And Tuesday we went over stressful shooting scenarios where they would have targets set up and be whispering in our ear, you know, certain colors that we'd shoot or numbers, and we'd have to do it, you know, offhand.

Q   So after you completed the academy, what happened next?

A   Graduated and went through the sheriff's office FTO program.

Q   So that was like when Lieutenant Gephardt who, I think, he was a sergeant at the time; is that correct?

A   Yes, sir.  Their field train -- training officer program.

Q   Were there other field training officers besides him?

A   Yes, sir.

Q   Are they -- who were they?

A   I can't recall.  He was my main, what we called our "home FTO."  He's the one that went through most of the stuff with in the beginning.  I believe I had went with, at the time, Brandon Hampton, who is no longer employed at the sheriff's office, and I can't recall the other ones.  There would've been two other ones, but Brandon Hampton was one.

Q   Okay.

A   At the time, he was a sergeant.

Q   Now, after you got through -- how long did the FTO program last?

A   I think it was -- it's three phases.  At the time, it was just you go for a couple of weeks, so I think a total of six weeks at the time.  They've redeveloped it since then.

Q   Now, after you completed the FTO program, what did -- what happened?  Where -- where did you go?

A   I was released on my own.

Q   And where were you assigned?

A   To night-shift patrol.

Q   Night-shift patrol at that time -- we'll come to it later -- what did that consist of?

A   Just patrolling neighborhoods after certain hours.

You know, late hours patrolling high-crime areas and conducting like traffic stops on vehicles.

Q   And did you work in one particular part of the county or did you rotate or exactly what?

A   We rotated.  We'd work two weeks in one area, then next, you know, vice versa.  And at the time, then, we had three deputies, so it'd be a north and central and south deputy.

Q   Okay.  And did you also have a sergeant in addition to the three deputies?

A   It depends on the time.  Yes, we had -- at that time, we had two sergeants, and they would work from noon to midnight.  But there was times where there was no sergeant.

Q   Okay.  So when you're saying three, that didn't include a sergeant; --

A   Correct.

Q   -- correct?

A   Correct.

Q   And so sometimes there'd be three of you plus the sergeant --

A   Yes, sir.

Q   -- on the night shift and other times there'd be just the three of you more after --

A   Yes, sir.

Q -- late at night, early -- to early the next day when the day people came on; correct?

A Yes, sir. But every -- once during one pay period we all -- all had to take short night, so we -- one of us would get off at eight o'clock, so one or the other two deputies would have to perform their -- cover their district to where they got off at one o'clock in the morning. There'd be -- say, it would be the central-south deputy -- or typically it'd be the south deputy. It would -- we'd be placed in that position so that way they -- when they get -- that's -- the slower-call-volume area was the south district. So they would have time to go up to the front office, do their reports and then be able to go home on time at one o'clock. So, therefore, the central deputy would take over the south district as well.

Q And when you -- you talk about it, because pay- -- once a payroll, was that the -- do you know if it was to avoid --

A Yes, sir.

Q -- overtime?

A Yes, sir.

Q 'Cause your shift wouldn't allow you to get -- if you worked all of it, you would cost the county more money?

A    Yes, sir.

Q    Now, how long were you a dep- -- a patrol deputy?

A    It would've been two years, and then I got promoted to a K-9.  I was given a K-9 -- I became a K-9 handler.

Q    Okay.  While as a K-9 handler, did you still have the rank of a just deputy or did --

A    Yes, sir.

Q    -- you have a special rank?

A    No, I was still considered a deputy.

Q    Was that extra pay on a hourly basis, or was it just the same as the other deputies?

A    Yes, sir.  They paid the dog seven hours a shift.

Q    When you say, "paid the dog," you mean the dog got money or the handler got paid?

A    Well, I got paid, but it was for putting up with him.

Q    Okay.  So -- and just for the -- when you say, "put up with him," the dog lived with you and your family --

A    Yes, sir.

Q    -- and you had to do dog care and training in addition to your duties as a police officer?

A    Yes, sir, we did.

Q    Dog recently pass away?

A   Yes, sir, he did.

Q   Now, so you -- how long were you a dog person?

A   For four or five years.

Q   Okay.  Then what happened next?

A   They retired my K-9 due to him having some medical issues with his teeth and stuff.

Q   Okay.  And then after the dog was retired, did the dog live with you and your family?

A   Yes, sir.  They -- they signed him over to us.

Q   Okay.  Just a minute.

A   I'm sorry.  Thank you.

Q   After your dog retired, did you revert back to being a patrol deputy?

A   Yes, sir.

Q   Did you ultimately get promoted?

A   Yes, sir, I eventually got promoted.

Q   Do you remember when you were promoted to sergeant?

A   Yes, sir.  It would've been February of 2020.

Q   Were you still assigned to the patrol division or did you go to work in some other --

A   No, sir.  I was still per -- still in the patrol position.

Q   And how did -- we talked about when you first came there was three of you on plus the sergeant part of

the time.

A    Yes, sir.

Q    What hap- -- when you came back as a sergeant, how many officers -- well, first, what were your hours a ser- -- sergeant when you came back?

A    It was 5:00 to 5:00.  5:00 p.m. to 5:00 a.m.

Q    And did you -- then how many people were working on that five o'clock in the afternoon to 5:00 in the morning shift as deputies under your supervision?

A    Typically, I would have four.  But here recently it would've been three.  I have a K-9 handler who had worked 2:00 to 2:00.  And I believe before I had left it ended up being noon to midnight.  Not 100 percent positive on that.  And then two other deputies under me.

Q    And so for the entire shift there would be two deputies plus you?

A    Correct.  Unless it was one of the deputies' short nights.

Q    So some nights there'd be just you and a deputy; is that correct?

A    Correct.  After one o'clock, it'd just be me and one deputy.

Q    And that was for all of the unincorporated part of Lonoke County?

A   Yes, sir.  If I'm correct, it's 993 square miles.

Q   Did -- and what are -- what about the dog officer, did they work -- you said at the end from noon to --

A   Midnight.

Q   -- midnight, so you -- they would be there for seven hours of your 12-hour shift?

A   Yes, sir, roughly.

Q   And they -- they would have days off also?

A   Yes, sir.  They take their short nights and it would be -- they'd get off at 10:00.

Q   And when you -- when you had the -- only you and one other deputy, sort of how did y'all handle 900 square miles of county?  I know that would include Cabot and Lonoke and --

A   We would majority stick around the central part of the area.  One of us would kind of stick the far-north-central part of the area, which would be Mt. Tabor area.  There's a church that sits there that we'd sit at or sit on the church on Mt. Tabor, and then the other one would be at the front office working on reports or close -- close to the south part.  And then there's some times where we'd just hang out together.

Q   Okay.  So and you did that for a number of years; is that correct?

A   Yes, sir.

Q   And let's go to the little bit about what was going on the night that this happened or early morning hours; okay?

A   Yes, sir.

Q   First, that was a Wednesday morning starting to work on Tuesday; is that correct?

A   Yes, sir.

Q   Now, with your 12-hour shifts, would you explain to the jury how that worked in a -- using a two-week rotation of time; okay?

A   Yes, sir.  Typically when we work, we work two -- two-week rotations to where one week would be our long week, we call it, which we work Monday and Tuesday, then off Wednesday, Thursday, and then work Friday, Saturday and Sunday.  The next week, we'd only work two days and it would be that Wednesday and Thursday.

Q   In this particular week that this happened, was that your long week or your short week?

A   Yes, sir, it'd have been our long week.

Q   So if this happened Tuesday, Wednesday, when had you first started working that week?

A   It would've been that Monday.

Q   Okay.  Now at that -- and you would've been off the preceding weekend; is that correct?

A   No, sir.  We would've worked that preceding

weekend.  I would've been off that Wednesday and Thursday.

Q   Okay.  Did you take time off that weekend to do something else beforehand?

A   Yes, sir.  The week -- the weekend prior to this incident, I had taken our -- it would've been our off week.  No, correction.  It would've been a week that we worked, but I had taken off some vacation time to go to -- to attend the Arkansas Fire Academy.

Q   Why did you attend the Arkansas Fire Academy?

A   Well, it was the fire -- Arkansas Fire Academy conference.  The fire -- it's fire week, we call it.  I'm a captain with the fire department, local fire department and we go to there -- to the conference.  They come in and show new equipment and have vendors that, you know, promote certain items and we get to look at new fire trucks.

Q   So are you a volunteer fireman or a full-time fireman, also?

A   A volunteer fire fighter.

Q   Where?  In the community that you live in?

A   Yes, sir.

Q   Now, that weekend where was the conference?

A   Hot Springs.

Q   Now are you prescribed a medication by a doctor?

**RT 718**

A   Yes, sir.  I'm -- well, now I'm prescribed multiple medications, yes, sir.

Q   But at that time, were you under a prescription?

A   Yes, sir.  I had two or three.

Q   And what -- was one of them Adderall?

A   Yes, sir.

Q   And did you have a -- did you take your Adderall on that Monday and Tuesday?

A   No, sir, I did not.

Q   Why not?

A   While we were in Hot Springs, I had lost it or left it in the hotel room.

Q   Okay.  Did that impact you in any way that you could tell?

A   No, sir.  I've -- I've taken my medicine and not taken my medicine numerous occasions while working.  It just ultimately depended on how much paperwork that I had to do.

Q   So the fact that you hadn't taken your Adderall Monday and Tuesday had no impact on you?

            MR. PHILLIPS: Object to leading.

            THE COURT: You are leading.

**BY MR. NEWCOMB:**

Q   Did -- did not taking the Adderall have any impact on you on Wednesday morning?

**RT 719**

A    No, sir, it did not.

Q    Now, what time -- when you work, you're working -- not your days off.  Sir, what is your routine?  You know, let's start with you're going to go to work at five o'clock this afternoon so -- and what -- what would your sleep pattern be before going to work that evening at 5:00?

A    Are you talking about like say for today if I went to work?

Q    Yes.

A    Tonight?

Q    Yeah.  And you'd worked last night.

A    I had worked last night?  Immediately when I came home, I'd take all my stuff off and I'd go to bed. Now my younger daughter would've came in and woke me up about 8:00 or so, 9:00 or so whenever she got up to give me hugs and kisses and stuff like that.  And I'd go back to sleep and then, you know, I wake up about 2:30, three o'clock and so that way I have time to hang out with her prior and then get ready for work.

Q    Okay.  So that would've been your routine that Tuesday before you went to work Tuesday night; correct?

A    Yes, sir.

Q    And what -- and you -- what time did you go to

work on Tuesday?

A It'd have been about 4:40, 4:45.

Q And -- and what time would you get off on a 5:00 to 5:00? I know now we'd start about 15 minutes before 5:00 --

A Yes, sir.

Q -- so what -- what --

A Well --

Q -- about getting off?

A -- typically if there wasn't anything going on that morning, that -- that would allow us to where we could've got off about my -- typically when we'd get off would be about 4:50, around that time, or five o'clock.

Q Okay. So that's sort of when the day shift reported and went to work?

A Correct. Our -- our unspoken policy was that we're to come on 15 minutes prior to our shift starting, so that way that the shift that we're coming in to relieve has enough time to get home and, also, we start taking calls so that they wouldn't have to worry about them and be left over, you know, getting overtime.

Q So sort of run us through that evening before these events. Do you remember sort of what went on

when you first came to work at -- I'm going to say five o'clock; okay?  And --

A   Yes, sir.

Q   -- at five o'clock are -- what would your routine be as the sergeant?

A   I'd typically call all my guys to ask since we were -- this would've been our last tour before we were off for a couple of days.  I'd call my two deputies that were under me, which was Deputy Rice and Deputy Ramm, to see what reports that they had hanging over their head or what reports they needed to be done, so that way I can allot time for them to have -- to be able to go down to the front office and take care of their reports before we got off shift.  So I would've called them.  But I believe on this day my wife had an auxiliary meeting with the fire department, and Olivia was kind of acting a fool and they were working on something important, so I'd stopped by to calm my daughter down and hung out with them for just a little bit.

Q   Okay.  And where this was, was this in the area that you would be working and you could respond to calls?

A   Yes, sir, it was.

Q   Now, at that time after you went to where your

daughter and wife were, what -- sort of what happened? Kind of take us through the evening until we get to the incidence we're here on.

Q Yes, sir. I had made arrangements to cover the -- I'm not sure exactly. I can't recall everything that happened, you know, step for step, but I do remember that I'd called Deputy Ramm because she was the one that had majority -- had a lot of reports, and this was her typical short night.

So I'd gotten with her, made arrangements for her to -- for me to cover the north district while she went to the front office to work on her reports. While down at the front office, we received a request for assistance from England Police Department in reference to a domestic battery subject that had fled the scene. They had requested our assistance, and since Deputy Rice was the central-south deputy, Ramm was at the front office working on the reports, they both responded and were down there for a little bit.

Q And so were you out in the northern part of the county?

A Yes, sir, that and kind of stuck close to central. I started down their way, so I would've been more central, so that way if they needed further assistance, I could make it down there to them or if a

call popped off up north, I could be there.

Q   Okay.  And then did that -- when did that situation resolve itself?  Did you --

A   I don't recall exactly what time it resolved itself, but it would've been before two o'clock -- 1:30, two o'clock.  Guesstimating.

Q   Okay.  So what did you understand your manpower was after that resolved?

A   From my understanding that Deputy Ramm had already completed her report.  She had -- I had called her prior to her going down to England, and I called her to confirm that she had taken care of all her reports, and she said she had taken care of all her reports that were necessary to be taken care of.

Q   And so she would've --

A   Been heading home at that time.

Q   Okay.  Let's go to a couple of things at that point.  Did you have a body camera?

A   Yes, sir, I did.

Q   And would you explain -- we've talked about it, but had you -- how long had you had that particular model that you had with you at that time?

A   It would've been a couple of months, I believe.  A month or so.  Maybe just a little bit longer.

Q   Okay.  Now what was -- what did you do -- how does

the body camera work?  Did you just -- does it just
stay on or --

A    No, sir.

Q    I know we've had testimony, but what had you found
from using it for that period of time?

A    That the battery life doesn't last for a full
shift, so, therefore, we can't keep it in standby
mode.  So we'd have to leave it off and then turn it
on before we had made contact with the public.

Q    Okay.  And what was your normal practice at that
time as far as when you turned it on involving a
traffic stop?  'Cause everything's probably a little
bit different --

A    Yes, sir.

Q    -- when you turn it on.

A    Yes, sir.  Traffic stops, we would -- typically,
as we were going to exit the vehicle, we would turn
our body camera on.  We'd stand -- stand at our
quarter panel observing the vehicle like we're taught
in the academy.  Observing the vehicle for any
movement and determine our approach.  And then as we -
- that -- that allowed the camera the five seconds,
five-and-a-half seconds to boot up.  And then as we
started to make our approach before we had passed the
front of our vehicle, we'd initiate our body camera by

tapping it two times.

Q   Now, on the night in question, when did you first become aware of Mr. Brittain's vehicle?

A   At Hwy 89 and Forbus Road.  It'd have been just south of that.

Q   Okay.

MR. NEWCOMB: May I have Exhibit No. 2, my Google Map.  Thank you.

**BY MR. NEWCOMB:**

Q   Do you recognize Exhibit No. 2?

A   Yes, sir.

Q   And what is that?

A   That is an ariel view of the Mahoney's Body Shop and shop.

Q   Okay.  Now is Forbus Road depicted on that?

A   No, sir, it's not.

Q   Is Forbus Road to the bottom or the top of that photograph?  What -- what directions would you go to get the --

A   It would be to the north.  If you're depicting that this be the top of the photo, that would be to the north and that's where Forbus Road would be is to the north of that.

Q   Okay.  It'd be -- if you went up the highway -- if you turn around -- if you came out of the driveway of

**RT 726**

the -- that goes back to the shop, which way would you turn to go to Forbus Road?

A   You'd turn west.

Q   And would that be right or left?

A   That would be right.

Q   Now how familiar are you with that general location?

A   Very familiar.

Q   Why are you very familiar with it?

A   I've patrolled that area for -- ever since I've been on patrol.

Q   And so how frequently would you say you drove that -- rode in that two-week period that you work those seven days in those two weeks?

A   I would typically drive this same trip, stretch of roadway at least four or five times a day during shift.

Q   Now, is -- you said you came in contact with the vehicle at Forbus Road and Hwy -- what drew your attention to the vehicle?

A   All the smoke coming from the vehicle.  At the time I'd wit- -- just witnessed it turn on to Forbus Road and I noticed that there's a large amount of smoke and there was also a large amount of smoke over the roadway from the direction that they would -- they

had just came.

Q   Okay.  And what did you -- did you -- so you would've -- did you pass them after they pulled onto Forbus Road?

A   Yes, sir.  I slowed down observing the vehicle.  I had noticed that there was a loud noise, lots of smoke coming from the vehicle.  I could not see anybody in the vehicle or, you know, see what was up with the vehicle due to just how dark it was in that area.  But they --

Q   Okay.  So -- go ahead.  I'm sorry.

A   They were stopped in the middle of Forbus Road in the nor- -- or the west and eastbound side of the travel lanes, parked in the -- stopped in the middle.  And the rear of the truck, the bed of the truck was partially in the northbound lane of travel of Hwy 89.

As I passed by them, I noticed that the reverse lights did come on.

Q   Okay.  And so what did you do then?

A   At that time, I continued southbound on Hwy 89 keeping -- keeping the vehicle -- trying to keep the vehicle in my rearview mirror as well as my side-view mirror just watching it.

I turned into Mt. Pleasant Baptist Church parking lot, I believe is the name of the church.

Q   Is that church depicted on these photographs?

A   No, sir, it's not.

Q   And about how far would you say Mt. -- well, first, how far would you say Forbus Road is from the body shop?

A   Approximately a mile and a quarter or mile and a half.

Q   Okay.  And the Mt. Pleasant Baptist Church, how far would it have been from you?

A   It would've been about a quarter mile south of Forbus.

Q   So what did you do at that point in time?

A   I turned into the second driveway of For- -- the Mt. Pleasant Baptist Church and was continuing northbound through the parking lot slowly, driving slow, observing the vehicle as it approached me.

As the vehicle was approaching, I turned into the turn-in lane to where I could turn in behind the vehicle.  I positioned my vehicle to where the vehicle that I noticed could clearly see that I was, you know, a fully-marked unit, a marked-sheriff's-department vehicle, and turned in behind them once they pulled in -- or once they passed.

Q   Well, you described a fully-marked and probably all the jurors have seen the vehicles, but let -- just

for safety's sake, would you describe when you say a "fully-marked."

A   Yes, sir.  We have vinyl and ours is reflective vinyling down the side of my pickup truck at the time. It says "Lonoke County" and "Sheriff" in big -- big letters, approximately three-inches tall.  I had a light bar on the top of my patrol vehicle and a push bumper.

Q   Okay.  So did you pull back out onto the -- the highway?

A   Yes, sir.

Q   Okay.  Then what did you do?

A   I pulled in behind the vehicle.  As I was behind the vehicle, I noticed it was really, really loud, making a loud racket.  There was a ton of smoke coming from the vehicle to the point where I could barely read the license plate.  When I was able to get a license plate, I ran the license plate.

Q   When you ran the license plate, what does that mean?

A   Basically running the -- the numbers and the letters that are on the back of your license plate, running it -- giving it to -- the information to dispatch and dispatch provides us with a return, whoever the vehicle's registered to.

Q   Does it give you a return and tell you where that person that it's registered to resides?

A   Yes, sir.

Q   And what did this return tell you?

A   It returned to out of McRae, if I believe correctly.

Q   Okay.  So at this point in time, you'd seen -- did you find the vehicle -- anything unusual or did it cause you to have any suspicions?

A   Yes, sir.

Q   Tell the --

A   Just --

Q   -- jury why and what.

A   -- just the time of night that it was being three o'clock in the morning or time of morning, for being three o'clock in the morning.  The vehicle went left of center multiple times.  At one point was well, you know, half the vehicle was into the on- -- you know, northbound lane of travel.  And the vehicle wasn't operating right.  A lot -- a ton of smoke.  Very, very, very loud.  And it was un- -- I -- I couldn't think of a reason why a vehicle from McRae would be in that area at that point in time in that morning.

Q   Okay.  So what did that cau- -- did you cause that -- you to have any suspicions at that point in time?

A    Yes, sir.  I'd felt -- I believed that the vehicle might have just recently been stolen.  Typically, people that steal vehicles, they'd steal them from outside of our county and then bring them back into our county so that way, you know, local law enforcement -- typically we wouldn't be looking for that.  But that is a known -- a known issue.  So I felt maybe that the vehicle had been damaged prior or during it being stolen or something to that effect to the point where I had requested that Deputy Rice start my way.  I knew he was just south of me.  I was going to back him on a call prior to noticing all this and seeing the vehicle, so I had him start my way so that way if the vehicle had fled on me, that he could get spike strips out and already be ahead of it.

Q    Did the vehicle -- you said was continuing -- all the things that you saw.  What about the driving all the way over into the other lane, did -- did that cause you any --

A    Yes, sir.

Q    Well --

A    Maybe that the subject might've been intoxicated or under the influence of a narcotic.

Q    Was there any reason that they had to dodge anything to go into the --

A   No, sir.

Q   -- other lane?

A   No, sir.  There's no -- no potholes, no roadkill or anything like that.

Q   No deer ran out in front of them?

A   No, sir.

Q   And where was this that they cro- -- when they crossed over to the left lane?

A   It'd have been shortly right after the church, shortly right after me getting behind them.

Q   Okay.  And then what did you do next?

A   I'd advised SO -- typically whenever we -- we project a traffic stop, we try to pick a spot, determine a spot that a reasonable person would pull into.  And so I determined that my shot or the point that I -- that he would turn into would've been at Tower Loop.  So right before Tower Loop or right be- -- right after Yates, I believe it is, that he would pull off to the side of the road there or actually turn onto Tower Loop.

Q   Okay.  Is -- in -- in this photograph, is Tower Loop in it?

A   Yes, sir, I do believe so.

Q   And where would it be?  If you'll stand up, you can point your finger where it would be.

A     I believe this would be Tower Loop.

Q     Okay.  So about how far would Tower Loop be from the body shop?

A     I'd say 300 yards.

Q     Okay.  Did he pull into Tower Loop?

A     No, sir, he did not.

Q     What did you notify the SO you were doing at that point in time?  Did you --

A     Well, initially whenever I had activated my lights to initiate a traffic stop, which is turning the blue lights on, I advised SO that we were -- I was going to be traffic with that vehicle at Tower Loop.  The vehicle then whenever we were traveling -- or when he noticed I turned my blue lights on, he let off the gas, then gassed it again, and it was really loud. And instead of pulling off to the right side of the road, he crossed the center line into the northbound lane of travel and came to a stop on partially in the northbound lane of travel and in the ditch.

Q     Okay.  Now is that area where he did come to a stop and partially in a ditch, is that on the Exhibit No. 2?

A     Yes, sir, I do believe so.

Q     And would you point that out the jury?  Stand up and --

A  Yes, sir.  Would've been right here.

Q  Okay.  Just right on the edge of -- of it.  Is there a road just past that location?

A  Yes, sir.  I believe it's a private drive.

Q  Okay.  Go ahead.  Sit down.  Did he ever make any attempt to pull into it?

A  No, sir.

Q  Okay.  So when he got over to the wrong side of the road, what -- what happens next?

A  The vehicle came to a complete stop to whenever I went to open my door to exit, he took off.  He gunned it.  He accelerated and it sounded as if he was taking off from me.

Q  Okay.  Now, let's talk about that for just a minute.  How fast were you going behind him starting there at the church coming down toward Tower Loop Road and the body shop?

A  It would've been between 30 and 40 miles an hour.

Q  And so you -- we got the vehicle now stopped and started again; correct?

A  Yes, sir.

Q  Did -- what are you thinking at that point in time?

A  That they were fleeing from me.  That they were taking off.

Q    And what -- does that -- what do you think when somebody's trying to -- you think somebody's trying to flee from you?

A    I -- I don't understand the question.

Q    Well, I mean, is that sort of normal or is it --

A    No, sir, that's not normal.

Q    And when it's not normal, what is your reaction based on your training and --

A    That it's their -- it's -- they have some other means or other reasons why they don't want to stop. Either the vehicle -- the vehicle's stolen or that, you know, they had just committed a crime or they have something in the vehicle that is -- they don't want us to have or find.

Q    And so now I guess they're proceeding south; is that correct?

A    Yes, sir.

Q    What happens next?

A    As I pick -- go to pick up my mic to advise -- as I recall correctly, my mic had fell in the floorboard. I was pulling my mic up as I was behind the vehicle. I went to go advise SO that they were fleeing on me, and they immediately whipped into the Mahoney's parking lot. So I'd advised SO that they were -- or that they were pulling into the Mahoney's parking lot.

**RT 736**

Q   Okay.   When you say "whipped in," would you point out on the exhibit where you're talking about they whipped in?

A   Yes, sir.   They came from here.   Continued when they stomped on it or floored it, fully accelerated the vehicle, they had came back into the normal bound lane of travel, came down here, and then whipped in here.

Q   Okay.   When they whipped in there, where -- what area on the map did they turn after they whipped in?

A   They turned immediately to the left right here.

Q   Okay.   And what did you do at that point in time?

A   I had pulled in behind them.   Whenever they had pulled in there, I immediately noticed before I could even get my vehicle into park, that the passen- -- or the driver's side door had came open.   So I had to slam my vehicle in park, while opening my door giving commands for the person to stay in the vehicle.   Went through the motions of put -- turning on my body camera and activating it.   I noticed the driver continued to get out of the vehicle.   I had told him to return to the vehicle two times.   At this point, he had already slipped on the gravel adamant about getting whatever he was getting out of the bed of the truck.   I noticed that the truck was rolling towards

me.  I told him to stop.  He started running towards the bed -- towards me.  I told him to stop, to -- whenever he had spun to -- and put one hand into the bed of the truck, I told him to stop and let me see his hands.

Q   Now, you -- you made an action with your left arm.  Was that the arm that he --

A   Yes, sir.

Q   So he put his left hand in first?

A   Yes, sir.  He dipped his left hand in first.

Q   Okay.  Well, did that cause you any concerns?

A   Yes, sir.

Q   Why?

A   I didn't know what he was reaching for.  I thought he was reaching for a gun, a rifle, specifically.

Q   Okay.  So what happens next?  Why did you think a rifle?

A   Because typically that's -- I mean, all the training scenarios and law enforcement educational videos that we see involving rifles and people in traffic stops, they retrieve the rifles from the bed of their trucks.

Q   And so what happens next?

A   As I was telling him to stop and let me see his hands, he had put his other hand into the bed of the

truck. And at that point, I thought -- it looked 100 percent like he was going for a rifle.

Q Why did that -- that action cause you to be 100 percent that he was going for a rifle?

A 'Cause at that point, he had ignored all my commands prior to that. Never acknowledged me. Never said anything to me. His vehicle's rolling back towards me.

Q Okay. Was there anything -- so what happened at that point?

A At that point, I had shot him one time. And immediately as he -- as -- after I shot him, his hands came up and a jug came out and flew to the side.

Q Okay. Now, let's kind of back up a minute there. When you came into the Mahoney's parking lot behind Mr. Brittain, how far would you say you were behind him when you both came to your initial stops?

A Are you talking about the first time before the vehicle rolled back to me or --

Q Yeah, before the vehicle rolled back to you.

A It would've been 20 feet or so.

Q And so did -- we've seen the pictures. So the vehicle ultimately hit -- hit's probably too strong -- rolled into your vehicle; correct?

A Yes, sir.

Q   What were you thinking when the vehicle was rolling backwards?

A   That he was in su- -- had such adamant intent to get whatever is from the back of that that he wasn't worried about following my commands and that he, you know, just didn't care to put it in park.  He's more worried about causing me harm.

Q   Were you mad at him?

A   No, sir.

Q   Did you want to hurt him before he stuck his hands in the --

A   No, sir.  I never want to hurt anybody.

Q   Now, explain to the jury, if you can -- we're talking about the -- where were you -- let me -- now.

I want to show you State's Exhibit No. 10 for a moment.  And I know this was taken by -- at daylight.  Were you still there when the pictures were taken?

A   No, sir, I do not believe so.

Q   Now we see a vehicle, a sheriff's vehicle.  Is that the one you were driving that night?

A   Yes, sir, it was.

Q   So when you're describing earlier to the jury a fully-marked vehicle, does that picture depict your vehicle as it was that night?

A   Yes, sir.

Q   And those -- that word "Sheriff" you said is a reflective paint or tape or whatever substance it may be?

A   Yes, sir.  It's made to reflect when lights are hit on it.

Q   Okay.  Did you ever move your vehicle from that position before you shot?

A   No, sir, I did not.

Q   Now, when you said you stopped about 20 feet behind the vehicle, is that white vehicle the one that Mr. Brittain was in?

A   Yes, sir.

Q   Now that's not -- is that in the position it was when it first stopped and you first stopped?

A   No, sir, it was not.

Q   Is that the position after it completely rolled back?

A   Yes, sir.

Q   Okay.  Now, again, let's -- I'm going to put it up as an idea, and if -- if you think there could be a better one, I'll get it out, but we -- we see somebody who looks like standing there sort of between -- not between but there beside the -- in front of your vehicle and the tailgate of the Brittain vehicle; correct?

A    Yes, sir.

Q    Usually that is a -- best photograph.  I can probably find better ones, but using that one, if you can for a moment, when you shot, can you give the jury approximately where Mr. Brittain was standing?  Not that it -- the truck was at that exact location at the time.  I'm not --

A    Yes, sir.

Q    Was it or was it not all the way back at the time you shot?

A    It was not all the way back at the time I shot.

Q    But as far as his positioning on the side of the truck, could you point to about where you think he was?

A    Yes, sir.  He would've been on the driver's side in this area right here with his hands in the bed of the truck.

Q    Could you see what was in the bed of the truck?

A    No, sir, I could not.

Q    Was -- so did he have his -- the -- his front to you or his back to you or his side?  Which --

A    He was -- if this was the bed of the truck, it would've been like this.

Q    And where would you have been?

A    Directly over in this direction.

Q   Okay.  Now, you said you thought right before you shot that he was going for a rifle?

A   Yes, sir.

Q   Well, was it -- why -- why didn't you wait to see if he actually came out with a rifle?

A   Because from my training and training that I've received that if you wait till you see the threat, you might not go home.

Q   Did you want to go home that night?

A   I promised my little girl that I was going home. I would be home to see her.  I told her that every night before I went -- left for shift.

Q   Was -- based on your training, you said that you've been train -- where were you trained at?  If you wait to actually -- if you -- what about your training caused you to believe you couldn't wait to see if he pulled that gun up, if there was a gun there?

A   Yes, sir.  MILO simu- -- or sim- -- simulations at the academy and also just from training videos that, you know, you've taken online and at the academy.

Q   What did those training videos and the training you had at the academy cause you to believe about waiting till you actually saw the gun before you shot?

A   That if you wait --

Q   When it came from a hidden location?

A   That if I waited by the time -- my reaction time. You know, I'm reacting to what they already know they're going to do, so, therefore, I would be behind. I would have to react to whatever they were doing which would cost me -- could cost me my life.  And, unfortunately, in most training videos like that, you know, it's cost the officer their life and that's why they do the training videos.

Q   You talked about the training videos.  You saw those at the Law Enforcement Academy?

A   Yes, sir.

Q   At the Law Enforcement Academy, did you go through simulations?

A   Yes, sir.

Q   Explain to the jury what a simulation is, how it worked when you went through the academy now, what, eight or -- well, now about 11 years ago.

A   Yes, sir.  They -- it was basically going through shoot/don't shoot scenarios on -- at the time it was called MILO.  So it's in a room and it's just you walk in and it has a big screen.  The pistol that it uses is kind of realistic but not 100 percent realistic, and they would just walk you through scenarios on shoot/don't shoot situations.

Q   In those situations, did -- were you looking at the situation from the perspective of the officer that was --

A   Yes, sir.

Q   And so you had to make a decision whether to shoot or not shoot?

A   Yes, sir.

Q   Now after going through that at the academy while you're at the sheriff's office, did you ever go through a similar situation of training on shoot or not shoot?

A   No, sir, I did not.

Q   Did you look at any shoot or not shoot training on video on your computer for online --

A   No, sir.

Q   Now you took online the -- No. 56; is that correct?  From CJI?

A   Yes, sir.

Q   Now is that an interactive one where you sort of like to get -- able to shoot or not shoot?

A   No, sir.  It's basically hinting -- hitting a key for the next slide.  It has some videos on it, but I can't recall the videos that were on it.

Q   Now when you say "videos on it," those weren't in -- interactive videos; correct?

**RT 745**

A No, sir. I don't recall.

Q They just showed an example of --

A Yes, sir. Situations.

Q Did you -- did you get into discussion at the academy about *Tennessee versus Garner* on giving verbal warnings except when possible? Did you get training on --

A Yes, sir.

Q -- that concept?

A Yes, sir.

Q Did they go through any situational reactive training showing situations where it was possible or not possible?

A No, sir, they did not.

Q Receive any training at the Law Enforcement Academy about what factors should go into being -- determining whether it was possible or not possible?

A No, sir.

Q At the sheriff's office during the years that you were there after the academy, did the sheriff's office ever give you any training on what the scenarios would be that showed it was possible or show when it wasn't possible?

A No, sir.

Q When you went through your FTO period with

Lieutenant Gorbit --

A Gephardt.

Q -- Gephardt, I mean, and the others, did any of them ever go through, Hey, here's what we're talking about in *Tennessee versus Garner*, or what -- when possible?

A No, sir.

Q No scenarios on that?

A No, sir.

Q Was this the first time you were involved in having to use deadly physical force other than when you had to shoot an animal?

A Yes, sir, it was.

Q And when you say -- I said, "have to shoot an animal," what -- not all of the situations, but what are we talking about there?

A Anytime somebody hits a deer or a dog or situations like that and the dog, basically there is no -- no chance for it to live or that nothing could be done for it, we humanely dis-- -- dispatch them is what we call them, so they don't have to suffer.

Q Now going back to the evening, how -- I know -- what happened that night as far as your realizing what's going on all around you, or were you concentrating on Mr. Brittain?

A   I was concentrating on Mr. Brittain.

Q   Did -- I think there was a question raised by somebody in one of them.  Why didn't you -- why did -- why did you feel that you were in danger if Mr. Brittain wasn't facing toward you?

A   Because he could -- the way he was positioned at the side of the vehicle, if he would've started shooting a rifle through a tailgate towards me and then brought it up, I -- you know, I would've never had a chance.

Q   Had you ever seen anything that caused you to have that opinion?

A   I don't understand the question.  What are you --

Q   Had you seen any training films or anything like that with that scenario --

A   Yes, sir.

Q   -- and had --

A   Yes, sir.

Q   Now, that evening what did you do -- you said, Shots fired.  I think we saw that on the video.  At some point you -- somebody directed you to go to another vehicle; is that correct?

A   Yes, sir.

Q   And who was that?

A   Nathan Rice.

Q   And so what did you do then?

A   I went to another vehicle and leaned over on the bed of his truck.

Q   Okay.  Did you get into his truck?

A   I'd opened the door to get into his truck.  That's where one of -- Crowder was sitting in the ba- -- back of his truck -- or King was sitting in the back of his truck, so I went and got in a different deputy's vehicle.

Q   Say anything to King at that point in time?

A   No, sir, I never said anything to him other than what I initially said whenever he was coming back with Rice.

Q   Did you -- after you went and sat in the other deputy's car, it looks like you -- the camera was still going; correct?

A   Yes, sir.

Q   Now when did you first realize -- you described that you went through the motions of turning it on.

A   Yes, sir.

Q   When did you first realize that you had not accomplished your objective?

A   Whenever I was keying up to go advise the SO that shots had been fired at the back of my truck.  I hadn't even had time to turn my portable radio on.  So

when I went to turn my portable radio on, I noticed that my camera wasn't recording.

Q   Is there any issue of why you don't leave your portable radio on while you're in the vehicle?

A   Yes, sir.  Squelch or anytime we key up on our main radio, it would echo in the background to where it'd be really loud and -- sorry -- and to where dispatch couldn't understand us and, you know, if we were wearing an earpiece at the time, it would mess our ears up.

Q   Okay.  So it was -- did you -- when you were an FTO, did you train new officers to leave the portables off?

A   Yes, sir.

Q   What about training them on when to turn their body cameras on?

A   Yes, sir.

Q   What -- what did you train them on that?

A   On traffic stops or on calls?

Q   Well, let's -- let's take the easier one, the calls.

A   Okay.  On calls, typically, as they're pulling up. They turn their camera on probably about ten, 15 seconds out from the call.  And, you know, it also depended on the situation that they were going to.

And if it was a call, a more serious call to where they might not remember to turn it on, at that point in time to go ahead and turn their camera on so that way they would know it was on.

Q   What about a traffic stop?

A   Typically, we wouldn't turn our cameras on until as we were getting out of the vehicle.

Q   Was the events with Mr. Brittain, did -- when they started, was that a call or a traffic stop?

A   A traffic stop.

Q   Now, did you tell your newer officers like you said when you got out of the car to turn it on on a traffic stop; --

A   Yes, sir.

Q   -- correct?

A   Yes, sir.

Q   When you pulled into Mahoney's, did you -- what did you consider your interaction with Mr. Brittain to be?  At traffic stop or something else at that point?

A   At that point, it would've been -- it was a traffic stop.

Q   Okay.  Did it ever change from a traffic stop?

A   No, sir.  The escalation of the traffic stop changed from a low-traffic stop to, you know, a high-risk traffic stop.

Q    What made it a high-risk traffic stop in your opinion?

A    The -- ever- -- the things leading up to that that were unusual or suspicious behavior from our training at the academy and just his behavior and demeanor, not following my commands, the way that he exited the vehicle, not putting the vehicle in park.  Just to jump out of the vehicle to the point where he had somewhat slipped on the gravel trying to get traction to get to whatever was in the bed of his truck, and him not acknowledging me whatsoever.

Q    What about his behavior?  Was there anything about his behavior prior to him turning in to Mahoney's property that caused you any concerns?

A    Yes, sir.  Him -- him bumping left of center going way left to where half -- at least half the vehicle was, you know, in the opposite lane of travel, and then him stopping on the side of the road crossing the center line, coming to a stop, and then as I get out, going.  And we're trained in the academy on ambush situations that that is stuff to look for.

Q    And by "ambush," you're talking about where people are laying in wait to kill a policeman?

A    Yes, sir.

Q    And when you say you're "trained" on it, have you

actually had those scenarios, or is it out --

A   No, sir.  It's just gone over in the -- the ALETA material.

Q   Okay.  They don't set up ambushes?

A   No, sir.

Q   Now, so you now have a high-risk stop; is that correct?

A   Yes, sir.

Q   When did it become that --

A   After the point --

Q   -- in your mind?

A   -- after the point that he took off from the initial stop location.

Q   All right.  Now, did you -- when you shot, what was all in your mind about assessing that situation? What was the totality at that point in time?

A   That he was going to kill me.  He's was going --

Q   What made you have that conclusion?

A   The way that he exited his vehicle, his demeanor, him not -- not listening to my verbal commands.  And he didn't just hop out of the vehicle and slow -- slowly walk towards this.  I mean, he jumped out with an -- with a purpose.

Q   When did you become aware of the passenger in the vehicle?  Not his name or who he was, but that there

was a passenger in the vehicle?

A   As I was getting verbal commands, the hands were out.  His hands came out the window or out the door. I couldn't tell from that side.  That's the reason why in my video when you see me retreating to that side, I'm looking down my dri- -- or passenger side door at that passenger side of that truck.

Q   That was after the shooting; correct?

A   Correct.

Q   Before the shooting, were you aware or not aware of somebody be- -- else being in the vehicle?

A   No, sir.

Q   Now, when did you first become aware that what Mr. Brittain apparently was reaching for was that oil can or transmission fluid jug?

A   Whenever it came out of the bed after I had shot. But I wasn't 100 percent positive if that was what he was intentionally going for.  That might've been something that he just had in his hand.

Q   Now did you, at that time -- after the shooting, okay?

A   Yes, sir.

Q   What did you do at that point in time?

A   I held cover on the vehicle.  Kept giving verbal commands to the passenger of the vehicle.  His hands

would drop or I wouldn't be able to see them, so I'd have to retell him to keep his hands where I can see them and waited for back up to get there.

Q When you first saw and recognized that there was somebody there in the vehicle, could you tell the jury where his hands were at that point in time?

A Outside the window.

Q Had you --

A Out --

Q -- were they outside the window before or after you told him to put them outside?

A Before.

Q Did you at anytime consider shooting the passenger?

A No, sir.

Q Why not?

A 'Cause he was cooperating.

Q Did -- when you -- I heard you on there, you know, talking about on shots fired. Did you request medical assistance?

A Yes, sir, I did.

Q Now, after the shooting, there was -- you -- you gave a statement to the State Police; correct?

A Yes, sir.

Q Was that -- had you delayed trying to give your

statement -- delayed trying to -- not trying. Did you delay giving your statement to the State Police?

A   No, sir.  I cooperated with State Police 100 percent whatever they needed.

Q   Who scheduled that time, to your knowledge?

A   I believe it was Bray.  I'm not 100 percent sure on that, though, but it was a state trooper, one of the special agents.

Q   And had they contacted you before you had a lawyer?

A   Yes, sir.

Q   And did you tell them you're willing to come in or did you tell them you weren't willing?

A   I told them I was willing to come in.

Q   Was that -- that Monday the first date that they suggested doing it?

A   Yes, sir.

Q   Has -- the shooting, was it something you did 'cause you wanted to?

A   No, sir.

Q   Why didn't you want to?

A   I don't want to take anybody's life.  I didn't get into this job to kill somebody.

Q   Why did you get into this job?

A   To help people.  That's all I've -- I mean, my

volunteer career, that's all I've ever wanted to do is help folks.

Q    And how long have you been a volunteer fireman?

A    Since 2009?

Q    How old were you then?

A    Nineteen -- 18.  I mean, I volunteer my time to go out of state to help like during hurricanes.  I've been on two or three different deployments.

MR. PHILLIPS: Judge, may we approach?

THE COURT: Yes.

(BENCH CONFERENCE.)

MR. PHILLIPS: I thought I'd make my objection up here.  This is more in the lines of sentencing testimony of good character and, I mean --

MR. NEWCOMB: He's arguing -- he wants to argue his state of mind.  They need do know what type of person he is.

THE COURT: Well, I think you've gone far enough.  You've already got what -- you got what you wanted.

MR. NEWCOMB: Yeah, I --

THE COURT: Okay.

MR. PHILLIPS: Thank you, Judge.

THE COURT: All right.

(BENCH CONFERENCE CONCLUDED.)

(IN OPEN COURT.)

**BY MR. NEWCOMB:**

Q    When you're talking about being an FTO and what you did or not did, who -- did you receive any training from any source on what to do as an FTO?

A    As me being an FTO?

Q    Yes.

A    Yes, sir.

Q    What was that?

A    Through -- I went through a two-week field-training-officer course.

Q    And was that put on by the sheriff's office or ALETA or some- --

A    No.  It was put on by Lonoke Police Department.

Q    Lonoke Police Department?

A    Yes, sir.

Q    And did you have anybody from the sheriff's office participate in that training, or was it done by people at Lonoke?

A    It was just people from Lonoke.  I believe there's another deputy that went through it as well with me through the -- from the sheriff's office.

          MR. NEWCOMB: Pass the witness, Your Honor.

**RT 758**

THE COURT: We're going to -- we're going to take a break. We're going to take a lunch break now. Sir, you can step down.

THE WITNESS: Thank you, Your Honor.

THE COURT: Um-hmn.

(WITNESS EXITS THE STAND.)

THE COURT: We'll be back at 1:30. I'm going to let the jurors go to the restroom, whatever they want to do first, and then go to the jury room. All rise.

Troopers, if you'll take them out to the restroom, please, those that want to go. If you don't want to go, you can go into the jury room.

(JURORS EXIT THE COURTROOM AT 12:25:09 P.M.)

THE COURT: You may be seated. I'm just going to relieve everybody else once my jurors are back.

(COURT IS IN RECESS AT 12:26:20 P.M.)

(COURT IS IN SESSION AT 1:39:49 P.M.)

THE BAILIFF: Court is now back in session. The Honorable Judge Barbara Elmore presiding.

THE COURT: Thank you. You may be seated. Mr. Davis, if you want to come on up, you can.

THE WITNESS: Do you want to re-swear me in?

THE COURT: No. You're sworn in. I'll probably remind you --

THE WITNESS: Okay.

THE COURT: -- just for their notion.

THE WITNESS: Yes, ma'am.

THE COURT: Fix those where you're comfortable with them. You can bring them in.

All rise.

(JURY ENTERS THE COURTROOM AT 1:40:53 P.M.)

THE COURT: You may be seated. Mr. Davis, you've already been sworn in. There will be no need to swear you in again. You're still under oath.

THE WITNESS: Yes, ma'am.

MR. PHILLIPS: Can I wait -- can I wait for everybody to get assembled?

THE COURT: You can give them a few minutes. I don't know if you can wait for everybody to get in.

MR. PHILLIPS: All right.

**CROSS EXAMINATION**

**BY MR. PHILLIPS:**

Q    Mr. Davis, I'm going to be asking you some

questions, and if I ask you a question that you didn't -- maybe didn't hear or didn't understand, you stop me. I'll do my best to reask it.

A   Yes, sir.

Q   I'll try to -- I'll do my best to ask questions that aren't compound, meaning two questions in one -- one question, 'cause that's not fair either.

A   Yes, sir.

Q   But you just let me know if there's an issue with the way I ask a question.

A   Yes, sir.

Q   I'm -- I'm curious, and I don't know if you know this or not, but I'm curious when you pulled the -- when you pulled Hunter over into Mahoney's parking lot, do you have any idea whether that -- that was a fast movement on your part into that parking lot, or a slow movement, or just a normal movement?

A   On my -- my part?

Q   Yes.

A   It was a fast movement on my part.

Q   What about on Hunter and his truck?

A   Yes, sir, fast movement.

Q   So -- so the movement from 89, Hwy 89 into Mahoney's was quick on both vehicles?

A   Yes, sir.

Q   Okay.  I think you also testified that you had been watching the vehicle closely when it caught your attention.  I guess it was the only vehicle on the road --

A   Yes, sir.

Q   -- that early morning?  Did you ever, while you were watching the vehicle closely, notice the name "Brittain" on the windshield?

A   No, sir, I did not.

Q   Did you ever see that afterwards, like the pictures that have been introduced?

A   Yes, sir, afterwards -- after the pictures, but as of that morning or after the incident, no, sir, I did not.

Q   Was there ever a time that you saw it traveling, the front of the truck toward you or by you?

A   Yes, sir, there was.

Q   But you never noticed that -- you said you were paying close attention, but you never noticed that name, "Brittain"?

A   Correct.

Q   If you had seen that name, "Brittain," that would've alerted to you it being a -- a name, a local name?

A   No, sir, it wouldn't.

Q   All right.  Because you didn't know these folks?

A   No, sir, I do not.

Q   Now throughout your time following this truck, did you -- did you continue to think that it was possibly fleeing?

A   No, sir.

Q   You did not?

A   No, sir.

Q   When did you form the opinion you -- that you thought it was fleeing from you?

A   Whenever the secondary -- or from the first stop where they had stopped after crossing -- crossing into the northbound lane of travel and then coming to a stop.

Q   When they pulled over to the left as your attorney --

A   Yes.

Q   -- told?  So when they pulled over to the left, that's when you said, I may have a fleeing situation?

A   Whenever they took off from that point.

Q   Okay.  So when they were over in the left and then accelerated into Mahoney's, that's when you thought?

A   Yes, sir.  They didn't accelerate directly into Mahoney's.  They accelerated back into the normal bound lane of travel and then whipped into Mahoney's.

Q   And I think you testified that the truck was going a speed of 40 miles an hour was --

A   Said between 30 and 40 miles an hour.

Q   And that was the top speed that you saw?

A   Yes, sir, from my --

Q   Or that you --

A   -- that I --

Q   -- anticipated was the --

A   Yes, sir.

Q   You heard it -- you heard testimony about how it was revving up.  And did you -- did you hear that with your --

A   Yes, sir.

Q   -- own ears?  Did it sound like a vehicle that couldn't get out of gear?

A   I don't recall that.  I'm not that familiar with mechanics of the vehicle.

Q   Okay.  Now if you had been -- if you had been -- if you had turned your body camera on as you were traveling behind the vehicle, would it have shown how they were driving?

A   No, sir.

Q   It would not?

A   No, sir.  My body camera, the way it was positioned on my chest, would've been right here, so

it would've caught my steering wheel.

Q   Is that the way it's always positioned --

A   Yes, sir.

Q   -- on you?  So there's never a time when you can turn your body camera on and see the traffic ahead?

A   Correct.

Q   When you say they gunned the vehicle and it -- it took off at a -- was it a high rate of speed?

A   No, sir.  It -- it sounded as if they had punched it and it was as if it was rapidly accelerating but it wasn't accelerating to what it should've with the sound of the vehicle.

Q   So like King was talking about, high acceleration, loud noise, engine revving up but not getting out of first?

A   Ge--

MR. NEWCOMB: Your Honor, objection to the form.  Objection as to form as to getting out of first.  He already said he did not have a mechanic attitude -- adept.

MR. PHILLIPS: I'll -- I'll rephrase.

THE COURT: Thank you.

**BY MR. PHILLIPS:**

Q   Engine revving up making a lot of noise only not going anywhere?

**RT 765**

A   It -- no, it got up and it went, but it didn't accel- --

Q   By -- by "not going anywhere," I mean not going anywhere the way it was revving up.

A   Yes, sir.

Q   So when you were processing in your mind all of the things that you were thinking about with the way it was driving and the smoke and the revving up, did it ever -- did you ever process the possibility that -- or consider that it was malfunctioning and -- and in bad shape?

A   Yes, sir.

Q   You also told your attorney during direct examination that -- that Hunter slipped on the gravel and was adamant to get in the back of the truck?

A   Yes, sir.

Q   Adamant?  Okay.  Does that mean like with -- what's your definition of "adamant"?

A   With such purpose to like that he depended on it.

Q   Like he -- he was interested in getting in the back --

A   Yes.

Q   -- of the truck --

A   Yes, sir.

Q   -- for some -- for some purpose?  And because of

that, because of that attitude of adamantly trying to get in the back of the truck, you took the leap that he was trying to kill you?

A   No, sir.  It was other factors.

Q   Well, let's talk about those factors.  Speeding or -- you didn't suspect the fleeing up until they pulled in; right?

A   Right.

Q   Or up until they went to the left?

A   No, sir.

Q   You didn't expect a fleeing until that; correct?

A   Correct.

Q   You suspected a theft, although, the tags returned to the vehicle that -- that it was affixed to; correct?

A   Correct.

Q   And you're not going to tell this jury that a car theft is inherently and necessarily a violent act; correct?

A   Reask your question.

Q   You're not telling this jury that a car theft in and of itself is inherently a violent act?

A   If the --

Q   Say is -- say --

A   -- the -- it depends on the situation.

Q   Sure.  Sure.  But you're right.  It depends on the situation, unlike say, for instance, a called-in armed robbery, which by its very nature is a violent act; correct?

A   Yes, sir.

Q   So it could be either.  It could be non-violent? Violent?  You just don't know?

A   Yes, sir.

Q   But you don't start out with the mentality of -- that it's violent, or do you?

A   No, sir.

Q   Okay.  And what else?  What were the other factors that led you to think he was going to kill you for adamantly getting to the back of his truck?

A   All the keys, the red flags that were put up prior to that.

Q   No, I'm asking you what those are not -- I've identified some, the suspicion of a -- of a theft, the possibility of a fleeing you never called in, a smoke -- was a smoking vehicle part of it to?

A   Yes, sir.  Smoking vehicle.

Q   And the revving up of the vehicle?

A   Correct.

Q   And what else?

A   Him jumping from the vehicle.

**RT 768**

Q   No, we -- we're talking --

A   Well, you --

Q   -- I'm saying other than he adamantly trying to get to the back of the truck.

A   Yes, sir.

Q   What else?

A   Yes, sir.  That and him not -- not complying with my commands.

Q   Okay.  And is there anything else?  Those are the things that led you to believe to the point of using deadly force that he was going to kill you?

A   Yes, sir.

Q   All right.

A   That and the unknown of what was in the bed of the truck.

Q   Right.  Now, you correct me if I'm wrong, when he went to the bed of the truck and you're watching him closely at this point; correct?

A   I'm watching his hand, yes, sir.

Q   Right.  And you're watching him dig around in that truck; right?

A   With one hand, yes, sir.

Q   He didn't have both hands in there?

A   No, he did.

Q   Okay.  Well, why did you say with one hand?

A    Because he was digging around with his first hand in the bed of the truck.

Q    Is that the left hand?

A    Yes, sir.

Q    Okay.  And then the right hand went in as well?

A    Yes, sir.

Q    And I think you showed this jury that his hands went in palms down, double overhand; correct?

A    Yes, sir.

Q    And I think you told the State Police the same story; right?

A    I --

Q    Or the same --

A    -- I believe so.  I can't be for sure on that.

Q    So to be clear --

MR. PHILLIPS: May I step away from the podium?

THE COURT: As long as if you don't talk.

MR. PHILLIPS: All right.

**BY MR. PHILLIPS:**

Q    To be clear, you're telling the jury it went like this?

A    Yes, sir.  But I'm not 100 percent positive on his hand going like that.  I just seen him going to the bed of the truck.  At the point in time when it went

**RT 770**

into the truck, it was like that.

Q   Okay.  And when you say, for the record, "like that," you're talking about palms down, both palms down --

A   Yes, sir.

Q   -- digging for something.

A   That -- this hand wasn't digging.  This hand had stopped digging.

Q   Okay.

A   They were both just in the bed of the truck.

Q   Did you tell the State Police, though, that the hands were digging?

A   Yes, sir.

Q   Okay.  Now you also said something today about a rifle, suspecting a rifle was back there?

A   Yes, sir.

Q   You never told the State Police that; did you?  You never mentioned a rifle?

A   I don't recall that.

Q   Hmn?

A   I don't recall that.

Q   You said he was looking for something, digging for something back there?

A   Yes, sir.

Q   You never mentioned pistol, rifle, weapon,

**RT 771**

firearm, anything like that?

A   Correct, sir.

Q   Right.  And so that him having those two hands in there adamantly getting there with both hands in there like this, made you think you were going to be killed?

A   No, sir, his -- his one -- his left arm was propped up along the side of the truck like this with this hand in here.

Q   And where was his right hand?

A   In the truck.

Q   All right.

A   Going into the truck.

Q   Okay.  Now you heard your expert talk about the three basic tenants of evaluating deadly force that should be used?

A   Yes, sir.

Q   Ability to cause death or great bodily harm?

A   Yes, sir.

Q   And he -- he stated that ability means the assailant possesses the power to kill or cripple?

A   Yes, sir.

Q   And "possesses" means in realtime, at that time?

A   Yes, sir.

Q   And so you're telling the jury that when Hunter reached into the truck the way you've described to

**RT 772**

them, that at that time, at that immediate time, he had and possessed the power to kill you?

A    Yes, sir.

Q    Okay.  And, also, your expert talked about under the tenants the opportunity to cause death or great bodily harm; do you remember that?

A    Yes, sir.

Q    An opportunity he established means he is immediately -- immediately capable of employing that power?

A    Yes, sir.

Q    And when he had those two arm -- hands -- arms in the truck digging for something, he had the -- in your -- in your mind, he had the immediate capa- -- capability of empowering?

A    The unknown factor, yes.

Q    I didn't ask about an unknown factor.  I asked about opportunity.

A    Yes, sir.

Q    Opportunity to cause you death or bodily harm?

A    Yes, sir.

Q    And "opportunity" meaning that he is immediately capable of employing that power?

A    With the unknown factor, yes.

Q    I didn't -- I didn't see unknown factor anywhere

in your expert's tenants.

A Okay.

Q Not anywhere in here.

A Okay.

Q 'Cause that's what I'm referring to now.

A Okay.

Q And then, three, "Is the officer or third party in jeopardy?" And "jeopardy," according to your expert, means, "His actions and/or words indicate to a reasonable, prudent person that he intends to do so or about to do so." Jeopardy.

A Yes, sir.

Q You said or you told this jury this time that he just didn't hop out; he jumped out with purpose?

A Yes, sir.

Q And you -- you processed that purpose to mean to harm you?

A Yes, sir.

Q And that was the only purpose, I guess, you processed that could've been his intent; right? 'Cause you ultimately did squeeze the trigger; correct?

A I'm not sure I understand the question.

Q Well, you didn't -- you didn't determine in your mind or process in your mind if there was any other

purposes. A purpose to wedge something under the truck tire, a purpose to anything else but something causing or requiring deadly force; right?

A   Correct, with him not following my commands.

Q   Now you've probably as an officer if you've -- if you've done this long enough as you have, you've probably encountered some people that have got out of a truck and there was no doubt in your mind that they were mad or angry or frustrated or --

A   Most definitely.

Q   -- volatile; right?

A   Yes, sir.

Q   But you have never described him in that way; correct?

A   Correct.

Q   You mentioned that the -- the passenger -- that Jordan was cooperative because you could see his hands when you were yelling commands?

A   Yes, sir.

Q   Now, could you -- are you telling the jury that you could see his hands out the window?

A   Yes, sir.

Q   And are you telling the jury that you could see his hands while you were in the V of your truck under -- with the protection of your truck door?

A    No, sir.

Q    Okay.

A    I di- --

Q    Well, when -- when did you see his hands and where were you located?

A    I noticed his hands whenever I was at the back -- or approaching to the back of the vehicle.

Q    Is that after the shot?

A    Yes, sir.

Q    Okay.  So -- 'cause I was confused about that.  So you're not telling the jury you saw his hands before the shot?

A    No, sir.

Q    Did you see anyone in the truck before besides Hunter?  Did you see --

A    No --

Q    -- you see anyone in that truck besides Hunter?

A    No, sir, not that I recall.

Q    Okay.  Now, if his hands hadn't been out the window, would you have considered shooting him?

A    No, sir.

Q    You just told this jury that the person that was adamantly intending to get to this bed of the truck that was going to kill you in your mind, wouldn't you have the same concern about the -- about the passenger

if --

A  No, sir, 'cause he as following my commands.  He was complying.

Q  No, I said if he hadn't showed you your -- his hands?

A  No, sir, 'cause I wouldn't have known that he was there.

Q  So that was the first and only time you ever knew he was there was when his hands came out of the driver -- of the passenger window?

A  Yes, sir, from what I recall.

Q  From what?

A  From what I recall.

Q  Okay.  Now you weren't given any initial indications when you confronted the vehicle or the car that there's any potential violent behavior about to occur when you were on Hwy 89?

A  Correct.

Q  Did you see if there were more than one person in the -- in the truck?

A  No, sir.

Q  You didn't -- you didn't see any suspicious behavior in the cab of the truck?

A  No, sir.

Q  Sometimes you -- sometimes officers see that,

though, rustling around, people bending over, things like that?

A    Correct.

Q    You never saw anything like that?

A    No, sir.  The windows were too dark tinted.

Q    Okay.  Did you use -- do you have a spotlight on your car?  On your --

A    No, sir, I do not.

Q    -- truck?  You did not have any kind of lighting technique that could -- that could go into the back windshield or anything like that?

A    I have takedowns, but that would interrupt with the blue lights, so I don't use the takedowns unless it's a different situation.

Q    Okay.  Who was -- what was the name of the officer that asked you on the video that maybe you should stop talking now?

A    I don't recall his name right now, but he is a sergeant with Cabot Police Department.

Q    Okay.  Do you remember telling the State Police that you were hollering and that that -- that was -- that's your word "hollering" -- Get back in the vehicle, very loud?

A    Yes, sir.

Q    And were you also yelling at Jordan after the shot

very loud?

A   Yes, sir.

Q   Show hands, things like that?

A   Yes, sir.

Q   Do you think they were the equal amount of loud from, Get back in your vehicle; Show me your hands; Show me your hands; Get back in the vehicle?  Do you think they -- you were yelling in the same -- the same tone?

A   Close to it.  The one -- initially, you know, for him to stay in his vehicle was as I was getting out of my vehicle.

Q   Okay.  And I'm not trying -- I'm not faulting you here at all.  I just want to clear something up.

A   Yes, sir.

Q   You -- you mentioned two or three times on the -- on the State Police interview that you went back to render aid to Hunter.

A   Yes, sir.

Q   You never rendered aid to Hunter; correct?  They -- they got you away from the scene and put you away?

A   Yes -- no, sir, I did render aid to him.

Q   What type of aid did you render?

A   Whenever I had -- whenever I had flipped him over to start rendering aid before Rice had told me to

leave, I heard him gurgling and at that point I knew that if I just left him laying on his back that he would suffocate.

Q   Okay.  So the aid you rendered was turning him over?

A   Correct.

Q   Okay.

A   In the recovery position.

Q   You also mentioned, though, is what I'm talking about is you mentioned that you went to get a bag and gloves but you never rendered any aid after you rolled him over; correct?

A   Correct.

Q   Okay.  I think you also mentioned that the hands -- the hands kill.  That's kind of a --

A   Yes, sir.

Q   But, actually, it's what's in the hands that kill; correct?  Unless we're talking about lethal weapons' hands, this is -- it's what's in the hands that kill; correct?

A   Yes, sir.

Q   All right.  Let's talk about June 23rd on the patrol.  Were you -- were you nervous or anxious on that day anymore so than any other?

A   No, sir.

Q It had been a long we- -- what you call a long week, which means you'd worked more days that long week than the short week; right?

A These -- this would've been our second day on our long week --

Q Okay.

A -- so it'd been only the second day.

Q So it was a short part of a long week?

A Yes, sir.

Q And that week started on --

A Tue- --

Q -- Monday?

A Monday, sorry. Yes, sir.

Q Now do you actually remember specifically -- when you went to give your interview with the State Police, do you actually remember what -- what you did or all the things you did on June 23rd?

A No, sir, I do not.

Q Okay. You had actually -- you and your attorney had actually asked to see your body cam video --

MR. NEWCOMB: Your Honor, may I approach?

THE COURT: Sure.

(BENCH CONFERENCE.)

MR. NEWCOMB: We did not waive attorney/client privilege based on --

THE COURT REPORTER: I can't hear you.

THE COURT: Wait. She can't hear you.

MR. NEWCOMB: We're not waiving attorney/client privilege and I take it the State -- if he's going into that, I ask --

MR. PHILLIPS: I'm not. That's my question. That was the only question.

THE COURT: I mean, you were about to say you and your attorney did something.

MR. PHILLIPS: Asked for -- to see the video.

MR. NEWCOMB: That's fine. I just --

MR. PHILLIPS: That's all.

MR. NEWCOMB: Okay. But --

MR. PHILLIPS: Yeah.

MR. NEWCOMB: -- it was.

THE COURT: Okay.

MR. PHILLIPS: No, it --

MR. NEWCOMB: I didn't want it to go and then --

MR. PHILLIPS: No.

MR. NEWCOMB: -- we have --

THE COURT: I understand. We can always put a cap on it before it gets out of the box.

MR. PHILLIPS: I get it. I was doing the

same thing, but I wasn't going to ask what you and your client talked about.

(BENCH CONFERENCE CONCLUDED.)

(IN OPEN COURT.)

**BY MR. PHILLIPS:**

Q   You and your attorney had asked to see your body cam before you gave a statement about it; correct?

A   Yes, sir, if I remember correctly.

Q   But that was not allowed; right?

A   Correct.

Q   How far back will that body camera go like to look back?

A   I believe 30 seconds.  But there would be no audio.  I'm not 100 percent sure on that.

Q   You don't know?

A   No, sir.  That new -- the camera I had, I think it was a newer model that I had just been issued about two or three months prior to this incident.

Q   Okay.  Now you've heard -- you've sat in the courtroom, obviously, and you've heard a lot of testimony about your policy and procedure manual on deadly force?

A   Yes, sir.

Q   And it says that you're required to let someone know you're going to shoot them if feasible.  We've

heard the -- the term "feasible" a lot.  Feas- --

A    Yes, sir.

Q    But there's no doubt that you did have the time and the opportunity to say, according to you in the State Police interview, Get back in your truck; Get back your truck; Show me your hands; Show me your hands; Show me your hands; right?

A    Yes, sir.  And I'm not sure if that many times or what but.

Q    Well, I'm just saying how many times you said it.

A    Yes, sir.

Q    So with -- encompassed in that time, you didn't feel that you had -- it was feasible to let Hunter know that you were -- while he was digging in the truck -- and I guess he was digging in the truck looking in it; correct?

A    No, sir.

Q    He was digging --

A    His -- he was looking --

Q    -- digging in the truck looking at you?

A    No.  He was looking to the side, this way.

Q    Which way?

A    Toward -- in the bed of the truck towards the back of it.

Q    Okay.  So he was looking away from you, then?

A    Towards me --

Q    Okay.

A    -- but into the bed of the truck.

Q    Okay.  So his head is down digging in the back of the truck looking toward the back?  In the bed of the truck looking toward the back not making eye contact with you; correct?

A    Correct.  Well, when you say he's digging in the truck, it's as if he was way taller than the truck. He was like this with this arm --

Q    Right.

A    -- propped up against the side of the bed of the truck and was looking this way and reached in like that.

Q    Right.  And he's like 5'6" and 117 --

A    Yes, sir.

Q    -- pounds?  But you're telling me that -- let me get this straight here.  You're telling me that you didn't have the opportunity, or it wasn't feasible for this kid looking in there, not looking at you, to say, I'm going to shoot you?  I am going to shoot you, instead of, Show me your hands?

A    Yes, sir.

Q    Instead of, Get back in the truck?

A    Was not feasible.

Q   Was not feasible for you to say that?

A   No, sir.  It was a rapid evolving situation.

Q   It was.

A   And --

Q   And you were rapidly saying, Get back in your vehicle; Get back in your vehicle?

A   Yes, sir.

Q   But that never transitioned to, I am going to shoot you --

A   Yes, sir.

Q   -- during this process?

A   Yes, sir.

Q   And right before you squeezed the trigger with his head looking into that pickup truck bed, with his head looking in there and not here, if you're standing there, you never said or had the feas- -- it wasn't feasible --

A   No, sir.

Q   -- to say, I'm going to shoot you?

A   No, sir.

Q   When you shot Hunter, were you aiming at his neck?

A   I was aiming center mass where I was taught.

Q   And where is center mass?

A   At that point, it would've been right in here.

Q   Okay.  So center mass for Hunter meant shoulder-

neck area and you hit what you were after; right?

A No. It would've been up here between here. So, I mean, yes, I did hit where I was aiming.

Q Right. I mean, that's where -- that's where you were aiming for and it hit -- and you hit and then scraped and then the entry into the neck?

A Yes, sir.

Q Do you remember, and I think you may have told the jury this, but do you remember when that left arm was extended out and the other arm was -- can you show me again? Can you -- you don't have to stand up. Can you show the jury like you did with Mr. Newcomb?

A He was like this with his hand in here and this one was like this.

Q Okay. All right. So that arm would've been extended out, which explained how the bullet grazed his shoulder, went through his neck and ended up in his arm?

A Correct. With his arm --

Q Right.

A -- propped up where -- like this on the bed.

Q Right. And you would agree with me that for him to actually -- well, let me ask it this way. You would agree that you never described in your statement to the State Police or here today him ever looking

toward you or turning his body toward you, just always in the bed of the truck; right?

A    Yes, from what I recall.

Q    Okay.  Well, that's -- you -- that's what you've said --

A    Yes, sir.

Q    -- consistently; right?  Now you're attorney brought up the issue about the Adderall.  You -- you have a prescription for Adderall --

MR. NEWCOMB: Your Honor, may we approach, again?

THE COURT: Sure.

(BENCH CONFERENCE.)

MR. NEWCOMB: I guess my question is can I then ask me -- the question that he is the one that told you he was going to bring it up and you ruled he could, 'cause it's now leaving the impression that it was voluntarily done by us and it was for (inaudible) trial strategy, so I think --

MR. PHILLIPS: All right.  I'll with- -- I'll rephrase it, then, if that's the problem.

THE COURT: Okay.  But --

MR. PHILLIPS: Is there any way you want me to phrase it?  I'm being serious.

(Attorneys confer.)

THE COURT: That don't need to be on record.

(BENCH CONFERENCE CONCLUDED.)

(IN OPEN COURT.)

**BY MR. PHILLIPS:**

Q   You have a medical prescription for Adderall; right?

A   Yes, sir.

Q   And I -- I guess that goes hand in hand with you having adult ADHD?

A   Yes, sir.

Q   And so that's what the Adderall is for?

A   Yes, sir.  I've been prescribed it since knee high to a jack wrench.

Q   All right.  And so when you take the Adderall, is there a purpose for that?

A   Just helps me focus --

Q   Okay.

A   -- on paperwork and stuff at hand like that.

Q   Right.  And I think you also testified that you hadn't taken it.  This happened on the 23rd.  And that you hadn't taken it since June 11th.

A   Correct.  I believe it was about six days or so.

Q   Well, June 11th -- from June 11th to June 23rd

would've been --

A   Oh.  Yeah.

Q   -- much more than --

A   Yes, sir.

Q   -- six --

A   You're right.

Q   -- days.  And you have this medical prescription.
You can't get Adderall over the counter?

A   Correct.

Q   A doctor prescribes it and tells --

A   Yes, sir.

Q   -- you how to take it?  And but you -- you lost
your prescription?

A   It was lost or taken or left in a hotel room.

Q   On the 11th or 12th?

A   Yes, sir.  It'd have been -- we went down there on
a Friday night, and the last time I had taken it was
Friday morning when we left.

Q   And the -- it -- this wasn't you not having it.
It wasn't a doctor's decision for you not to get it
anymore; it was, basically, you lost it and never got
it or someone took it and you never had it refilled?

A   I was supposed to have it refilled.  I think it
was due for a refill that Friday before this incident
occurred, but I don't always take the medication on

duty so.

Q   All right.  You said -- I think you told the jury that you take it for writing reports?

A   Yeah.  If I have a lot of reports or a lot of paperwork or something like that that I need to focus on, I'll take it.

Q   So it helps in your -- your ability to focus and --

A   On paperwork and stuff like that.

Q   -- complete tasks?

A   Yes, sir.

Q   Did you not have any paperwork that -- from the 11th to the 23rd?

A   No, sir, not an abundant amount of paperwork.  I mean, I still had paperwork.

Q   Now, and you still hadn't taken any when -- when you came to the State Police to give the interview; right?

A   Correct.

Q   Do you remember telling Officer Middleton -- and I think we've talked about it -- you -- as you've consistently said, his hands were still in the back of the truck; right?

A   Yes, sir.

Q   And you told him that you believed, (as read) "He

**RT 791**

was adamant to cause me harm because he hadn't
listened to the commands; he hadn't acknowledged me;
he hadn't said anything; the truck was rolling"?

A   Yes, sir.

Q   And so based upon all of that, you thought -- you
thought he was going to kill you?

A   Yes, sir.

Q   And is there any one factor that you've listed
that was more -- more of an indicator that you were in
big trouble while his hands and head were down in the
truck?

A   The fact that he didn't put the vehicle in park
and the way his behavior on jumping out of the vehicle
and not following my commands.

Q   And, again, the commands are getting back in the
truck and getting back in the truck and, Show me your
hands?

A   Yes, sir.

Q   Okay.  Now let's talk about something else.  If
you are wrong in your recollection, and if you didn't,
in fact, give those commands till after you shot, that
would be a bad situation, then; wouldn't it?

A   Yes, sir.

Q   That would be awful?

A   Yes, sir.

Q   'Cause then you would -- then you would've just reacted; you would've misinterpreted; you wouldn't have given anybody any chance --

A   Yes, sir.

Q   -- and you would've just shot?

A   Yes, sir.

Q   So we agree with that?

A   Yes, sir.

Q   If you hadn't -- if you hadn't yelled at him and whatever you yelled at him to do before the shot, that would've been bad?

A   Yes, sir.

Q   Reckless?

A   Yes, sir.

Q   That's all.

THE COURT: Mr. Newcomb?

**REDIRECT EXAMINATION**

**BY MR. NEWCOMB:**

Q   Going back to this incident, is this the first time you'd ever stopped a vehicle by yourself at night?

A   No, sir.

Q   How many times do you think you've done it in your career?

A   Excuse me.  3,000.  I mean, there's no telling.  A

bunch.

Q   Okay.

A   That was my main purpose whenever I was a K-9 handler.  Stopping -- stopping vehicles was my main purpose.

Q   You went through a number of events.  A number of events occurred prior to you shooting; correct?

A   Yes, sir.

Q   It wasn't a just sticking his hands in the back of the truck; was it?

A   No, sir, it was not.

Q   Did -- let me ask you before we get to that.  I think you were asked by the prosecutor did you ever consider that he was getting out to put a -- some type of -- something to block his truck from rolling?

A   No, sir.

Q   How many times have people gotten out of their trucks and tried to stop them with a -- some type of can instead of --

A   None.

Q   -- putting them in park or putting the brake on or whatever?

A   None.  None that I've dealt with.

Q   So in the numerous stops you've made at night -- and I guess you've also made them during the day;

Q correct?

A Correct.

Q Had anybody ever gotten out of their vehicle to do that?

A No, sir.

Q Had you had people get out of their vehicles for other reasons?

A Yes, sir.

Q You ever had anybody jump out -- well, let's take it this way. We have, first, nothing unusual about seeing the truck, sort of an investigation -- what's the story here at three o'clock in the morning?

A Yes, sir.

Q Obviously, I think, as you said earlier, you -- you wondered why somebody -- you didn't think somebody would drive their truck purposely with that mechanical problem; --

A Correct.

Q -- is that correct?

A Especially at three o'clock in the morning.

Q Yes. And let's start about -- the cer -- certain circumstances you had. We're talking about three o'clock in the morning; --

A Yes, sir.

Q -- correct?

A   Yes, sir.

Q   This was -- there wouldn't have been any hunting seasons going on in June; would there?

A   No, sir, not to my knowledge.

Q   You see the vehicle at 3:00 and that -- and it's pulling into Forbus Road and not pulling into it properly; correct?

A   Correct.

Q   So now we got two things?

A   Yes, sir.

MR. PHILLIPS: Judge, I'm going to object to the leading.

THE COURT: It is your witness and you are leading.  If you could ask --

MR. NEWCOMB: Well, I could do it a lot slower then to satisfy him.

THE COURT: Do whatever you need to do.

BY MR. NEWCOMB:

Q   Well, let's go back.  Go through all the things that happened that night one at a time in the order that you can; okay?

A   Yes, sir.  The turning onto Forbus Road in the middle of the roadway partially blocking the northbound lane of travel on 89, the vehicle smoking, all the loud racket, the vehicle going left of center

multiple times.  The vehicle, whenever I initiated a traffic stop on it, it slows down, then speeds up and crosses the center lane and then comes to a complete stop in the opposite lane of travel partially in the ditch.  And before I could get out, they take off going --

Q   Okay.  Let -- let's stop right there.  Had you checked the license plate or anything on the vehicle before --

A   Yes, sir.  Yes, sir.

Q   And what -- was there anything about the information you received?

A   Yes, sir.  It returned to out of McRae, I believe.

Q   Was that any type of --

A   It was in -- it's out of White County and approximately 30 to 35 miles north of our location where this incident occurred.

Q   And let's stop there for a minute.  I think I've written down five things; does that sound about right?

A   Yes, sir.

Q   Had you decided that you needed to shoot him at that point?

A   No, sir.

Q   Was -- was the number of these five things make any difference versus how you perceive the issue

versus when you just saw the Forbus Road pull in?

A   Yes, sir.

Q   Okay.  Now we return to slowed down and started up.  I think it would be the sequence.  What happened next?

A   The vehicle stopping on the -- on -- on the side of the road in oncoming -- or in the opposite lane of travel, partially off the road and in the road and then immediately punching it or fully accelerating the vehicle, going back into its lane of travel and then whipping or rapidly turning into Mahoney's Body Shop.

Q   Okay.  Had you decided there was a possibility that needed to shoot him at that point?

A   No, sir.

Q   Okay.  Now, we've got him turning in to Mahoney's.

A   Yes, sir.

Q   Okay.  What do we have next?

A   Him coming to a stop or jumping out of the vehicle and the vehicle rolling back to me before I even have time to put my vehicle in park and then me jumping out, going through the motions on my camera, giving him verbal commands as I'm getting out of the vehicle and him not complying with my commands.

Q   Okay.  The vehicle stopping and rolling back, what -- what did you perceive that to mean?

A    That he didn't care whatever he was about to do. He wasn't worried about putting it in park.

Q    Based upon your life experiences, what is the normal practice of people when they exit their vehicle?

A    To put the vehicle in park.

Q    Okay.  When he -- he jumped out of the vehicle, had you decided at that point there was a possibility you needed to shoot him?

A    No, sir.

Q    So up until that point there wasn't -- was there any need to give him a warning that you might shoot him?

A    No, sir.

Q    Okay.  Now after the -- tell him to get back in the car, he --

A    Yes, sir.  Get back in the car, or it was, Return to your -- or, Stay in your vehicle, and then, Return to your vehicle.

Q    Okay.  Well --

A    And then when he immediately didn't follow those and then turned to the side towards -- to go put his hands into the bed of the truck, or the one hand his left hand, and I -- it's at that point in time I told him to, Stop; Let me see your hands.

Q   Had you decided to shoot him when you said that?

A   No, sir.

Q   Okay.  He put his left hand in.  Okay.  What happens next?

A   At that point, he went to put his right hand in after being told not to -- or, you know, told you, Show me your hands, and to, Stop.

Q   Had you decided at that time to shoot him?

A   Yes, sir.

Q   And why did you decide at that time to shoot him without telling him?

A   From all those factors leading up to that point, him refusing to follow my commands, I felt that he was going for a rifle or going for a gun.

Q   You were asked by the prosecutor if you can't see the hands then you don't know what's in them; do you remember that question?

A   Yes, sir.

Q   If you don't know what's in them, how can you decide -- what are you trained if you can't see them? Do you have to wait to --

A   That's where -- that's where -- that's where the death's going to come from is they -- if you can't see the hands, whatever the hands have.

Q   What has your training been as far as that you

have to absolutely wait till you see a gun?

A    If the threat's, you know, imminent, then -- if you feel the threat's imminent, then you don't have to see the weapon.

Q    You talked about going through the simulator.

A    Yes, sir.

Q    Did they have scenarios where --

A    One or two, I believe.

Q    What happened when the --

A    You shot or you got shot.

Q    And was that before you were able to see what was in the hand?

A    Yes, sir.

Q    Is there any doubt in your mind that you told Mr. Brittain to get back in the car or show -- show his -- your -- your hands?

A    No, sir.  I'm positive I told him.  Otherwise, I wouldn't have shot him.

             MR. NEWCOMB: No further questions, Your Honor.

             THE COURT: All right.  Mr. Phillips?

**RECROSS EXAMINATION**

**BY MR. PHILLIPS:**

Q    Otherwise, you wouldn't have shot him, but you didn't tell him you were going to shoot him?

A   Yes, sir.

Q   Okay.  You need a minute?

A   I mean, I didn't even know he was a kid until afterwards.

Q   I --

MR. PHILLIPS: Judge, that's nonresponsive to any question.

THE COURT: Okay.  I'll get him some water, if you don't mind.

MR. PHILLIPS: All right.

THE WITNESS: Thank you.

**BY MR. PHILLIPS:**

Q   Can you tell the jury what's the longest number of days you've ever gone without taking your medically prescribed Adderall?

MR. NEWCOMB: Your Honor, beyond the sco- -- wasn't on recross --

THE COURT: That's correct.

MR. NEWCOMB: -- redirect.

MR. PHILLIPS: It -- Judge, it goes to the point of him stating that right out of the -- right out of redirect he says, How many times have you stopped a vehicle at night by yourself?  And so my follow-up to that is, How many times has he gone this long without

taking Adderall?  If we're doing the how many times question.

THE COURT: No.

MR. PHILLIPS: No, ma'am?

THE COURT: No.

MR. PHILLIPS: All right.

**BY MR. PHILLIPS:**

Q   Now you didn't tell the State Police that you decided to shoot him when he put his right hand in after having put in his left hand in; did you?

A   No, I don't recall that, sir.

Q   Well, did you review your statement to State Police before this trial?

A   Somewhat of it, yes, sir.

Q   Do you ever remember seeing that in there?

A   Not that I recall.

Q   Okay.  And you had five days to think about it when you went to talk to the State Police; correct?

A   Yes, sir.

Q   But you never told them that you -- the decision to shoot him was after he put the second hand in; correct?

A   Correct.

Q   Now if he's left-handed and there's a pistol in there, when that left hand goes in, you could've been

in trouble too; right?  To follow you're thinking; right?

A   Yes, sir.

Q   But it took a second hand with palm down to make you think that he's going to get a rifle -- he's going to get a rifle out and then he's going to harm you with that rifle that he's grabbing like this?

A   No, sir.

Q   Well, that's how you showed the jury he was grabbing.

A   No.  It's the fact that he -- he did not follow my commands.

Q   Let me ask you this.  Did you tell the jury that he reached into the bed of the truck that way?

A   Yes, sir.

Q   Did you tell the State Police that he reached into the truck that way?

A   Yes, sir.

Q   All right.  That was my question.  And when you tell the jury now that the right hand came in and that's when you decided you had to shoot him, where was it?  Was it up near the left hand?  Was it straight out?  Where was it?

A   I --

Q   The right hand.

A -- showed you earlier. He went in like this.

Q Well, the -- both hands in that scenario went in at the same time.

A Well, his --

Q On redirect you told your attorney that it was the left hand in and then the right hand in, but then -- just then you showed --

A Okay. Re- --

Q -- me both went in at the same time.

A Reask the question. I must have misunderstood you. I'm sorry.

Q Okay.

A I apologize.

Q Where did the right hand go? You -- you -- you've talked about the left hand and where --

A Yes, sir.

Q -- it was. And part of -- and that's relevant because of the medical examiner's testimony.

A Yes, sir.

Q So you focused maybe on the left hand more. I'm just trying to figure out where you're saying the right hand went in. It could've gone here. It could've gone toward the left hand. I don't know.

A His hand -- his -- right there.

Q Uh-huh.

A His right hand had went in like this.

Q Okay. Just pretty much parallel?

A Yes, sir.

Q All right.

MR. PHILLIPS: That's all.

THE COURT: Anything else?

**FURTHER REDIRECT EXAMINATION**

**BY MR. NEWCOMB:**

Q The -- there was some -- as you describe it, the -- you shot not immediately when he got out the door of the car; correct?

A Correct.

Q Or did other events occur?

A Correct.

Q So if Mr. King said he opened the door and there was an immediate shot, would that have been accurate?

A No, sir.

MR. NEWCOMB: No other questions.

THE COURT: Anything else?

MR. PHILLIPS: That's all.

THE COURT: Mr. Davis, you may step down.

THE WITNESS: Thank you, Your Honor.

(WITNESS EXCUSED.)

MR. NEWCOMB: Your Honor, the Defendant rests.

**CERTIFICATE**

I, **Krystal A. Jones**, Official Court Reporter for the First Division Circuit Court of the Twenty-third Judicial District of Arkansas, certify that I recorded the proceedings by Stenomask recording in the case of **State of Arkansas versus Michael Davis**, Lonoke County Circuit Court No. **43CR-21-489**, on the **15th,** day of **November, 2021, and the 14th, 15th, 16th, 17th AND 18th** day of **March, 2022,** before the Honorable Barbara Elmore, Circuit Judge, at Lonoke, Arkansas; that said proceedings have been reduced to a transcript by me, and the foregoing pages numbered __1__ through __940__ constitute a true and correct transcript of the proceedings to the best of my ability.

**WITNESS MY HAND AND SEAL this** 6th **day of** June, **2022.**

_____

Krystal A. Jones

Supreme Court Certified Reporter #493

Cost of Transcript: $3397.90

**RT 941**